# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **ANITA G. ZUCKER, TRUSTEE OF THE ANITA G. ZUCKER TRUST DATED APRIL 4, 2007, AS SUBSEQUENTLY AMENDED OR RESTATED,** *et al.* | * * * * * | |
| **Plaintiffs,** | * | |
| **v.** | * | **Civil Case No. SAG-21-01967** |
| **BOWL AMERICA, INC.,** *et al.* | * * | |
| **Defendants.** | * * * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## <u>MEMORANDUM OPINION</u>

Lead Plaintiffs Anita G. Zucker, Trustee of the Anita G. Zucker Trust Dated April 4, 2007, as Subsequently Amended or Restated, and Anita G. Zucker, Trustee of the Article 6 Marital Trust, Under the First Amended and Restated Jerry Zucker Revocable Trust dated April 2, 2007, (collectively, "Plaintiffs") filed this putative class action against Bowl America, Inc. ("Bowl America" or "the Company"), Bowlero Corp. ("Bowlero"), Duff & Phelps Securities LLC, Cheryl Dragoo, Allan Sher, Merle Fabian, Gloria Bragg, Nancy Hull, and Ruth Macklin (collectively, "Defendants") alleging violations of state and federal law arising from Bowlero's acquisition of Bowl America (hereinafter referred to as "Merger"). ECF 25. Defendants have filed a Motion to Dismiss the Complaint ("Motion"). ECF 28. The issues have been fully briefed, ECF 28-1, ECF 29, ECF 33, and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2021). For the following reasons, Defendants' Motion will be granted in part and denied in part.

## I.    BACKGROUND

The following facts are derived from the Second Amended Class Action Complaint ("Complaint"), ECF 25, and are taken as true for purposes of evaluating Defendants' Motion.

Bowl America was a publicly traded Maryland corporation founded in 1958 during a post-World War II era of bowling enthusiasm.  ECF 25 ¶¶ 10, 33; *see also* ECF 28-2 at 25 (Bowl America, Inc., Proxy Statement (Schedule 14A) (July 13, 2021) (hereinafter referred to as "Merger Proxy")).  Leslie Goldberg became Bowl America's Chief Executive Officer ("CEO") in 1976, ushering in a period of sustained corporate flourishing through an emphasis on real property investments.  ECF 25 ¶¶ 35-39.  In 2018, in light of Goldberg's declining health, Bowl America's Board of Directors ("Board")—comprised of Dragoo, Sher, Hull, Fabian, Macklin,[1] and Bragg (collectively, "Director Defendants")—began exploring the Company's long-term strategic future. ECF 28-2 at 25.  In January, 2019, Dragoo succeeded Goldberg to the role of CEO.  ECF 25 ¶ 13. The Board subsequently amended and restated Dragoo's employment agreement to include a lump sum cash payment of $400,000 ("Change-of-Control Payment") to Dragoo in the event of a change of control of the Company.  *Id.* ¶¶ 13, 56-58; ECF 28-2 at 85.  Upon Goldberg's passing, his stock holdings transferred to his sister, Fabian, resulting in her having majority voting control of the Company.[2]  ECF 25 ¶¶ 18, 55.

---

[1] Macklin served as a director until May 17, 2021, ECF 25 ¶ 24, and therefore was not a member of the Board at the time it approved the merger agreement on May 27, 2021.  The Complaint alleges, however that "Macklin agreed to vote her shares in favor of the Merger prior to the August 11, 2021 shareholder vote."  *Id.* ¶ 27.

[2] At the time of the Merger, Bowl America had 3,746,454 shares of issued and outstanding Class A common stock, each entitled to one (1) vote per share, and 1,414,517 shares of issued and outstanding Class B common stock, each entitled to ten (10) votes per share, which constituted 17,891,624 total votes.  ECF 28-2 at 5.

To explore the Company's strategic options, the Board retained Foley & Lardner LLP ("Foley") and Duff & Phelps Securities LLC ("D&P") as its outside counsel and merger and acquisition advisor, respectively.  *Id.* ¶¶ 63,66.  The Board also appointed Dragoo and Sher to lead any potential sales process on behalf of the Company, *id.* ¶ 64.  Between November, 2019 and March, 2020, D&P contacted over 132 prospective buyers, including "a mix of strategic companies, financial sponsors, and real estate-oriented investors."  ECF 28-2 at 26.  The Company subsequently entered confidentiality agreements and provided evaluation materials to 35 of those parties.  *Id.*  In February, 2020, the Board entered negotiations with four potential buyers: Bowlero, Party X, Party Y, and Party Z.  ECF 25 ¶ 67; *see also* ECF 28-2 at 26.  On March 11, 2020, Sher and Dragoo met with representatives of D&P and Foley to provide an update on the sales process.  ECF 28-2 at 26.  At the meeting, D&P reported that Party Z was no longer interested in purchasing the entire Company, Party Y had not submitted a revised indication of interest during D&P's outreach,[3] and that both Party X and Bowlero had decreased their offering prices after conducting initial diligence.  *Id.*

On March 18, 2020, the onset of the COVID-19 pandemic prompted the Company to close all bowling centers pursuant to state and federal mandates.  ECF 25 ¶ 71.  On March 25, 2020, D&P attended a meeting with the Company's Board, where it advised that "as a result of market disruptions caused by the emerging COVID-19 outbreak, only two potential buyers remained for the entire Company, including Bowlero."  *Id.* ¶ 72.  At a subsequent board meeting on March 30, D&P raised the possibility of suspending the sales process due to COVID-19, but the Board remained intent on pursuing a sale.  *Id.* ¶¶ 73-74.  On April 10, 2020, D&P informed Sher and

---

[3] Plaintiffs allege that in November, 2020, the Board agreed to notify Party Y if it decided to proceed with a sale, but ultimately failed to do so.  ECF 25 ¶ 78.  The Merger Proxy, by contrast, states that D&P told Party Y that it was focusing on interested bidders.  ECF 28-2 at 28.

Dragoo that Bowlero had decided to pause negotiations in light of COVID-19, and that "Company X would only move forward with a much lower purchase price than what had been offered due to an inability to obtain financing." *Id.* ¶ 75.  On April 13, 2020, the Board agreed to suspend negotiations. *Id.* ¶ 76.  In furtherance of the Board's instructions, however, D&P maintained regular contact with potential buyers from April, 2020 through December, 2020. *Id.* ¶ 77-78.

On December 15, 2020, D&P reported to the Board that it had received two potential offers for the sale of the entire Company. *Id.* ¶ 80-81.  First, Bowlero offered $43 million in a cash and debt-free transaction that would not be contingent on financing. *Id.*; *see also* ECF 28-2 at 28. Second, a new party, Party 2, offered $40 million in a cash and debt-free transaction with a financing contingency.  ECF 25 ¶ 81; ECF 28-2 at 28.  Both offers represented a discount on the Company's $9.20 per share stock price on the same day.  ECF 25 ¶ 81.  Pursuant to a request for the parties' final and best offers, Bowlero increased its offer to $44 million, whereas Party 2 reiterated its previous offer.  ECF 28-2 at 28.  On January 12, 2021, Bowlero and Bowl America entered a non-binding letter of intent for a total value of $44 million and a 90-day exclusivity period. *Id.*  Over the next several months, Bowlero, Bowl America, and their respective representatives exchanged draft merger agreements, conducted diligence, and negotiated material provisions of the prospective acquisition.  ECF 28-2 at 28-29.

On May 27, 2021, the Board met to consider the revised merger agreement ("Merger Agreement"), which contemplated an offer price of $44 million plus a $3 million dividend. *Id*. at 28, 32.  Under the terms of the Merger Agreement, all holders of Class A and Class B common stock would receive the same per share merger consideration of $8.53 per share in cash plus an extraordinary dividend of $0.60 per share, representing a total of $9.13 per share.  ECF 28-2 at 31; ECF 25 ¶ 87.  The Merger Agreement further provided that if the acquisition was terminated under

specified circumstances, the Company would pay a "Company Termination Fee," which was defined as "a termination fee equal to $1,645,000 plus reimburse [Bowlero] for its reasonable and documented third party expenses in an aggregate amount not to exceed $3,500,000." ECF 28-2 at 83. As part of its consideration, the Board received a written opinion from an independent financial advisor, Kroll LLC ("Kroll"),[4] which concluded that the Merger Agreement was fair to Bowl America's public shareholders from a financial point of view ("Fairness Opinion"). ECF 25 ¶ 96-97.

Thereafter, the Board unanimously voted to recommend approval of the Merger Agreement to the shareholders, and to cast their votes in favor of the Merger. ECF 28-2 at 30. That same day, stockholders owning a majority of the voting power of the Company's Class B common stock, (hereinafter referred to as "Majority Holders") executed voting and support agreements in favor of the Merger. ECF 25 ¶ 87; ECF 28-2 at 5. In the aggregate, the Majority Holders—comprised of Fabian, Macklin, Hull, and members of the Katzman family—beneficially owned approximately 85.6% of the total voting of the Company's common stock, a percentage that was sufficient to approve the Merger. ECF 28-2 at 25, 52, 67. The Merger Agreement did not condition the Merger on an affirmative vote from a majority of the minority shareholders. ECF 25 ¶ 30.

On July 13, 2021, the Company filed and disseminated a Merger Proxy in advance of an August 11, 2021 shareholder vote on the Merger. *See generally* ECF 28-2. The Merger Proxy stated that the Board unanimously recommended approval of the Merger as in the best interests of the Company and its stockholders. ECF 25 ¶¶ 110(b)-(c). The Merger Proxy cited among the

---

[4] Kroll's legal name is "Duff & Phelps, a Kroll Business operating as Kroll, LLC." ECF 28-2 at 14. Kroll and Defendant D&P are affiliated entities. ECF 28-2 at 48. The Merger Proxy refers to Kroll as "Duff & Phelps," *id.* at 14, and to Defendant Duff & Phelps Securities LLC as D&P, *id.* at 26. By contrast, the Complaint refers to the two entities interchangeably. To avoid confusion, this Court will refer to Defendant party as D&P, and its affiliated non-party entity as Kroll.

factors that the Board considered in reaching its determination: Kroll's Fairness Opinion, *id.* ¶ 110(c); the Company's limited ability to finance requisite substantial capital investments, *id.* ¶¶ 110(d)-(f); and the likelihood that the Company would be required to reduce or eliminate its historic dividend if continued as a standalone entity, *id.* ¶ 110(e).  The Merger Proxy further reported that the Majority Holders' pledged support was sufficient to approve the Merger.  ECF 28-2 at 5, 7, 52.

Plaintiffs were beneficial owners of the Company's stock, collectively holding approximately 7.5% of the Company's outstanding shares of Class A common stock on the record date.  ECF 25 ¶¶ 6-8; *see also* ECF 28-2 at 61.  Plaintiffs filed this action in August, 2021, seeking class certification and alleging violations of: Section 14(a) of the Securities and Exchange Act against Bowl America and the Director Defendants (Count I); Section 20(a) of the Securities and Exchange Act against Director Defendants (Count II); breach of common law fiduciary duties against Director Defendants and Controlling Stockholders (Count III); breach of fiduciary duties in violation of the Maryland Corporate Code against Director Defendants (Count IV); aiding and abetting Director Defendants' breach of fiduciary duties against Bowlero (Count V); and aiding and abetting Director Defendants' breach of fiduciary duties against D&P (Count VI).  *See* ECF 25.

## II.    STANDARD OF REVIEW

Under Rule 12(b)(6), a defendant may test the legal sufficiency of a complaint by way of a motion to dismiss.  *See In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  A Rule 12(b)(6) motion constitutes an assertion by

a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Federal Rule of Civil Procedure 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for all civil actions[.]") (quotation omitted); *see also Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). However, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Further, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) (per curiam).

Nevertheless, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556.

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Semenova v. MTA*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). However, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Defendants have attached several exhibits, including the Merger Proxy, ECF 28-2, to the briefing of their Motion. At the motion to dismiss stage, courts generally do not consider extrinsic evidence. It is well-recognized, however, "that the court may consider, without converting the motion to dismiss into one for summary judgment, documents attached to the complaint as exhibits, and documents attached to a motion to dismiss if the document is 'integral to the complaint and there is no dispute about the document's authenticity.'" *Reamer v. State Auto. Mut. Ins. Co.*, 556 F. Supp. 3d 544, 549 (D. Md. 2021) (quoting *Goines*, 822 F.3d at 166). A document is "integral" where its "very existence, and not the mere information it contains, gives rise to the legal rights asserted." *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC,* 794 F. Supp. 2d 602, 611 (D. Md. 2011) (internal quotation marks omitted) (emphasis removed). Similarly, federal courts may consider documents incorporated into a complaint by reference

without converting a 12(b)(6) motion into a motion for summary judgment. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). Where the complaint incorporates a document on which a claim is based, "crediting the document over conflicting allegations in the complaint is proper." *Goines*, 822 F.3d at 167.

Applying those standards, the Merger Proxy is both expressly referenced in and integral to the Complaint because its allegedly false and misleading content gives rise to Plaintiffs' federal claims. *See* ECF 25 ¶ 4; *id.* ¶¶ 136-49. No party has challenged the authenticity of the Merger Proxy, and this Court accordingly deems it appropriate to consider it in adjudicating Defendants' Motion, without converting the Motion into one for summary judgment.

## III.  DISCUSSION

### A.  The Securities and Exchange Act (Counts I-II)

In Counts I-II, Plaintiffs allege violations of § 14(a) and § 20(a) of the Securities and Exchange Act of 1934 ("the Act"). To state a claim under § 14(a), a plaintiff must allege that: "(1) [a] proxy statement contained a material misrepresentation or omission[;] (2) that caused the plaintiff injury and that[;] (3) the proxy solicitation was an essential link in the accomplishment of the transaction." *Hurtado v. Gramercy Prop. Tr.*, 425 F. Supp. 3d 496, 513-14 (D. Md. 2019) (quoting *Hayes v. Crown Centr. Petrol. Corp.*, 78 F. App'x 857, 861 (4th Cir. 2003) (per curiam)). For purposes of § 14(a), "[a] fact is material if there is 'a substantial likelihood that the disclosure of the . . . fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" *In re Willis Towers Watson plc Proxy Litig.*, 937 F.3d 297, 304 (4th Cir. 2019) (quoting *Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 656 (4th Cir. 2004). Likewise to state a claim under § 20(a), a plaintiff must allege: (1) an underlying

predicate violation of the Act; and (2) control by the defendant over the primary violator. *In re Constellation Energy Grp., Inc. Sec. Litig.*, 738 F. Supp. 2d 614, 639 (D. Md. 2010).

As private actions under the Act, Counts I-II are subject to the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4. *See Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 165 (2008). The PSLRA requires that a plaintiff alleging a material statement or omission particularly "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading[.]" *Hurtado*, 425 F. Supp. 3d at 516 (quoting § 78u-4(b)(1)). The PSLRA further requires a plaintiff to "prov[e] that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4); *see also Teachers' Ret. Sys. of LA v. Hunter*, 477 F.3d 162, 185 (4th Cir. 2007).

The Complaint alleges that the Merger Proxy was plagued by a bevy of material omissions or misrepresentations that rendered the statements therein false and misleading in violation of § 14(a). *See* ECF 25 ¶¶ 109-22. Specifically, the Complaint alleges that the Merger Proxy "omitted and/or misrepresented" the following material information: (1) the Board's consideration of strategic alternatives to a sale; (2) the basis for the Board's selection of interested parties; (3) the contents and prices of all offers submitted to the Board; (4) all information related to the actual value of the Company's real estate holdings; (5) the basis for the Board's selection and retention of D&P; (6) the details surrounding Kroll's past and/or present engagements by Bowl America; (7) the details surrounding the past and/or present engagements by Bowlero, and any fees paid for such work; (8) Director Defendants' actual or potential conflicts of interest; and (9) estimates of the Company's future revenues, earnings, and cash flows. *Id.* ¶¶ 111, 113-14. In their Motion,

Defendants insist that none of these alleged omissions and/or misrepresentations may serve as the basis of a § 14(a) claim.  This Court agrees.

As an initial matter, several allegations regarding information omitted from, or misrepresented in, the Merger Proxy are belied by the text of the Merger Proxy itself.  Indeed, the Merger Proxy contains accurate, adequate, material disclosures regarding the first, second, fifth, sixth, seventh, eighth, and ninth categories of information enumerated above.  *See* ECF 28-2 at 25 (detailing the Board's consideration of strategic alternatives to a sale); *id.* at 25-28 (describing process through which prospective buyers were identified and selected); *id.* at 26 (disclosing interview process and rationale for selecting D&P as advisor); *id.* at 48 (detailing Kroll's informal valuation work for the Company in the preceding two years, and the fees received for such work); *id.* (enumerating Kroll's prior work for Bowlero on an unrelated matter and the fees paid therein); *id.* at 26, 51 (describing conclusion that Director Defendants had no conflicts of interest and disclosing Director Defendants' stock holdings); *id.* at 26, 37 (explaining that the Company does not maintain financial projections because it has no long term contracts or purchase orders and depends primarily on revenue from promotional, league and open play bowling; disclosing the methodology applied by Kroll to reach its Fairness Opinion, and appending the Fairness Opinion in full).  To the extent that the Complaint asserts that the Merger Proxy omitted information that clearly appears in the text of the Merger Proxy itself, such allegations are not entitled to the assumption of truth.  *See Goines*, 822 F.3d at 167 (4th Cir. 2016) ("When the plaintiff attaches or incorporates a document upon which his claim is based . . . crediting the document over conflicting allegations in the complaint is proper.").  Moreover, insofar as the Complaint alleges that § 14(a) requires more exhaustive information on each of these topics, the argument runs contrary to the weight of relevant caselaw.  *See, e.g.*, *In re Columbia Pipeline, Inc.*, 405 F. Supp.

3d 494, 521 (S.D.N.Y. 2019) ("A proxy thus serves as an information-sharing tool that must disclose *important* facts.") (emphasis in *In re Columbia Pipeline*); *Hysong v. Encore Energy Partners LP*, 2011 WL 5509100, at *8 (D. Del. Nov. 10, 2011) ("Plaintiff might want more information to enable him to make a more informed decision.  But section 14(a) does not entitle him to 'more' information . . . ").

Once these allegations are culled from the Complaint, then, Plaintiffs' § 14(a) claim relies on the omission of two pieces of information: first, the offer prices from various bidders to acquire the Company during pre-pandemic times; and second, the valuations of the Company's real estate assets.  *See* ECF 29 at 29 (citing ECF 25 ¶ 67).[5]  Because these omissions are not material and do not render the Merger Proxy misleading, they cannot carry the weight of Plaintiffs' § 14(a) claim.

Turning first to materiality, Plaintiffs fail to allege that either omission would have "significantly altered the total mix of information made available" to shareholders.  *In re Willis Towers Watson*, 937 F.3d at 304.  Information regarding pre-pandemic offer prices would be material, for instance, if it indicated that a higher stock price may be available if the Merger Agreement were not approved.  *See Washtenaw Cnty. Employees' Ret. Sys. v. Wells Real Est. Inv. Tr., Inc.*, 2008 WL 2302679, at *5 (N.D. Ga. Mar. 31, 2008) ("The crucial information that was material to shareholders was that a higher stock price was offered if [the acquisition] did not occur.").  Here, however, the initial, non-binding indications of interest that were submitted to the Board had been withdrawn or decreased, either after initial diligence or in light of COVID-19.  *See* ECF 28-2 at 26-28.  Simply put, the particular details of offers or opportunities that were no longer

---

[5] In their briefing, Plaintiffs also insist that the Merger Proxy is false and misleading "with respect to the viability of Company's business operations, including the Board's knowing failure to implement any long term succession plan . . . ."  ECF 29 at 28-29.  To the extent that this allegation can be construed as a disclosure failure, rather than generalized criticism of the Board's leadership, it fails for lack of any indication as to how such an omission rendered the Merger Proxy misleading.

available to the Company could not be material to shareholders' decision regarding the Merger. The Merger Proxy detailed the contents of the materialized, competing offer from Party 2; under these particular circumstances, no more is required. *See id.* at 28. Plaintiffs' argument regarding the materiality of real estate valuations is similarly unavailing. The Merger Proxy disclosed that a real estate-oriented investor submitted "a preliminary non-binding letter of interest . . . to acquire the entire real estate portfolio for $37 million . . .". *Id.* Given that a professional investor offered to purchase the Company's real estate portfolio for a substantially lower price than was available in the Merger, it is highly unlikely that a reasonable shareholder would need a separate valuation of the Company's real estate portfolio before casting an informed vote. *TSC Industries v. Northway*, 426 U.S. 438, 449 (1976) ("An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.").

Finally, even assuming materiality, the Complaint lacks sufficient factual matter from which this Court could plausibly infer that these omissions made any particular statement within the Merger Proxy misleading. *See Hurtado*, 425 F. Supp. 3d at 516 ("Under the PSLRA, a plaintiff must . . . 'specify each statement alleged to have been misleading' and 'the reason or reasons why the statement is misleading[.]'" (quoting § 78u-4(b)(1))). Instead, the Complaint conclusory alleges that the mere fact of the omissions necessarily rendered the Merger Proxy misleading. *See* ECF 25 ¶¶ 112, 139. Such vague allegations satisfy neither the heightened PSLRA standard nor the Federal Rules of Civil Procedure. *See Twombly*, 550 U.S. at 555 (If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient).

In sum, Plaintiffs fail to adequately allege that the Merger Proxy contained material misrepresentations or omissions, or that any such omissions rendered statements within the Merger

13

Proxy false or misleading in violation of § 14(a).  Because Plaintiffs have failed to allege a primary predicate violation of the Act, their claim for liability under § 20(a) also fails.  Counts I-II will therefore be dismissed.[6]

### B.  Breach of Fiduciary Duties (Counts III-IV)

In Count III, Plaintiffs allege that the Director Defendants and Controlling Stockholders (defined in the Complaint as Fabian, Macklin, and Hull, *see* ECF 25 ¶ 29) are liable for common law breach of fiduciary duties.  Likewise, in Count IV, Plaintiffs assert a claim against the Director Defendants for breach of fiduciary duties in violation of Md. Code Ann, Corp. & Ass'ns § 2-405.1(a).  Because under Maryland law, § 2-405.1 "[i]s the sole source of duties of a director to the corporation or the stockholders of the corporation," this Court will analyze the counts together.

"To establish a breach of fiduciary duty as an independent cause of action, a plaintiff must show: '(i) the existence of a fiduciary relationship; (ii) breach of the duty owed by the fiduciary to the beneficiary; and (iii) harm to the beneficiary.'"  *Plank v. Cherneski*, 469 Md. 548, 599 (2020) (quoting *Froelich v. Erickson*, 96 F. Supp. 2d 507, 526 (D. Md. 2000), *aff'd sub nom. Froelich v. Senior Campus Living, LLC*, 5 F. App'x 287 (4th Cir. 2001)).  In their Motion, Defendants argue that the Board's actions are protected by the business judgment rule, and the Complaint fails to allege any breach of fiduciary duty.   In opposition, Plaintiffs insist that: (1) Controlling Stockholders' conflicts require that the Merger be reviewed for entire fairness rather than applying the business judgment rule; and (2) that even if the business judgment rule applies, the Complaint

---

[6] In light of this Court's conclusion that Plaintiffs failed to allege that the Merger Proxy was misleading due to material omissions or misrepresentations, it is unnecessary to consider Defendants' arguments regarding Plaintiffs' allegations of loss causation and transaction causation.

contains allegations sufficient to rebut its presumptions.  This Court will address Plaintiffs' contentions in turn.

### i.   Applicability of Entire Fairness

As an initial matter, the parties dispute whether Defendants' conduct should be evaluated under the business judgment rule or entire fairness.  The business judgment rule is the default standard of review for evaluating director decision-making.  *In re Trados Inc. S'holder Litig*., 73 A.3d 17, 43 (Del. Ch. 2013).[7]  The business judgment rule reflects the presumption that directors of a corporation act "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  *Werbowsky v. Collomb*, 362 Md. 581, 608-09 (2001); *see also Wittman v. Crooke*, 120 Md. App. 369, 376 (1998); Md. Code Ann., Corps. & Ass'ns § 2-405.1(g).  Accordingly, a court applying the business judgment rule will not ordinarily disturb a board's informed course of conduct.  *See id.*  By contrast, under the onerous entire fairness standard, defendants bear the burden of establishing both that the transaction was the product of fair dealing and that the price was entirely fair.  *Firefighters' Pension Sys. of City of Kansas City, Missouri Tr. v. Presidio, Inc.*, 251 A.3d 212, 249 (Del. Ch. 2021); *see also In re S. Peru Copper Corp. S'holder Derivative Litig.*, 52 A.3d 761, 787 (Del. Ch. 2011).  Entire fairness review is triggered when a board of directors or a controlling stockholder labors under a disabling conflict of interest.  *IRA Tr. FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964, at *6 (Del. Ch. Dec. 11, 2017).  Plaintiffs here allege that entire fairness applies because the Controlling Stockholders were conflicted by "personal desire to liquidate their majority position through the sale of the entire Company."  ECF 25 ¶ 161; *see also id.* ¶ 64.  Plaintiffs' argument is wholly unpersuasive.

---

[7] "Maryland courts have historically found Delaware law in matters involving business law highly persuasive."  *In re Nationwide Health Properties, Inc.*, 2011 WL 10603183, at *8 (Md. Cir. Ct. May 27, 2011).

Courts have recognized certain instances in which a controlling stockholder's unique need to liquidate his shares in a corporation may constitute a disabling conflict of interest. *Firefighters' Pension Sys.*, 251 A.3d at 257. Although viable, these liquidity-driven conflicts are difficult to plead insofar as they "require[s] the court 'to make [the] extraordinary inference[ ] that rational economic actors have chosen to short-change themselves' in favor of liquidity." *Id.* To state a claim based on a liquidity-driven conflict, complaints typically allege specific facts—such as a controlling stockholder's conduct, statements, or circumstances—that evidence his divergent liquidity interest relative to other stockholders. *See New Jersey Carpenters Pension Fund v. Infogroup, Inc.*, 2011 WL 4825888, at *9 (Del. Ch. Sept. 30, 2011) (alleging that controlling stockholder owed $25 million in debt, had reimbursed company $4.4 million dollars, had no sources of income, and sought a new business venture); *In re Answers Corp. S'holder Litig.*, 2012 WL 1253072, at *1-2; 7 (Del. Ch. Apr. 11, 2012) (alleging that controlling stockholder manipulated the sales process, including by threatening to replace entire management team if corporation not sold in the near future); *In re Mindbody Stockholders Litigation*, 2020 WL 5870084, at *3 (Del. Ch. Oct. 2, 2020) (alleging that controlling stockholder publicly discussed difficulties of having capital locked in the company, and being unable to liquidate his holdings on the market). As a general matter, a fiduciary's interest in receiving liquidity value for his shares does not give rise to the inference of a disabling conflict. *In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1035 (Del. Ch. 2012).

The Complaint does not contain facts suggesting that the Controlling Stockholders, or the Director Defendants, possessed a liquidity-driven conflict. Liberally construed, the Complaint attributes the Controlling Stockholders' liquidity-driven conflict to two circumstances: (1) Fabian's and Macklin's advanced ages; and (2) the illiquidity of their large stock holdings. ECF

16

25 ¶¶ 17, 25, 92.  Taken as true, these allegations fall far below the threshold of showing that the interests of the Controlling Stockholders diverged from fellow stockholders who stood to receive the same consideration from their respective shares.  The Complaint lacks any factual allegations suggesting that the Controlling Stockholders were cash-strained, aggressively advanced the Merger, labored under immense debt loads, or otherwise had some immediate or exigent need for liquidity.  Absent some indication that the Controlling Stockholders had a unique or distinct interest in cashing out their shares, their generalized desire to exit a relatively illiquid investment does not constitute a conflict of interest; to the contrary, it suggests that their interests are aligned with that of fellow stockholders.[8]  *See In re Synthes*, 50 A.3d at 1035.  Because Plaintiffs have failed to allege facts triggering entire fairness, the Director Defendants' decisions are properly reviewed under the business judgment rule.

### ii.  Business Judgment Rule

Plaintiffs next insist that, even if the business judgment rule applies, they have pled sufficient facts to rebut its presumptions.  Unless the business judgment rule is rebutted, "the court merely looks to see whether the business decision made was rational in the sense of being one logical approach to advancing the corporation's objectives."  *In re Dollar Thrifty S'holder Litig.*,

---

[8] Plaintiffs' reliance on *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635, 642 (Del. 2014) ("*MFW*"), *abrogated in part on other grounds by Flood v. Synutra Int'l, Inc.*, 195 A.3d 754 (Del. 2018), is wholly misplaced, even assuming that Maryland law accords with Delaware law on this point.  The court in *MFW* held that where a controlling stockholder is conflicted, a transaction will be reviewed under entire fairness unless conditioned *ab initio* on "(1) the approval of an independent and fully-empowered Special Committee that fulfills its duty of care and (2) the uncoerced, informed vote of the majority of the minority stockholders."  *Id.*  If those dual procedural protections are in place, a transaction with a conflicted controlling stockholder is cleansed and thus reviewed under the business judgment rule.  The burden shifting framework in *MFW* only applies, however, where a transaction would otherwise be subject to entire fairness.  Contrary to Plaintiffs' assertion, an arms-length transaction does not warrant entire fairness merely because it lacked the procedural protections described in *MFW*.

14 A.3d 573, 598 (Del. Ch. 2010).  A plaintiff carries its burden to rebut the business judgment rule "by introducing evidence of director self-interest or self-dealing, or that the directors lacked good faith or failed to exercise due care."  *In re Nationwide Health Properties, Inc.*, 2011 WL 10603183, at *13 (Md. Cir. Ct. May 27, 2011) (citation omitted).

Plaintiffs contend that the Complaint rebuts the business judgment rule by alleging that the Director Defendants breached their common law duties of candor and maximization of shareholder value, as well as each of the triad of their fiduciary duties of due care, loyalty, and good faith.  This Court concludes that Plaintiffs have alleged facts sufficient to allege a breach of due care and good faith only insofar as their claims concern the Director Defendants' approval of the Company Termination Fee.  By contrast, Plaintiffs' claims in Counts III-IV are not cognizable to the extent that they are premised on other conduct or decisions.

### 1.   Candor and *Revlon*

The Complaint alleges that the Director Defendants violated their duties of candor through an allegedly false and misleading Merger Proxy, as well as their *Revlon* duties to maximize shareholder value in the event of a sale of control.  ECF 25 ¶¶ 151, 153; *see also* ECF 29 at 14 (citing *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc*., 506 A.2d 173, 182 (Del. 1986)).  Neither theory states a claim.

Maryland has historically recognized a common law duty "to disclose with entire candor all material information concerning the merger."  *In re Nationwide*, 2011 WL 10603183, at *17 (quoting *McMullin v. Beran*, 765 A.2d 910, 917 (Del. 2000)).  Even to the extent that this duty survived the Maryland General Assembly's 2016 amendment to § 2-405.1, however, Plaintiffs' claim still fails.  As described in Sec. III.A, *supra*, the Complaint does not identify any material

information that was omitted from the Merger Proxy.  As such, the Complaint does not state a claim for a potential breach of the Director Defendants' duty of candor.

Similarly, Plaintiffs' claims are subject to dismissal insofar as they are premised on the Director Defendants' alleged violation of a duty to maximize share value.  *See Revlon*, 506 A.2d at 182 (holding that when a sale of control or break-up becomes inevitable, directors are "charged with getting the best price for the stockholders at a sale of the company.").  To the extent that Maryland once recognized a common law duty to maximize shareholder profit in a sale of control, this Court understands such duty to have been abrogated by the Maryland General Assembly.  *See* 2016 Maryland Laws Ch. 171 (H.B. 354) (amending § 2.405.1 to clarify that it "[i]s the sole source of duties of a director to the corporation or the stockholders of the corporation, whether or not a decision has been made *to enter into an acquisition or a potential acquisition of control of the corporation . . .*") (emphasis added).  Accordingly, Plaintiffs may not proceed on a claim based on an alleged failure to maximize the sale price of the Company. [9]

### 2.  Loyalty

Plaintiffs also fail to rebut the presumption that Director Defendants acted consistent with their duty of loyalty.  "To rebut the presumption of loyalty, the Complaint must contain well-pleaded facts that, if proven true, would demonstrate that a majority of the Board, stood to receive 'personal financial benefit from [the transaction] in the sense of self-dealing . . .'".  *In re Nationwide*, 2011 WL 10603183, at *14 (quoting *Werbowsky*, 362 Md. at 609) (alterations in *In*

---

[9] Notably, the Complaint makes much of the fact that the transaction consideration represented a discount to the Company's trading stock price.  *See, e.g.*, ECF 25 ¶¶ 112, 114, 123.  Even were this Court persuaded Maryland imposes a *Revlon* duty on its directors, courts have routinely rejected claims based on a board's acceptance of an offer below market trading price.  *See, e.g.*, *In re Essendant, Inc. S'holder Litig.*, 2019 WL 7290944, at *14 (Del. Ch. Dec. 30, 2019); *In re CompuCom Sys., Inc. S'holders Litig.*, 2005 WL 2481325, at *7 Del. Ch. Sept. 29, 2005); *In re Comverge, Inc.*, 2014 WL 6686570, at *13.

*re Nationwide*)).  The Complaint alleges that the Director Defendants breached their duty of loyalty because Dragoo was improperly incentivized by a Change-of-Control Payment, and because the Director Defendants were improperly dominated by conflicted Controlling Stockholders.  Neither allegation amounts to a breach of the duty of loyalty.

"[T]he possibility of receiving change-in-control benefits pursuant to pre-existing employment agreements does not create a disqualifying interest as a matter of law."  *Huff Energy Fund, L.P. v. Gershen*, 2016 WL 5462958, at *11 (Del. Ch. Sept. 29, 2016).  Accordingly, to allege that Dragoo breached her duty of loyalty, the Complaint must include facts suggesting that the Change-of-Control Payment was "of a sufficiently material importance, in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties."  *In re Nationwide*, 2011 WL 10603183, at *14 (quoting *In re GM (Hughes) S'holder Litig*., 2005 Del. Ch. LEXIS 65. at *31 (Del. Ch. May 4, 2005)).  The Complaint contains no such facts.  Even were this Court persuaded that Dragoo was conflicted, such allegations still would not suffice to rebut the presumption of loyalty with regards to the Board's conduct.  To do so, Plaintiffs must allege that a majority of the Board—not merely a single director—was compromised.  *See id*; *Werbowsky*, 362 Md. at 609.  Allegations that the Director Defendants lacked independence from Controlling Stockholders are similarly insufficient.  *See* ECF 25 ¶¶ 59-60.  Although courts recognize that a director may be compromised if he is financially or personally beholden to an interested person, Plaintiffs have identified no caselaw suggesting that directors are tainted merely by their shared board membership with interested persons.  *See In re Oracle Corp. Derivative Litig.*, 824 A.2d 917, 939 (Del. Ch. 2003).  More fundamentally, as

described above, the Complaint does not adequately allege that the Controlling Stockholders possessed a disabling conflict.[10]

### 3.  Care and Good Faith

Finally, the Complaint levels a series of alleged violations of the Director Defendants' duties of care and good faith.  To survive a motion to dismiss for an alleged violation of the duty of care, "the Complaint must allege facts that, if proven true, would tend to show that the [Director] Defendants acted with gross negligence."  *In re Nationwide*, WL 10603183, at *15 (collecting cases).  In the corporate context, "[t]o support an inference of gross negligence, 'the decision has to be so grossly off-the-mark as to amount to reckless indifference or a gross abuse of discretion.'" *In re Zale Corp. S'holders Litig.*, 2015 WL 6551418, at *4 (Del. Ch. Oct. 29, 2015) (internal citation omitted); *see also Marriott Corp. v. Chesapeake & Potomac Tel. Co.*, 124 Md. App. 463, 478 (1998).  Likewise, to state a claim based on the duty of good faith, a plaintiff must allege conduct motivated by an intent to do harm, or actions amounting to an "intentional dereliction of duty, a conscious disregard for one's responsibilities."  *In re Walt Disney Co. Derivative Litig*., 906 A.2d 27, 62 (Del. 2006).  The Complaint alleges that the Director Defendants violated their duties of care and good faith by: (1) failing to implement a long-term succession plan for Goldberg; (2) relying on outside advisors; (3) conducting a flawed sales process; and (4) implementing draconian deal protections.  This Court finds only the final contention persuasive.

---

[10] The Complaint also alleges a conflict of interest because D&P's compensation was contingent in part on the consummation of a transaction.  ECF 25 ¶ 103.  Courts have recognized that in certain circumstances, the interests of contingently compensated advisors may diverge from those of common stockholders. *See Firefighters' Pension Sys.*, 251 A.3d at 278.  Such arrangements are not *per se* improper, however, and there are no facts suggesting that the payment arrangement actually compromised D&P, or the Director Defendants' privilege to reasonably rely on them. Allegations that Kroll was conflicted due to its affiliation with D&P are similarly unfounded.

The first three categories of claims are easily rejected.  First, allegations regarding the Company's long-term succession plan are largely conclusory, and in any event, do not support a claim for fiduciary breach.  *See Zucker v. Andreessen*, 2012 WL 2366448, at *11 (Del. Ch. June 21, 2012) (rejecting claim based on lack of succession plan because "Plaintiff[s'] brief does not cite, nor is the Court aware of, any [ ] precedent that stands for the proposition that failure to adopt a long-term succession plan amounts to a breach of duty.").  Similarly meritless are the allegations that the Director Defendants breached a duty by relying on Kroll's allegedly flawed Fairness Opinion, *see* ECF 25 ¶¶ 96-104.  Maryland law provides that Director Defendants are entitled to reasonably rely on the advice of qualified financial professionals, § 2-405.1(d)(1), and Plaintiffs do not allege why such reliance was unreasonable in this case.  Third, although the Complaint details a laundry list of perceived inadequacies in the sales process, none provide any basis from which this Court could infer a fiduciary breach.  *See* ECF 25 ¶¶ 82 (failing to reject "lowball offers as clearly inadequate"); *id.* ¶¶ 74, 76 (declining to halt sale during COVID-19); *id.* ¶¶ 84-89 (undervaluing Company's real estate portfolio); *id.* ¶ 78 (neglecting to inform Party Y that it had decided to proceed with a sale).  Taken as true, the Complaint alleges tactical blunders or miscalculations at most, rather than the requisite reckless indifference, conscious disregard, or absence of a deliberate and informed sales process.  This is particularly so given that the Complaint concedes that the sales process unfolded over the course of roughly two years, during which time the Director Defendants engaged multiple expert advisors, contacted over 100 potential purchasers, and negotiated a higher price for the Company after Bowlero's initial offer.  At bottom, then, Plaintiffs essentially allege that they would have run the process differently.  "The business judgment rule, however, is not rebutted by Monday morning quarterbacking."  *In re Affiliated Computer Servs., Inc. S'holders Litig.*, 2009 WL 296078, at *10 (Del. Ch. Feb. 6, 2009).  Plaintiffs'

allegations that in hindsight the Board should—or could—have made different decisions throughout the sales process are insufficient to infer a fiduciary breach or to rebut the business judgment rule.

Finally, the Complaint alleges that certain deal protections in the Merger Agreement violated the Director Defendants' duties of due care and good faith.  Specifically, Plaintiffs object to the inclusion of a 90-day exclusivity provision and a "crippling" termination fee.  ECF 25 ¶¶ 84, 106-07.  At this early stage, this Court is persuaded that the latter of these provisions may be sufficiently onerous as to state a claim for breach of a fiduciary duty.

Initially, this Court observes that the Complaint's allegations regarding the Merger Agreement's 90-day exclusivity provision is contradicted by the great weight of relevant caselaw. Courts readily dismiss claims based on similar exclusivity, or "no-shop," provisions unless they purport to define or otherwise limit directors' fiduciary duties.  *See Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 48 (Del. 1994) (no-shop provision may not validly define or limit directors' fiduciary duties); *see also In re Cogent, Inc. S'holder Litig.*, 7 A.3d 487, 502 (Del. Ch. 2010) (rejecting challenge to no-shop provision with "fiduciary out"); *In re Toys "R" Us, Inc., S'holder Litig.*, 877 A.2d 975 (Del. Ch. 2005) (same).  Because there is no indication that the exclusivity provision limited the exercise of the Director Defendants' fiduciary duties, it cannot serve as the basis of a viable claim.

By contrast, the Merger Agreement's termination, or breakup, fee presents a more difficult question.  The Merger Agreement defined the "Company Termination Fee" as "a termination fee equal to $1,645,000 plus reimburse Parent for its reasonable and documented third party expenses in an aggregate amount not to exceed $3,500,000."  ECF 28-2 at 83.  If this Court were to include the reimbursement provision in its calculation of the breakup fee, it would comprise $5.15 million,

amounting to either roughly 11.7% (based on $44 million per share consideration) or 10.9% (based on per share consideration plus $3 million dividend) of the transaction value.  A breakup fee of this percentage well exceeds the range of those that prior courts have approved.  *See Phelps Dodge Corp. v. Cyprus Amax Mins. Co.*, 1999 WL 1054255, at *2 (Del. Ch. Sept. 27, 1999) (stating that "6.3 percent certainly seems to stretch the definition of range of reasonableness and probably stretches the definition beyond its breaking point."); *In re Comverge, Inc*., 2014 WL 6686570, at *14 (Del. Ch. Nov. 25, 2014) (5.55% fee "tests the limits of what this Court has found to be within a reasonable range for termination fees.").

Defendants do not argue that a breakup fee between 10%-12% of the Merger's value would fall within a range of reasonableness consistent with their fiduciary duties.  Rather, Defendants insist that this Court should not consider the reimbursement expense provision to be part of the Company Termination Fee.  Defendants' position on this point is in tension with both the Merger Proxy itself—which defines the "Company Termination Fee" to include the $3.5 million reimbursement provision—and caselaw that considers reimbursement expenses when determining the reasonableness of a breakup fee.  *See In re BioClinica, Inc. S'holder Litig.*, 2013 WL 5631233 (Del. Ch. Oct. 16, 2013) (upholding termination fee calculated at 5.3%, which included required expense reimbursement); *see also Golden Cycle, LLC v. Allan*, 1998 WL 892631, at *17 (Del. Ch. Dec. 10, 1998) (approving termination and expense reimbursement provisions, which together amounted "to only $4 million dollars, or less than 3% of the transaction value.").  Defendants further insist that because the provision only authorized reimbursement "in an aggregate amount *not to exceed* $3,500,000," it merely "set a ceiling for expenses, not a definite number."  ECF 28-1 at 22-23.  This may be so.  But at the motion to dismiss stage, drawing all reasonable inferences in favor of Plaintiffs, the Complaint adequately pleads that the fee plus the reimbursement

provision collectively functioned as an unreasonably preclusive or coercive breakup fee.  Unlike the process claims, Plaintiffs' allegations regarding the Director Defendants' apparent acceptance of the Company Termination Fee are sufficient to overcome the presumption that they acted with due care and good faith.  *See In re Comverge*, 2014 WL 6686570, at *17 (sustaining claim where convertible notes combined with the termination fee and reimbursement provision was 13% of equity value of the transaction because "it conceivably is true that the Board's apparently passive acceptance of those terms without any pushback was 'so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.'").

In sum, the Complaint plausibly states a claim that the Director Defendants breached their fiduciary duties of care and good faith in approving the Company Termination Fee; Counts III-IV will accordingly survive only to the extent that they are premised on this decision.

### C.  Aiding and Abetting (Counts V-VI)

Finally, the Complaint alleges that Bowlero (Count V) and D&P (Count VI) are liable for aiding and abetting the Director Defendants' breaches of fiduciary duty.  To assert a claim for the tort of aiding and abetting under Maryland law, a plaintiff must allege: "(1) independent tortious conduct by the principal of the tort; (2) assistance, aid or encouragement to the principal of the tort; and (3) knowledge that the tortious act would be the natural consequence of their conduct." *Natarajan v. Raju*, 2017 WL 386540, at *2 (D. Md. Jan. 27, 2017); *see also Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 340 Md. 176, 199 (1995) (expressly recognizing aider and abettor tort liability).  Defendants assert that both counts must be dismissed for "fail[ure] to allege that either Bowlero or D&P encouraged, incited, aided, or abetted action by the Board with actual knowledge that such an action would be a breach."  ECF 28-1 at 33-34.  Defendants are correct.

As described in Sec. III.B, *supra*, Plaintiffs only state a claim for alleged breach of fiduciary duties insofar as it concerns the Director Defendants' approval of a potentially onerous, preclusive, or coercive Company Termination Fee.  The Complaint, however, includes no facts through which this Court could infer Bowlero's or D&P's level of involvement in the creation or approval of the breakup fee—much less that either party actively encouraged the Director Defendants with the requisite level of knowledge or scienter.  Rather, the Complaint focuses on Bowlero's and D&P's knowledge of Controlling Stockholders' "ulterior motives," and general involvement in the Merger.  *See, e.g.*, ECF 25 ¶ 74.  This Court doubts whether such conclusory allegations would suffice even if the Complaint had stated a predicate underlying breach on either of these bases.  However, because the Complaint alleges no participation or scienter on the part of Bowlero or D&P with regards to the deal protections in the Merger Agreement, the claims in Counts V-VI must be dismissed.

## IV.  CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss, ECF 28, is GRANTED WITHOUT PREJUDICE as to Counts I, II, V, and VI; and GRANTED IN PART AND DENIED IN PART as to Counts III-IV.  A separate Order follows.


Dated: May 27, 2022                           _____/s/_____
                                                              Stephanie A. Gallagher
                                                              United States District Judge