UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| ANITA G. ZUCKER, TRUSTEE OF THE ANITA G. ZUCKER TRUST DATED APRIL 4, 2007, AS SUBSEQUENTLY AMENDED OR RESTATED<br>4838 Jenkins Avenue<br>Charleston, SC 29405-4816<br><br>and<br><br>ANITA G. ZUCKER AS TRUSTEE OF THE ARTICLE 6 MARITAL TRUST, UNDER THE FIRST AMENDED AND RESTATED JERRY ZUCKER REVOCABLE TRUST DATED APRIL 2, 2007<br>4838 Jenkins Avenue<br>Charleston, SC 29405-4816<br><br>　　　Individually and on behalf of all others<br>　　　similarly situated,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>BOWL AMERICA, INC.<br>c/o The Corporation Trust Company, Statutory Agent<br>2405 York Road, Suite 201<br>Lutherville-Timonium, Maryland 21093-2264<br><br>and<br><br>BOWLERO CORP.<br>c/o The Corporation Trust Company, Inc., Statutory Agent<br>Wilmington, DE 19801<br><br>and<br><br>DUFF & PHELPS SECURITIES LLC,<br>c/o Corporate Creations Network Inc., Statutory Agent | No. 1:21-cv-01967-SAG<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

1

3411 Silverside Road
Tatnall Building, Suite 104
Wilmington, DE 19801

and

CHERYL A. DRAGOO
10201 Heron Pond Terrace
Burke, VA 22015

and

ALLAN L. SHER
20 Ocean Park Blvd, Apt 12
Santa Monica, CA 90405

and

MERLE FABIAN
4620 N Park Ave., Apt 1202W
Chevy Chase, MD 20815

and

GLORIA M. BRAGG
c/o The Corporation Trust Company,
Statutory Agent
2405 York Road, Suite 201
Lutherville-Timonium, Maryland 21093-2264

and

NANCY E. HULL
3299 K St., NW, Suite 100
Washington, DC 20007

and

RUTH MACKLIN
212 Washington Ave., #1407
Towson, MD 21204,

     Defendants.

2

Lead Plaintiffs Anita G. Zucker, Trustee of the Anita G. Zucker Trust Dated April 4, 2007, as Subsequently Amended or Restated and Anita G. Zucker Trustee, of the Article 6 Marital Trust, Under the First Amended and Restated Jerry Zucker Revocable Trust dated April 2, 2007 (collectively, "Plaintiffs") hereby file this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated against Defendant Bowl America, Inc. ("Bowl America" or the "Company"), Defendant Bowlero Corp. ("Bowlero"), Defendant Duff & Phelps Securities LLC ("D&P"), and Defendants Cheryl Dragoo, Allan Sher, Merle Fabian, Gloria Bragg, Nancy Hull, and Ruth Macklin (collectively, the "Board" or "Director Defendants") (Bowl America, Bowlero, D&P, and the Board shall be referred to collectively as the "Defendants"), and allege as follows based upon personal knowledge as to themselves and their own acts and, as to all other matters, upon information and belief based upon, *inter alia*, investigation conducted by their attorneys which included a review of the Company's public filings, press releases and other publicly available materials.  All claims alleged in the Second Amended Complaint that were dismissed by the Court's Memorandum Opinion dated May 27, 2022 (ECF No. 32) and separate Order dated May 27, 2022 (ECF No. 33) are set forth herein solely for the purpose of preserving them for appeal.  Accordingly, this Third Amended Complaint is filed solely for the purpose of amending the allegations related to the Court's jurisdiction as alleged in paragraph 31 in connection with the claim the Court ruled was permitted to proceed.

## NATURE OF THE ACTION

1.    This shareholder class action challenges the sale of Bowl America to Bowlero (the "Merger"), which the Board, dominated by the Company's controlling stockholders, illegally orchestrated to satisfy the controlling stockholders' desire to cash out of their majority position – even at a massive discount – while simultaneously retiring from their fiduciary positions at Bowl

America.  Significantly, the Company's leader for more than 40 years, Leslie Goldberg ("Goldberg") died at the end of 2019 after a long illness, but the controlled Board, in breach of its fiduciary duties, never made any succession plans, even though Goldberg was 88 years old when he died, and the Company's second in command, Cheryl Dragoo, a 71 year old, planned to retire. Instead, the Board improperly pursued a business strategy to satisfy the controlling stockholders' desire to exit their investment by selling the entire Company (which included their illiquid voting stock) even if such a sale harmed and was unfair to the minority stockholders' interests.

2.    The controlled Bowl America Board did not let anything stand its way of finding a willing buyer in spite of global COVID-19 pandemic, which had temporarily impacted Bowl America's business.  The members of the controlled Board breached their fiduciary duties by taking actions that were adverse to the interests of the Company and its minority shareholders by approving the sale of the Company at a price that was approximately ***40% less than the Company's worth on the open market based on the trading price of Bowl America's stock price prior to the impact of COVID-19***.  No minority stockholder had a reasonable expectation that the Board would approve a deal to sell the Company at substantially less than its market and objectively intrinsic value.

3.    Moreover, the Board's breaches of fiduciary duty related to the sale were aided and abetted by the Company's financial advisor, D&P, which provided a misleading financial opinion regarding the value of the deal.  In addition, D&P was conflicted because it had previously provided financial advice to Bowlero and was also retained to provide valuation services in connection with Bowlero's upcoming merger with ISOS Acquisition Corp. through which Bowlero would become a publicly traded company.  Bowlero also aided and abetted the Board's breaches of fiduciary duty by opportunistically stepping into the leadership void at Bowl America

and purchasing it at a deeply discounted price. Here, the Board provided clear signals that it was not acting in the Company's minority stockholders' best interests by, among other things, aggressively pursuing a fire sale of the Company during an unprecedented global pandemic while there was no leadership at the Company and no financial urgency for the Company to be sold. As such, both D&P and Bowlero knew that the Board was conducting the sales process to satisfy the desire of the Company's controlling shareholders to quickly cash out their illiquid majority position and then retire from the responsibilities as Bowl America fiduciaries. They, therefore, also knew the controlled Board was willing to approve a deal at an unfair price, including a massive discount to the Company's worth, which served Bowlero's business strategy and objectives as it prepared for its expected public offering. Indeed, all parties actively worked together to conceal the true value of Bowl America, which included the Company's ownership of 17 of the bowling alleys and accompanying land –all of which were unencumbered. Those properties had been mortgage free for decades, and Bowl America had never made accurate disclosures about true value of these properties, which the public believed was objectively worth up to $80 million as reflected in recently published *Seeking Alpha* articles.

4.     Notably, the Board utterly failed to fulfill its common law duty of candor under Maryland law, and its statutory disclosure requirements pursuant to Section 14(a) of the Exchange Act, by issuing a materially false and misleading Proxy Statement on Schedule 14A dated July 13, 2021 (the "Merger Proxy"). For example, the Merger Proxy failed to disclose the true value of the Company's business including its most valuable asset – unencumbered real estate holdings. Indeed, the publicly available evidence suggests that Bowl America's real estate holdings alone may be worth ***almost double*** the deal price of $44 million. The Merger Proxy, however, misleadingly omits all information related to their value while also acknowledging that D&P had

performed a valuation of such properties. Likewise, the Merger Proxy also omitted material information about offers that potential bidders made for the Company as a whole and for its parts. For these reasons and others, the Company's minority stockholders were uninformed when they were asked to cast their votes related to the approval of the Merger – which was already *a fait accompli* due to the controlling stockholders' ability to control the outcome due to their majority voting position.

5.    On August 11, 2021, the Company held the special meeting of shareholders, where the controlling stockholders, who controlled 78% of the Company's voting power, used that power for the ulterior purpose of approving the Merger at an unfair deal price that was adverse to the minority stockholders' interests. Notably, the controlled Board further oppressed the Company's minority shareholders' interests and violated their duty of loyalty by failing to require measures, such as the approval of the Merger by a majority of the minority stockholders, to ensure that they could have stopped the Merger's consummation against the controlling stockholders' wishes. The Merger then closed on August 18, 2021. As a result of Defendants' misconduct, Plaintiffs and other similarly situated shareholders have suffered significant harm and bring this class action to hold Defendants responsible for their unlawful actions related to the Merger.

<b><u>PARTIES</u></b>

**A.    Plaintiffs.**

6.    Plaintiff Anita G. Zucker, Trustee of the Anita G. Zucker Trust Dated April 4, 2007, as Subsequently Amended or Restated was the beneficial owner of 15,000 shares of Bowl America's Class A stock as set forth in the Certification dated August 3, 2021 and filed in this case on August 5, 2021. This Trust owned 0.431474% of all of Bowl America's outstanding Class A stock.

6

7.  Plaintiff Anita G. Zucker Trustee of the Article 6 Marital Trust, Under the First Amended and Restated Jerry Zucker Revocable Trust dated April 2, 2007, was the beneficial owner of 264,596 shares of Bowl America's Class A stock as set forth in the Certification dated August 3, 2021 and filed in this case on August 5, 2021.  This Trust owned 7.062572% of all of Bowl America's outstanding Class A stock.

8.  Plaintiffs collectively owned 279,596 shares of Bowl America's Class A stock, which represented a total of 7.46295% of Bowl America's 3,746,454 outstanding shares of Class A stock.

**B.    Defendant Bowl America.**

9.  Defendant Bowl America was a publicly traded Maryland corporation, with its principal place of business at 6446 Edsall Road, Alexandria, Virginia 22312.  In the Merger, Potomac Merger Sub, Inc., a Maryland corporation, merged with and into Bowl America, with Bowl America as the surviving entity and a wholly-owned subsidiary of Bowlero.

10. Bowl America's Class A stock was listed and traded on the NSYE American Exchange under the ticker symbol "BWL-A."  Each of the issued and outstanding 3,746,454 shares of Bowl America's Class A stock was entitled to one (1) vote per share for an aggregate of 3,746,454 votes, and each of the issued and outstanding 1,414,517 shares of Bowl America's Class B stock was entitled to ten (10) votes per share for an aggregate of 14,145,170 votes.  The total number of votes represented by outstanding Class A stock and Class B stock as of the Merger date was 17,891,624.

**C.    Defendant Bowlero.**

11. Defendant Bowlero is a publicly traded Delaware corporation with its principal place of business at 222 W. 44th Street, New York, New York 10036.  Bowlero owns and operates

over 300 bowling centers in North America and owns the Professional Bowlers Association. On July 1, 2021, Bowlero announced that it had agreed to become a publicly traded company through a merger with a special purpose acquisition company, Isos Acquisition Corp. (the "SPAC Transaction"). The SPAC Transaction contemplated the closing of Bowlero's Merger with Bowl America, and included those assets as part of that deal. Notably, the combined company has been valued at around $2.6 billion dollars.

**D.     Defendant D&P.**

12.     Defendant D&P is a Delaware corporation with its principal place of business at 55 E. 52nd Street, 14 Floor, New York, New York 10055. D&P provides financial advice, valuation services, fairness opinions and various other financial services to its clients, such as Bowl America and Bowlero.

**E.     The Director Defendants.**

**a.     Cheryl Dragoo.**

13.     Defendant Cheryl A. Dragoo ("Dragoo") was appointed to Bowl America's Board of Directors on September 25, 2008, and was 72 years old when she approved the Merger. Dragoo took over the role as Bowl America's Chief Executive Officer ("CEO") in January 2019 after Goldberg began experiencing health issues in 2018, and became Bowl America's President in December 2019 after the passing of long-time CEO, Goldberg. Dragoo also served as the Company's Chief Financial Officer ("CFO") since 2002 and was employed by the Company since 1972. Dragoo was the beneficial owner of 14,010 shares of Bowl America's Class A stock and was entitled to cast 14,010 votes.

14.     The Board provided Dragoo with a $400,000 cash bonus, which was contingent on assisting with the consummation of the Merger, placing her interests in conflict with those of the

Company's minority stockholders. Dragoo agreed to vote her shares in favor of the Merger prior to the August 11, 2021 vote. Dragoo signed the Merger Proxy and Letter to Stockholders on behalf of the Board urging the Company's minority shareholders to vote in favor of the Merger.

    **b.**  **Allan L. Sher.**

   15.  Defendant Allan L. Sher ("Sher") was appointed to Bowl America's Board on February 15, 1997, and was 88 years old when he approved the Merger. Sher was the beneficial owner of 52,500 shares of Bowl America's Class A stock and was entitled to cast 52,500 votes.

   16.  Sher agreed to vote his shares in favor of the Merger prior to the August 11, 2021 vote.

    **c.**  **Merle Fabian.**

   17.  Defendant Merle Fabian ("Fabian"), Goldberg's younger sister and the daughter of founder, Edward Goldberg, was appointed to Bowl America's Board on March 20, 1990, and was 82 years old when she approved and voted her shares for the Merger to satisfy her own personal interests.

   18.  Fabian was the beneficial owner of 879,463 shares of Bowl America's Class A stock, which entitled her to cast 879,463 votes and the beneficial owner of 872,026 of Bowl America's Class B stock, which entitled her to cast 8,720,260 votes. In total, Fabian was entitled to cast 9,599,723 votes and, by herself, had majority voting control of the Company after Leslie Goldberg's death.

   19.  Fabian agreed to vote her shares in favor of the Merger pursuant to a Voting and Support Agreement that was executed between Bowl America, Bowlero, and Fabian.

    **d.**  **Gloria M. Bragg.**

20.    Defendant Gloria M. Bragg ("Bragg") was appointed to Bowl America's Board on September 24, 2020.  Bragg was not the beneficial owner of any shares of Bowl America.

e.    **Nancy E. Hull.**

21.    Defendant Nancy E. Hull ("Hull"), who is an heir of an original founder, was appointed to Bowl America's Board on June 17, 2014.

22.    Hull was the beneficial owner of 212,359 shares of Bowl America's Class A stock, which entitled her to cast 212,359 votes and the beneficial owner of 217,417 of Bowl America's Class B stock, which entitled her to cast 2,174,170 votes.  In total, Hull was entitled to cast 2,386,529 votes.

23.    Hull agreed to vote her shares in favor of the Merger pursuant to a Voting and Support Agreement that was executed between Bowl America, Bowlero, and Hull.

f.    **Ruth Macklin**

24.    Defendant Ruth Macklin ("Macklin"), who is Fabian's cousin, and heir of the founder, Sollie Katzman, served on Bowl America's Board from February 14, 1978 through May 17, 2021.

25.    Upon information and belief, Macklin was intimately involved in all aspects of the Merger between Bowl America and Bowlero until her resignation due to failing health reasons. Macklin was 91 years old when the Merger was consummated.

26.    Macklin was the beneficial owner of 184,585 shares of Bowl America's Class A stock, which entitled her to cast 184,585 votes and the beneficial owner of 183,407 of Bowl America's Class B stock, which entitled her to cast 1,834,070 votes. In total, Macklin was entitled to cast 2,018,655 votes.

27.     Macklin agreed to vote her shares in favor of the Merger prior to the August 11, 2021 shareholder vote.

g.     **Board of Directors - Summary**

28.     In total, Hull, Fabian, Sher, Dragoo, and Macklin were the beneficial owners of 1,342,917 shares of Class A stock, which entitled them to cast 1,342,917 votes.  In total, Hull, Fabian, and Macklin were the beneficial owners of 1,272,850 shares of Class B stock, which entitled them to cast 12,728,500 votes.

29.     Hull, Fabian, Sher, Dragoo, and Macklin owned or controlled 14,071,417 of a total of 17,891,624 votes, representing over 78% of the total number of votes.  In addition, Hull, Fabian, and Macklin were Bowl America's "Controlling Shareholders" because they owned or controlled 14,004,907 of a total 17,891,624 votes, representing over 78% of the total number of the votes, and the ability to use their voting power for the ulterior purpose of forcing a sale of Bowl America, including at an unfairly low and massively discounted price, to satisfy their personal interests to cash out their significant holdings in the Company.

30.     Based upon the forgoing, the Controlling Stockholders, on their own, voted to approve the Merger and none of the Company's minority stockholders had any power to stop the Merger's consummation, because none of the Board members ensured that the Merger had any requirements to protect the Company's minority stockholders' interests.  Instead, a vote by a minority stockholder against the Merger's approval had no impact at all because the Merger's terms failed to include a majority of the minority provision to protect them.

## JURISDICTION AND VENUE

31.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and pursuant to 28 U.S.C. § 1331.  This Court has

4846-8005-5540, v. 1

supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367.  This Court also has jurisdiction over the subject matter over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class of Plaintiffs is a citizen of a state different from a Defendant.

32.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) in that many of the acts and practices complained of herein occurred in this District, and Defendants conduct business or reside in this District.

## BACKGROUND FACTS

### A.     History of Bowl America and its Leader, Leslie Goldberg.

33.     In the late 1950s and early 1960s, more than 10 million Americans bowled on a weekly basis and flocked to the 12,000 bowling alleys around the nation.  Taking advantage of this post-World War II trend, Bowl America was founded in Maryland by Edward Goldberg, Sollie Katzman, Samuel Sobkov, and Samuel Higger.  The Company began with one bowling center.

34.     In order to finance growth, Edward Goldberg and the other founders took the Company public in 1958, garnering $600,000 for 300,000 shares at $2 a-piece.  That money was used to expand Bowl America's business, but by 1963, the Company was heavily in-debt just as the allure of bowling began to wane in the country.  As a result, the Company's stock price fell, and Edward Goldberg and the other founders had to sell off certain bowling alleys, and make personal guarantees on loans to keep the remaining business intact.  This restructuring, however, provided an opportunity for Edward Goldberg and the other founders to provide themselves with high-vote Class B stock, which allowed them to maintain control of the Bowl America's

12

operations, even as a publicly traded company via its Class A shares.  Notably, Bowl America's Class B stock, which provides each share with the power of 10 votes, is not traded on the open market, but it is still entitled to any dividend payments like all Class A stock, which was publicly traded and entitled its shareholders to only one vote per share.

35.    In addition, the founders' experiences in the early 1960s resulted in the Company pursuing a strategy of owning its bowl locations, rather than leasing locations to better protect the Company in downturns in the business.  Indeed, while bowling has always been one of the nation's favorite pastimes for all genders and ages, it is nonetheless a cyclical business, and prudent planning and business strategies were the keys to Bowl America's continuing operational success for many decades.

36.    In 1976, Goldberg took over the Company's management.  Goldberg ensured that Bowl America had solid growth and profitability, and for ***over 40 years the Company never experienced an operating loss.***

37.    Indeed, due to Goldberg's leadership, Bowl America's fortunes flourished, especially, in the 1990s.  For example, on October 29, 1990, the *Washington Post* published an article entitled, "Bowl America On A Roll," in which Bowl America was described as "one of the most dependably profitable publicly traded companies in the Washington area and in the bowling business."  At that time, the article noted that since 1986, the Company's "average return on equity, a measure of company profit, has been more than 20 percent, about twice the industry average."  The article also detailed how Bowl America's profit had more than doubled to $4.3 million from $1.8 million, which resulted in a substantial increase in the payment of dividends.

i.  Bowl America's Real Estate and Monetary Investments

38.     Goldberg set Bowl America up for continued success by doing two notable things. First, Goldberg continued the founders' strategy to ensure that the Company owned the vast majority of the real estate, where Bowl America's bowling operations were located.  Second, Goldberg established an investment fund, which would serve as a key revenue provider in down times for the Company's bowling operations due to the cyclical nature of the bowling business. These two key strategies helped Bowl America to operate for 55 years without an operating loss.

39.     With respect to Bowl America's real estate holdings, by the early 1990s, the Company already owned 11 of its sites, when it was operating 25 bowling alleys.  The number of sites that Bowl America purchased continued to grow.  For example, Goldberg highlighted in his 2008 annual letter to Bowl America's stockholders that Bowl America owned 17 of its 19 bowling centers, and how ***none of those centers had a mortgage.***  At this time, Goldberg emphasized how the Company had a "deep protection for [its] ability to finance [its] center operations and to support possible expansion."  Likewise, in Goldberg's 2011 letter to shareholders, he detailed how it had "been over 20 years since [the Company] paid off [its] last mortgage."  Goldberg further drove home this point by explaining that the Company ***owned both the land and buildings*** at 17 of its 19 bowling centers.

40.     Notably, Bowl America and the Director Defendants never revealed the true worth of these valuable real estate holdings, and they also worked to actively conceal their value in connection with the Merger Proxy to mislead the Company's minority shareholders about the Company's true worth when deciding how to vote on the Merger.

41.     Moreover, it is well known that Bowl America hid the actual value of these properties on its balance sheets by undervaluing them for decades in the Company's SEC filings. For example, in 1990, the *Washington Post* noted that Bowl America's publicly disclosed financial

4846-8005-5540, v. 1

results did not "reveal other financial strengths, including virtually no debt… and almost $10 million in cash investments.  And that, say analysts, also leaves out the drastically undervalued real estate."

42.     Many years later, investors have continued to question the true untapped value of Bowl America's real estate holdings.  In this regard, *Seeking Alpha* published an article on January 18, 2021, entitled, "Bowl America: Rolling Through the Pandemic With Value to Spare." Specifically, this article noted that Bowl America's "[o]perating results have plateaued around $2m per year but extremely valuable assets are hidden on the balance sheet."  The *Seeking Alpha* article further considered the potential value of some of Bowl America's properties.  For example, this article stated that Bowl America's "most valuable location" was "in the heart of Falls Church, VA, assessed at $8m."  It then explained that "a 13K square foot office building one block away on half an acre, [was] listed as a redevelopment opportunity for $4.5m and assessed at $2.1m." Thus, this article projected that Bowl America's location as a "redevelopment opportunity on over 2 acres in the same area could value this location as $15-20m, not the $8m implied by tax assessments."

43.     Likewise, the *Seeking Alpha* article also commented on Bowl America's location on San Jose Boulevard in Jacksonville, which is in "one of the best parts of the city."  This article further noted that Bowl America's three-acre location was assessed for $1.1m for tax purposes, while a bank a couple of blocks away from it on a 2.4 acre lot was listed for $3.7m.

44.     Significantly, the *Seeking Alpha* article concluded that even in the middle of a global pandemic, Bowl America's base real estate portfolio was worth "around $60m, with $70m possible as an upside case."

45.    Indeed, Plaintiffs' investigation based on publicly available property information records for Bowl America's holdings, further confirms that Bowl America's base real estate portfolio was worth over $75 million.

46.    Along with owning its locations' real estate to make Bowl America a financially strong company, in the early 1980s, Goldberg invested $800,000 of the Company's cash in American Telephone & Telegraph Co.  Bowl America then profited when the conglomerate broke up and the value of the stock in its spinoffs climbed.  By the early 1990s, Bowl America owned approximately $2.6 million worth of stock in a range of Baby Bells.  In fact, in the 1990s, the Company's cash investments were worth almost $10 million.

47.    At the beginning of 2021, a *Seeking Alpha* article highlighted how Bowl America still held about $5 million in telecom stocks and about $500,000 in an investment in a Ginnie Mae mutual fund.  It also pointed out that these investments provided about $270,000 in annual dividend income on top of Bowl America's bowling operations' profits.

**B.    Bowl America Repeatedly Represented That its Business Was Strongly Positioned to Continue its Operations for the Company's Long-Term Future**

48.    Due to its real estate holdings and its investment portfolio, Bowl America made repeated representations in its Form 10-Ks, which were filed with the SEC, about how those assets put Bowl America in a uniquely strong financial position, and would enable Bowl America to operate for the long-term, including investing when appropriate in updating Bowl America's equipment.  Specifically, Bowl America's 2018 Form 10-K/A dated October 15, 2018 ("2018 Form 10-K/A) stated, "A portion of earnings has consistently been invested to create a reserve to protect the Company during downturns in business, to capitalize on opportunities for expansions and modernization, to provide a secure source of income and to provide a predictable return to its owners."  Notably, the 2018 Form 10-K/A represented that the "Company has no long-term debt

and has made no application for third party funding as cash and cash flows are currently sufficient to finance all contemplated purchases and to meet short-term purchase commitments and operating lease commitments."

49.    The 2018 Form 10-K/A further disclosed that the fair market value of the Company's securities as of July 1, 2018 was approximately $4,817,000, and that they were worth approximately $5,272,000 on July 2, 2017 – a year earlier.  The 2018 Form 10K/A explained that in "August 2017, approximately $1,000,000 of shares in [the GNMA] fund were redeemed to meet the August 2017 dividend payment."  The 2018 Form 10K/A noted that the Company paid cash dividends totaling approximately $3.5 million in fiscal 2018.

50.    Similarly, Bowl America's Form 2019 10-K dated September 26, 2019 ("2019 Form 10-K)stated, "A portion of earnings has consistently been invested to create a reserve to protect the Company during downturns in business, to capitalize on opportunities for expansions and modernization, to provide a secure source of income and to provide a predictable return to its owners."  The 2019 Form 10-K also represented that the "Company has no long-term debt and has made no application for third party funding as cash and cash flows are currently sufficient to finance all contemplated purchases and to meet short-term purchase commitments and operating lease commitments.  The 2019 Form 10-K then disclosed that the fair value of the Company's securities on June 30, 2019 was approximately $5,100,000.  Significantly, the Company's financial investments' worth had increased by several hundred thousand from the prior year, even though the Company again redeemed approximately $1,000,000 from its GNMA fund to meet the August 2019 dividend payment.

51.    In fact, even after the COVID-19 forced Bowl America to shut down all of its operations for a period of time, the Company's Form 2020 10-K filed with the SEC on September

24, 2020, which the Merger Proxy specifically incorporated, represented that the Company continued to maintain a strong financial position due to its investments in securities with a fair market value of approximately $4,725,000 as of June 28, 2020. Likewise, unlike other bowling companies that shuttered their doors and still had leases or mortgages to pay during the COVID-19 pandemic, Bowl America's financial position was further protected because it owned the real estate – debt-free – in which its bowling operations were located. As such, it was not saddled with large lease or mortgage payments when the Company's operations were adversely impacted by COVID-19, including related federal and state shut down orders. Further, Bowl America was able to obtain a $1.5 million loan at 1% interest under the CARES Act as part of the Payroll Protection Program. Accordingly, Bowl America was uniquely situated to survive the COVID-19 pandemic intact, and continue with a strong business for years to come.

52.     The Company's Controlling Stockholders, who were also members of the aging Board, however, had ulterior motives to help themselves cash out of their majority position in the Company at an unfairly low price, even a massive discount, and then to retire from their Bowl America director positions, as soon as Goldberg could no longer run the Company due to health issues in 2018. In fact, the Board, which was dominated by the Controlling Stockholders, abandoned its fiduciary duty to the Company to ensure its proper management, including a succession plan despite the obvious need for one because: (1) Goldberg was nearly 90 years before his death in 2019, (2) the Company's second in command, Dragoo, had also disclosed her intention to retire, and (3) the majority of the other Board members also needed to be replaced due to their elderly ages.

C.     **After Goldberg Falls Ill and Dies, the Controlling Shareholders and the Board Breached Their Fiduciary Duties, Resulting in the Sale of the Company At a Massive Discount To Its Intrinsic Value, Harming the Minority Stockholders' Interests.**

18

53.     Even before Goldberg became ill in 2018, the Board had a fiduciary duty to implement a succession plan for Goldberg, who was in his late 80s, and the other Board members who were also long past "retirement" age, but the Board did nothing to address this critical issue for Bowl America's future operations.  Instead, the Controlling Stockholders used their positions on the Board to illegally facilitate the sale of their majority interest in Bowl America by selling off the whole Company, while also taking adverse positions to the Company and its minority stockholders to appease their blatant self-interests.

54.     After Goldberg's death in October 2019, Bowl America remained the only publicly-listed pure-play bowling stock available for purchase.  By early 2021, investors were speculating about the Company's future due to the Board's failure to implement a viable long-term succession plan nearly two years after Goldberg's death.  For example, in a *Seeking Alpha* article, dated January 18, 2021, the author noted, "I don't know if the management team wants to keep running a bowling business."  Little did the public know, the Controlling Stockholders and the Board were acting in violation of the best interests the Company and its minority stockholders, like Plaintiffs, by engaging in a rigged and self-interested sales process to cash out the Controlling Stockholders' majority position at any available price, including a massive discount to the Company's true value, while also allowing themselves to retire from their fiduciary positions at Bowl America after having for years shirked their responsibilities to oversee and manage the Company's business.

55.     Once Goldberg died his large stock holdings in Bowl America passed to his sister, Fabian, giving her majority voting control of the Company on her own.  Fabian, however, acted together with the other founder's heirs, Macklin (Fabian's cousin) and Hull, who were also serving on the Board to use both their domination and control of the other Board members to engage in a

sales process for the improper purpose of cashing out the Controlling Stockholders' majority stake in the Company, regardless of the harm it caused to the Company or its minority stockholders.

56.    To further the Controlling Stockholders' liquidation goal, shortly before Goldberg's death following a long illness, on September 26, 2019, Dragoo and Bowl America entered into an Amended and Restated Employment Agreement.  The Board dominated by the Controlling Stockholders offered it as a financial incentive to convince Dragoo to postpone her retirement, despite the fact that Dragoo was in her early 70s and her personal desire was to retire as soon as possible.  Moreover, this wasteful and improper cash bonus incentive for Dragoo was necessary because the Board had failed to implement any viable succession plan to replace Goldberg (and Dragoo, who had wanted to retire) as the Company's senior management.  Not to mention its failure to provide any succession plan for an aging Board.

57.    Indeed, the Board was well aware of Goldberg's frail health condition more than a year before he died.  Tellingly, not a single annual proxy statement filed by Bowl America made any reference to a succession plan (either at the management or the Board level) and, significantly, any risk attendant to the Company's business going forward.

58.    Instead of fulfilling their fiduciary duties to the Company by actively searching for senior management, including a long-term CEO and CFO, Dragoo and the rest of the Board conspired to amend and extend Dragoo's employment agreement to expire on June 27, 2021, while also providing Dragoo with an annual base salary of $200,000 and allowing her to keep acting as the Company's CFO as well.  Indeed, Dragoo was further motivated to work for the Controlling Stockholders' interest to cash out of their majority position by forcing the sale of the entire Company at an unfairly low price, including a discount to its intrinsic value, due to additional terms in her new employment agreement that conflicted with the interests of the minority

20

stockholders. Specifically, Dragoo would receive a lump sum cash payment equal to 2x her annual base salary (i.e., $400,000) if the Company experienced a "change in control." Moreover, even if Dragoo decided to resign or was terminated by the Company without cause, she was entitled to cash lump sum payment equal to nine months of her base salary. As such, Dragoo was not independent, but was fully beholden to the Controlling Stockholders' interests and her own personal retirement goals. Accordingly, she had multiple powerful motivations to take adverse actions related to the Company and its minority stockholders' interests resulting in the approval of a transaction with any willing buyer, no matter the price or circumstances. And that is exactly what Dragoo and the rest of the Director Defendants did.

59. The Board chose a conflicted Dragoo and Sher, an 87-year old director, who had been loyal to Goldberg and the other Controlling Stockholders for over 20 years, to oversee the Company's sales process. Dragoo also suffered from another conflict of interest created due to her lack of independence from the Company's Controlling Stockholders, who also served as her fellow Board members. In this regard, Class B stockholders, like Fabian, Hull, and Macklin, nominated and then voted their Class B shares in favor of keeping Dragoo on the Board.

60. Likewise, after serving as director for Goldberg and the other Controlling Stockholders for over twenty years, Sher likewise lacked independence from the Controlling Stockholders, who could use their significant Class A voting power to vote him off of the Board. As the Board's designees to advance a possible sale of the Company, neither Dragoo nor Sher took any necessary or reasonable steps to protect the Company's minority stockholders' interests when conducting the sale process purportedly on their behalf. Instead, Dragoo and Sher caved to the Controlling Stockholders' interest to sell the entire Company to allow them to cash out of their large stake, along with exiting their management roles as directors for the Company.

4846-8005-5540, v. 1

61.     Indeed, the Controlling Stockholders knew that they could use that majority voting power to force through any sale, as long as the Board, which they controlled because they were also Bowl America directors, failed to protect the minority stockholders' interests.  For example, the Board could have insisted that any deal be subject to a majority of the minority clause to approve the Merger, which would have fully protected the Company's minority stockholders' interests by providing them with the ability to prevent an unfair deal, like the Merger, from being consummated through their votes.  Here, the Board, however, failed to take the necessary and appropriate steps to ensure the minority stockholders' interests were protected.

**D.     The Board Pushed Forward With A Sales Process to Satisfy the Company's Controlling Stockholders' Desire to Cash Out Their Entire Position Through the Sale of Whole Company Despite Bowl America's Stock Price and the Market for Bowling Alleys Being Depressed Because of the COVID-19 Pandemic.**

62.     From January 1, 2019 through December 31, 2019, the price of Bowl America's Class A stock ranged from a low of $13.97 per share to a high of $17.48 per share and the average closing price per share during this pre-pandemic time period was $15.25.  As such, all of the Company's minority stockholders possessed a reasonable expectation that in the event of a sale, the Board would not agree to sell Bowl America for less than its market value, which was approximately $80 million based on the Company's $15.38 per share trading price on March 19, 2019 – the same day, the Board formally began the Company's sales process.

63.     On March 19, 2019, the Board engaged the law firm of Foley & Lardner LLP ("Foley") to explore purportedly strategic alternatives, including a potential sale of the Company. On the same day, the Board decided to engage an investment banker, and thereafter, interviewed D&P and one other investment banking firm for the position.

64.     The Board then did not form a special committee of independent directors to protect the sales process from any of conflicts of interests related to the Controlling Shareholders' desire to cash out their position.  Instead, the Controlling Stockholders, who also served as Board members, put their loyal and self-interested directors, Sher and Dragoo in charge of leading the Company's efforts to solicit a buyer and to serve as the Company's primary points of contact with Foley and the investment bank.

65.     It is inexplicable that the Board failed to create a special committee filled with only independent directors to run the sales process.  This Board, dominated by the Controlling Stockholders had, in fact, appointed Dragoo to lead the Company's sales process while also creating a conflict of interest for Dragoo, by incentivizing her $400,000 golden parachute payment that would be triggered only if the Company was sold.  Moreover, Dragoo's self-interest to retire from all of her Bowl America positions placed her in conflict with her duty to the Company and its minority stockholders.

66.     On May 7, 2019, the Board engaged Duff & Phelps Securities LLC ("D&P") as its investment banker for purposes of soliciting a buyer.  The Board elected to use D&P despite the fact that D&P had done significant work for Bowlero, one of the Company's biggest rivals, within two years of the Merger.  In this regard, the Merger Proxy discloses that during the two years preceding the date of its Opinion, D&P independently performed valuation work for Bowlero unrelated to the Merger with the Company for which it received a fee of $180,000 for its services. The nature of the work was not disclosed in the Merger Proxy.  In addition, at the same time the Merger was pending, D&P was retained by Bowlero to provide valuation services in connection with the SPAC Transaction it had agreed to with ISOS Acquisition – a transaction that was announced just weeks after the Merger.  Nor does the Merger Proxy disclose whether the same

23

members of D&P's team for Bowlero included any of the same members, who worked on the D&P team related to Bowl America's sales process.

67.    On or about February 2020, the Board entered negotiations with four parties that expressed interest in acquiring Bowl America.  These parties are identified in the Merger Proxy as Parent (being Bowlero), Party X, Party Y (an affiliated entity of an existing Class A stockholder of the Company), and Party Z.[1]  The Merger Proxy states that these four parties submitted preliminary non-binding indications of interest for the entire Company to D&P.  The Merger Proxy also mentions that one party submitted a preliminary non-binding offer for the Company's business operations, while another party made submitted a preliminary non-binding offer for the Company's real estate portfolio.  Sher and Dragoo decided both of those offers were insufficient, presumably because they did not accomplish the Controlling Stockholders' desire to cash out their entire stake in the Company, and get rid of their responsibilities as Bowl America directors through a sale of the whole Company.  The Merger Proxy omits all information concerning the price of these referenced offers or the potential benefits to stockholders, which occurred at the initial and critical stage of the Company's sales process.  Moreover, these offers were made prior to the start of the COVID-19 pandemic, and thus, were unaffected by any temporary impact on the Company's business.  This omitted information about the monetary consideration offered by these potential bidders was material information, which was necessary for the Company's minority stockholders to review prior to casting their vote related to the Merger.

68.    In February 2020, the Company's stock traded as high as $15.68 per share, and then dropped as low as $12.27 per share as COVID-19 risks began to emerge.  In other words, the Company's market value ranged from a high of slightly over $81 million to a low of $63 million

---

[1] On March 11, 2020, as COVID-19 began to sweep the nation, the Board was advised by Foley and D&P that Party Z was no longer interested in purchasing the entire Company.

on February 28, 2020 as more news related to COVID-19 emerged, and eventual federally mandated closures related to that pandemic arrived in March 2020.

69.    The Merger Proxy also failed to disclose whether prior to this time, the Board possessed any valuation or estimated valuation of the Company or what its financial worth would be either as an ongoing entity or in a sale to a willing buyer.

70.    On March 11, 2020, D&P met with Sher and Dragoo, and advised among other things that "the emerging COVID-19 outbreak was beginning to negatively impact sale process and markets in general."

71.    On March 18, 2020, the Company closed all bowling centers as required by the orders from state and federal governments, in an effort to mitigate the spread of COVID-19.

72.    On March 25, 2020, the Board was advised by Foley and D&P that, as a result of market disruptions caused by the emerging COVID-19 outbreak, only two potential buyers remained for the entire Company, including Bowlero, Bowl America's biggest rival.[2]

73.    Just five days later, at the Board's March 30, 2020 meeting, D&P "discussed the impact of COVID-19 on the process and the consideration of putting the process on hold with one potential buyer electing to drop out altogether in light of the COVID-19 outbreak." The Board, however, remained intent on selling the entire Company regardless of the circumstances, including an unprecedented global pandemic that had closed down much of the U.S. economy in March 2020.

74.    Despite the fact that the Company had lost a significant portion of its market capitalization and D&P had advised the Board to pause its sales process due to the COVID-19

---

[2] In the Merger Proxy, Bowl America identifies the two remaining prospective buyers as Bowlero and Company X. This is incorrect as Company Y (presumed to be NIL Funding Corporation) continued to express its interest in purchasing Bowl America.

pandemic, the Board members rejected that valid advice, and instructed D&P to pursue a transaction with Bowlero, the only remaining bidder and the Company's biggest rival, who also happened to be D&P's client too. At the same time, the Board members did not provide D&P with any guidelines related to specific price or price ranges for those negotiations with Bowlero, thereby abdicating their responsibilities and breaching their fiduciary duties. As such, D&P understood that the Board's decision to continue the Company's sales process against its financial advisor's advice was done purely to serve the Controlling Stockholders' ulterior personal interests to cash out their majority position in the Company while simultaneously ridding themselves of their director positions at Bowl America. Nevertheless, D&P continued to assist the Board with their illegal scheme.

75.    In fact, just ten days later, on April 10, 2020, D&P informed Sher and Dragoo that it had followed up with Bowlero, but Bowlero reasonably decided not to engage further in negotiations as it wanted to wait to determine the effect of COVID-19. D&P also advised Sher and Dragoo that Company X would only move forward with a much lower purchase price than what had been offered due to an inability to obtain financing. The Merger Proxy, however, omitted all material information concerning the actual amounts of Company X's offers. Due to Bowlero's suspension of all activities and Party X's inability to obtain financing, as well as the Company's closure of all of its bowling centers as a result of the COVID-19 pandemic, D&P again recommended to Sher and Dragoo that the Company's sales process be slowed or suspended completely.

76.    On April 13, 2020, the Board agreed to suspend negotiations with potential buyers. On this day, the Company's stock had recovered slightly, and traded as high as $10.75 per share or giving Bowl America a market capitalization of over $55 million.

77.     Less than two weeks later, however, the Board reversed course and had D&P begin negotiations again to sell the entire Company. The Merger Proxy confirms that from April 2020 through November 2020, D&P contacted Bowlero, Party X, Party Y (believed to be NIL Funding Corporation), and Party Z at various points to gauge their continued interest in purchasing Bowl America.  These repeated contacts during a global pandemic sent potential buyers the obvious signal that the Board was desperate and wanted to sell the entire Company, even at a depressed pandemic price.  In fact, during this time, D&P advised Sher and Dragoo that the continued impact of the COVID-19 pandemic was limiting the overall interest of bidders to reengage.   D&P, however, continued to push the Company's sales process forward in an attempt to satisfy the Controlling Stockholders' and the Board's desire for a sale of the whole Company, including at an unfairly low and massively discounted price.

78.     As recently as November 28, 2020, D&P agreed to notify NIL Funding Corporation (believed to be Party Y in the Merger Proxy, and which is affiliated with Plaintiffs) if Bowl America decided to proceed with a sale.  Despite that assurance, D&P and Bowl America's Board terminated all discussions with NIL Funding.  Instead showing favoritism towards Bowlero, who was also D&P's client, the Board elected to continue exclusive negotiations with Bowlero without contacting NIL Funding (and potentially others) to determine if they would agree to a higher purchase price or more favorable terms.  Nor did D&P follow up with NIL Funding on the Board's behalf.

79.     Bowlero was well known for purchasing bowling alleys at depressed prices.  For example, in 2013, Bowlero cheaply bought one of its biggest rivals, AMF Bowling Center, out of bankruptcy, expanding Bowlero's portfolio of bowling locations to hundreds across the U.S.  D&P, therefore, sought to curry favor with its existing client by allowing it to purchase Bowl America

at a severe discount too, knowing the Board would approve virtually any deal to satisfy the Controlling Stockholders' desire to liquidate their entire holdings in Bowl America promptly through the sale of the whole Company.

80.    The Board remained focused on fulfilling the Controlling Stockholders' self-interested desire to cash out their entire majority interest in the Company as quickly as possible, regardless of the harm those fiduciaries' actions would cause to the Company's minority stockholders' and the Company's interests.  In this regard, by December 15, 2020, D&P solicited only two offers for the entire Company.

81.    First, Bowlero made a low-ball offer of $43 million – when the Company's still depressed stock had traded as high as $9.20 per share, giving the Company a market capitalization of over $47 million – on that same day.  Notably, the Board also knew that the Company's real estate portfolio alone was worth more than $43 million, and Bowlero's offer was a negative premium to the Company's then stock trading price, which had been severely impacted due to the COVID-19 pandemic.  Further, the $43 million offer reflected a discount of approximately 40% off the Company's trading price immediately before the pandemic.  Likewise, Party 2 also made an offer to buy Bowl America at the fire sale price of $40 million.  Neither offer reflected the true value of Company or its assets.

82.    Instead of rejecting these lowball offers as clearly inadequate or providing a counter-offer that reflected the Company's true value, the Board, with no valuation of its own in hand to guide negotiations, simply caved and instructed D&P to further engage with Bowlero and Party 2 to see if they would make their "final and best offer."

83.    On January 7, 2021, Bowlero presented Bowl America with a non-binding letter of intent with a proposed 180-day period of exclusivity.  In this letter of intent, Bowlero had increased

its wholly inadequate $43 million offer by a mere $1 million, for a total of $44 million to acquire 100% of Bowl America.  Notably, on this day, Bowl America's stock was trading at $9.73 per share, giving the Company a market capitalization of over $50 million.  As such, Bowlero's offer for the Company significantly undervalued it, even when viewing Bowlero's offer in relation to the Company's stock's trading price, which was severely depressed due to temporary COVID-19 restrictions.  Nor did Bowlero's $44 million offer adequately compensate the Company's minority stockholders for their interests in the Company's valuable real estate portfolio.

84.    The Bowl America Board, however, did not act in the Company's minority stockholders' best interests when responding to Bowlero's unfair and inadequate $44 million offer. Instead, it improperly favored the Controlling Stockholders' interests, who wanted to quickly push forward to sell the entire Company at whatever price, even if it meant taking a drastic discount, so they could have their inheritance money and be done with serving as Bowl America's directors. Showing that the Board, D&P, and Bowlero all knowingly acted together to structure the grossly unfair Merger, the Board did not instruct D&P to push back to ask Bowlero to increase its clearly inadequate $44 million offer at all.  Nor did D&P advise the Board to do so, even though it knew the Company's value was easily worth 25-50% more than Bowlero's offer **based on the Company's real estate portfolio alone**.

85.    By January 12, 2021, the Controlling Stockholders were well on their way to cashing out their entire stake in the Company while simultaneously retiring from the Bowl America Board, regardless of whether, in breach of their fiduciary duties, they oppressed the Company's minority stockholders' interests.  In this regard, the Bowl America Board, which was dominated by the Controlling Stockholders, caused Bowl America to execute a letter of intent with

Bowlero, for the purchase price of $44 million and an exclusivity period of 90-days through April 12, 2021, which was subsequently extended to April 30, 2021.

86.     The Board made no reasonable or necessary attempt to protect the Company's minority stockholders to ensure that their votes had the power to stop the Merger, if they were not supportive of it, through the inclusion of a requirement of a majority of the minority provision. Such a provision could have blocked the Merger's consummation, if a majority of the minority stockholders had been fully informed when voting on the Merger.  Instead, the controlled Board did the exact opposite, showing how it was favoring the Controlling Stockholders' and Dragoo's interests to immediately cash out their significant stakes in the Company, and rid themselves of the responsibilities of their Bowl America positions.

87.     On May 27, 2021, the Board took the final self-interested step by approving Bowlero's proposal to acquire Bowl America for $44 million.  Moreover, Bowl America's long-term securities portfolio was also liquidated to fund an additional dividend of up to $0.60 per share for a purported total of $9.13 per share.  In conjunction with the sale, the Board, including those directors who were also the Controlling Stockholders, pledged to vote 100% of their shares in favor of the Merger.

88.     On May 27, 2021, the day the merger agreement was signed, the price of a share of Bowl America's Class A stock was $10.50 per share.

89.     ***By agreeing to sell Bowl America for $8.53 per share, the self-interested Board accepted almost $2.00 less per share than what any shareholder could sell their shares for on the open market on May 27, 2021 – the same day the merger agreement was signed – and more than a 40% discount to the pre-pandemic trading price.***  Instead of negotiating a premium, even to the $10.50 trading price, the Board, including the Controlling Stockholders, approved an unfair

30

and discounted purchase price for the Company, betraying the confidence bestowed upon them by Plaintiffs and other minority shareholders in violation of their fiduciary duties.

      E.       **The Board and the Controlling Stockholders Breached their Fiduciary Duties.**

            i.    **The Board and the Controlling Stockholders Placed their Personal Interests Above the Best Interests of the Company and its Minority Shareholders.**

90.      Upon information and belief, many of the Board members and Controlling Stockholders acquired their shares through an inheritance or by other means that did not require the exchange of consideration.

91.      Upon information and belief, because some or all of the Board members did not pay the fair market value of their shares when they acquired them, they would receive a windfall from any sale, regardless of the price and, as a consequence, their self-interests in the Merger thus diverge significantly from Class members, who were the Company's minority stockholders.  The minority stockholders, such as Plaintiffs, took significant losses as compared to certain members of Board, who engaged in self-dealing by prioritizing their own interests over Class members, who are the Company's minority stockholders.  The Controlling Stockholders and the other members of the Board, then further illegally used their majority voting power to control the outcome of the shareholder vote to approve the Merger and liquidate their equity positions in the Company along with ridding themselves of their fiduciary roles at Bowl America.

92.      Due to the size and nature of their stock holdings, the Board, which included the Controlling Stockholders could not easily liquidate their stock.  The Controlling Stockholders, therefore, improperly used the Company's resources to finance an expensive sales process while a global pandemic raged to satisfy their goal of cashing out of the Company by selling the entire Company, allowing everyone to retire from their Bowl America positions.  The lowball Merger

with Bowlero presented the Board with their only option to liquidate all of their stock, while also relieving them from the responsibilities of their Bowl America positions. The Board and the Controlling Stockholders further used their Bowl America positions to ensure that the Company's minority stockholders' vote could not stop the Merger's consummation, because they failed to negotiate the inclusion of a majority of the minority provision as part of the Merger's terms.

93.    Upon information and belief, when Goldberg passed in October 2019 after a long illness that began in 2018, the Board had no business plan in place and no interest in continuing to operate the business. Nor did the Board have any intention of putting a long-term succession plan in place either as to the CEO or with regard much needed Board succession as the majority of the Board member were well past retirement age. Indeed, as evidenced by the Company's SEC filings, for several years, the Board had stopped managing the Company for its best interests to ensure that Bowl America had a long-term future as a stand-alone public company. As the Merger Proxy confirmed, the controlled Board improperly focused all of its attention on a sale of the Company; rather than finding a viable long-term replacement for Goldberg in 2018 and 2019 after learning about his health problems before his death, and Dragoo's desire to retire from her management positions with the Company. Nor did the Board make any succession plans for the other members of the Board, like Fabian, Macklin and Sher, who were in their 80s and 90s. As such, the Company had no long-term plan to ensure to it continued to run profitably, whether or not a sale of the whole Company could be completed.

94.    Further, the Board failed to take the appropriate and necessary steps to protect the Company's minority stockholders' rights during Bowl America's sales process, like forming a special committee of independent directors to protect their interests. Critically, the Board also failed to require the Merger to be approved by a separate vote of the majority of the minority

32

stockholders' votes.  Such steps are consistent with well-known best practices to protect minority stockholders' interests in the sale of controlled companies.

95.    Plaintiffs and other similarly situated minority shareholders, who paid valuable consideration for their shares suffered significant financial losses as a result of the Board's breaches of fiduciary duties.

> **ii.  A Conflicted D&P Based its Fairness Opinion on Flawed Methodology and Incomplete Data to Aid and Abet the Board's Breaches of Fiduciary Duty in Approving the Merger.**
>
> > **a.  The Fairness Opinion Fails to Account for the Value of Bowl America's Real Estate Assets which, Standing Alone, are Worth Significantly More than the Merger's Price.**

96.    On May 27, 2021, D&P provided a fairness opinion to the Board concerning the Merger (the "Opinion").

97.    In its Opinion, D&P improperly concluded that purchase price of $8.53 per share was fair to Bowl America's public shareholders.

98.    Upon information and belief, prior to the pandemic, the value of Bowl America's unencumbered real property assets alone was approximately $50 million dollars based on tax records.  The taxable value of real property typically represents just a fraction of the property's actual value and reflects no added value separately attributable to the current real estate market or Company's business.

99.    Upon information and belief, Bowl America's real estate holdings have and would have continued to appreciate.  When considering the Merger, the Board, in breach of its fiduciary duties, however, failed to obtain any independent valuation of the Company's real estate holdings from which it could establish the true value of the Company.

100.    Moreover, in connection with rendering the Opinion, D&P did not evaluate the Company's solvency or conduct an independent appraisal or physical inspection of any specific assets or liabilities (contingent or otherwise) or consider a prior valuation of Bowl America's real estate –prepared by D&P for which it was paid $95,000.  D&P, Bowl America, and the Director Defendants concealed the results of that valuation and omitted it from the Merger Proxy.  Further, and inexplicably, those valuations were not used by D&P (or the Board) in evaluating the fairness of the Merger.

101.    By failing to consider the value of Bowl America's real property assets, D&P could not have reasonably concluded that the Merger was fair to all shareholders, including the minority shareholders.  By failing to obtain or disclose any independent valuation of the Company's most valuable asset before approving the Merger, the Board breached its fiduciary duties and were aided and abetted by D&P, who neglected to fully consider the value of those assets when issuing its Opinion.

102.    By concluding that the Merger, in which Bowl America's Board agreed to sell the Company at a price per share that is below the price that shareholders could receive on the open market, and far below the pre-pandemic price, D&P could not reasonably conclude that the Merger was fair to all Bowl America stockholders.

103.    The May 21, 2021 engagement of D&P to provide the Opinion by the Board presented a conflict of interest.  In undertaking the engagement, D&P had a vested interest to conclude that the deal was fair to all shareholders because if D&P concluded that the deal was fair and the Merger closed as a result, D&P would receive a $1 million dollar fee in connection with the sale of the Company, in addition to the fee for the Opinion.  If the deal did not close, D&P would not receive the $1 million contingent payment.  In addition, the Board engaged D&P to

34

provide the Opinion regarding the Bowlero Merger despite the fact that D&P had recently provided services to Bowlero and was engaged to advise Bowlero with respect to the upcoming SPAC Transaction, presenting further conflicts of interest for D&P.  Moreover, D&P knew that Bowlero had a history of buying bowling alleys from its rivals as cheaply as possible, including from bankruptcy proceedings, and was likely aware that Bowlero was actively acquiring properties for its expected SPAC Transaction of which news leaked not even a month after the announcement of the Merger, making D&P even more likely to favor Bowlero's interests to facilitate a cheap sale of Bowl America.

104.    The Board, in relying upon D&P's flawed, incomplete, and biased opinion and data, failed to uphold its fiduciary duties to Plaintiffs and their fellow minority shareholders because they were focused on favoring the Controlling Stockholders' interests, which required the sale of the entire Company, even at a huge discount to Bowl America's intrinsic value.

### iii. The Board Tainted the Sales Process from the Start By Acceding to the Interests of the Controlling Stockholders, Resulting in an Unfair Purchase Price for the Company's Minority Stockholders.

105.    The Company's sales process was riddled with conflicts from the start, which resulted in the failure by the Board to maximize the value of the Company's purchase price, and instead, obtained an unfair massively discounted price for the Company's minority stockholders. Most importantly, this process was initiated due to the Controlling Stockholders' personal desire to cash out its entire majority stake by selling the whole Company and rid themselves of their responsibilities for managing and overseeing Bowl America's business.  Those Director Defendants, as described herein, thus, made sure that no protections were implemented to protect the Company's minority stockholders' interests.  Instead, the controlled Board used its power over the Company's operations combined with the Controlling Stockholders' majority voting power for

the ulterior motive of pushing through a sale of the Company at a massively discounted and unfair price to cash out and retire.

106.    The Board further agreed to Merger terms that made it impossible for another suitor to replace Bowlero in further breach of its fiduciary duties.  For example, the Board agreed to an exclusivity provision, while failing to negotiate a go-shop period that would have allowed another party to bid on the Company without any issues related to a termination fee.  In addition, the Board agreed to a crippling termination fee, which required Bowl America to pay up to $5.1 million, or 11.7% of the total guaranteed price of the deal, if Bowl America were to receive a better offer, effectively locking out any competitive offers  That termination fee alone was evidence that the Merger was the result of bad faith because typically, those types of fees represent 3-5% of the transaction's price.  Finally, two of the three Controlling Stockholders, Fabian and Hull, also executed voting agreements, which would assure the Merger would be approved while also discouraging any other potential purchasers from making a bid.

107.    On the same day Bowl America entered into the merger agreement, the Board, likely recognizing that the Merger represented a prima facie breach of their fiduciary duties to Plaintiffs and Bowl America's other minority shareholders, unilaterally adopted a series of self-dealing amendments to Bowl America's by-laws, the first amendments since 1984.  These amendments required Bowl America to indemnify and pay the directors' expenses for a lawsuit that arises out of their failure to protect their shareholders' interests and seek to deny a shareholder the right to challenge the Merger in a forum in the shareholder's state of residence other than the State of Maryland.

108.    In agreeing to sell Bowl America, after Bowl America's business had been temporarily and negatively impacted because of mandatory closures that resulted in a total

interruption of all business activities instead of waiting for pandemic restrictions to ease and its business to recover, the Board breached its fiduciary duty by favoring the Controlling Stockholders' self-interested plan to sell the entire Company, in order for them to liquidate their majority position and retire from the fiduciary positions at Bowl America, rather than rejecting offers like Bowlero's that failed to maximize the sales price. Bowl America was a debt-free company with adequate cash reserves, and absolutely no need existed to conduct a fire sale while the economy is still recovering from a global pandemic. The Board, however, for years completely ignored its fiduciary duties to implement a succession plan to replace both Goldberg and Dragoo, as well as an aging Board, and chose instead to improperly focus full time on selling the Company to cater to its Controlling Stockholders' personal interests.

> **F.    The Merger Proxy Omitted or Misrepresented Material Information Necessary for Bowl America's Minority Shareholders to Make an Informed Decision as to How to Vote.**

109.    In connection with the August 11, 2021 shareholder vote on the Merger, Defendants filed and disseminated a materially false and/or misleading Merger Proxy in contravention of §§14(a) and 20(a) of the 1934 Act and/or Defendants' duty of candor and full disclosure under state law. The Merger Proxy, which recommended that Bowl America shareholders vote in favor of the Merger, misrepresented and failed to disclose material information necessary for the Company's minority stockholders to make an informed decision as to whether to vote their shares in favor of the Merger with Bowlero.

110.    The Merger Proxy represented to shareholders, among other things, that:

a.    "the merger agreement, including the merger...are fair to, and in the best interests of, the Company and its stockholders";

b.    "the board of directors unanimously resolved to recommend that stockholders of the Company approve the merger" and related transactions;

c. The Board recommended the Merger based, in part, on an incomplete and misleading opinion from D&P that the Merger was fair, from a financial point of view, to shareholders;

d. the lack of any "desirability [to] ... undertak[e] a substantial capital investment program to update the Company's bowling centers" as one of the reasons prompting the Board to approve the Merger;

e. the Board had thoroughly evaluated Bowl America as a stand-alone company and concluded that a reduction in dividend would be necessary, if it continued in that direction; and

f. the Company had "limited access to capital to finance capital improvements" as a factor in support of the Merger.

111. These statements were materially false and misleading at the time they were made because the Merger Proxy omitted and/or misrepresented material information about the Company's flawed sales process, conflicts of interests that corrupted it, the lack of projections and proper valuations, and the fairness of the sales price to minority stockholders, including the following:

a. the basis for the Board selection of, and the process by which the Board identified and selected parties who might have been interested in pursuing a strategic transaction with the Company;

b. the details concerning the Board's consideration of other potential strategic alternatives, including the offer prices, or failure to consider such alternatives, including continuing as a stand-alone, independent company;

c. all information related to the actual value of the Company's real estate holdings;

d. the basis for the Board's selection of, and the process by which the Board selected and retained D&P as its financial advisor for the Company's sales process;

e. the details surrounding D&P's past and/or present engagements by Bowl America, including its evaluation of Bowl America's real estate assets; and

      f.    omitted the details surrounding D&P's past and/or present engagements by Bowlero, and any fees paid to D&P pursuant to all such engagements.

112.    The Merger Proxy was false and materially misleading in that it gave Bowl America's minority stockholders an incomplete and inaccurate portrayal of the Company's sales process and left the Company's minority stockholders unable to determine whether the Board was acting in their best interests when it approved the sale of the Company through a rigged process and at a discount to its market and intrinsic value. The Merger Proxy failed to provide any information regarding the prices offered by competing bidders, which the Board rejected, by which minority stockholders could determine the fairness of any transaction. The Merger Proxy further provided no explanation for the "fire sale" urgency of entering into a transaction in the midst of the COVID-19 pandemic, which the Company ostensibly could wait out. Such material information was critical for Bowl America's minority stockholders to know in order to make an informed decision about how to vote on the Merger at the August 11, 2021 shareholder meeting.

113.    In order for the Company's minority stockholders to make an informed decision about whether to vote for the Merger, Defendants were required to disclose even potential conflicts of interest. Bowl America's minority stockholders, therefore, were entitled to know if their fiduciaries have interests in the Merger that are even potentially in conflict with the minority stockholders' interest in the Board maximizing value in the sale of the entire Company. Defendants, here, failed to disclose material information concerning actual and potential conflicts that tainted the Company's entire purported sales process.

114.    The Merger Proxy also omitted and/or misrepresented material information about the intrinsic value of the Company, which made it more likely that Bowl America's minority stockholders were misled into voting in favor of the Merger without that material information

regarding the critical decision they face.  In particular, the Merger Proxy failed to disclose any basis for the Board accepting an offer at a substantial discount to the Company's market price, failed to address or consider the Company's most valuable asset – its real estate holdings – and failed to provide minority stockholders with any estimates of future revenues, earnings and cash flows, all critical measures of the Company's value.  The Merger Proxy further provided no analysis of the financial impact of any possible capital improvement program and no analysis of Bowl America as a stand-alone company and the impact on its dividend.

115.    Without disclosure of the foregoing material information, Bowl America's minority shareholders are unable to assess whether the Board's recommendation, including D&P's financial analyses, which supported its Opinion, sufficiently valued the Company's intrinsic value.

116.    These omissions render the information concerning the financial analysis provided by D&P as contained in the Merger Proxy materially misleading.

117.    Moreover, the statements in the Merger Proxy contradicted the Company's representations in its SEC filings, including its annual Form 10-Ks.  For example, from 2017-2019, the Company's Form 10-Ks repeatedly represented that "A portion of earnings has consistently been invested to create a reserve to protect the Company during downturns in business, to capitalize on opportunities for expansions and modernization, to provide a secure source of income and to provide a predictable return to its owners."  Indeed, in light of the Company's prior representations in its Form 10-Ks that is had consistently invested to modernize its facilities, and that it had sufficient reserves to weather business downturns, the Merger Proxy's supposed justification for the Board's approval of the Merger related to this point is misleading.

118.    The Merger Proxy is misleading related to a possible reduction in the dividend because neither the Board nor D&P prepared any projections on which to base this assessment.  In

fact, the Merger Proxy admitted that "Company's management does not regularly prepare financial projections," and "Company did not provide or prepare, or assist any prospective purchaser (including [Bowlero]) in preparing, any financial projections in connection with the merger because the Company has no long term contracts or purchase orders as its performance depends primarily on revenue from promotional, league and open play bowling." Thus, the Board admittedly had no basis for determining an objectively fair value for the Company.

119.    Moreover, the Board could not adequately evaluate the Company's prospects as a stand-alone company, its ability to make capital improvements, or the expected return on investments for those improvements, and the impact on dividend payments without making financial projections. The Merger Proxy was devoid of any financial projections, depriving Plaintiffs and fellow minority shareholders of the right to make an informed decision their votes related to the sale of the Company. Nor did D&P's opinion include any such analysis.

120.    Indeed, the Merger Proxy conceded that D&P "did not receive any financial forecasts or other financial projections from the Company." Instead, Bowl America's "management from time to time provided general guidance on the internal estimates necessary to bring the Company's centers into better operating condition and the general near-term operating conditions of the Company" to D&P. The Merger Proxy then highlighted that due to the Company's lack of projections, D & P "was unable to use a discounted cash flow analysis to derive a value indication." Notably, a discounted cash flow analysis represents a standard way in the M&A setting to determine the value of a company by computing the present value of cash flows over the life of the company. Typically, a Merger Proxy discloses the Company's discounted cash flow analysis, which is material information that shareholders evaluate when determining how to vote on a deal.

41

121.    In addition, Bowl America owned its own facilities and had a strong balance sheet with no debt and liquid securities.  The Board failed to mention any communications with banks, lenders, or other sources of capital or to provide any basis for the representation that it would be difficult to obtain financing purportedly necessary to make capital improvements.  This stunning lack of detail suggests that the Board made this representation while making no effort to determine whether it was true.

122.    The Board blindly accepted D&P's Opinion without providing any substantiation for its accuracy.  Upon information and belief, the peer groups used by D&P for its analysis includes companies that own little or no unencumbered real estate.  The Merger Proxy and Opinion did not describe how or why these companies were selected, which deprived the minority shareholders from assessing the credibility of D&P's analysis.

**G.    Bowlero and D&P Aided and Abetted the Board and the Controlling Stockholders in Breaching Their Fiduciary Duties.**

123.    In furtherance of the Controlling Stockholders' goal to liquidate their majority position through the sale of the entire Company, the Board engaged D&P to ostensibly explore "strategic alternatives," which purportedly included continuing to operate Bowl America as a stand-alone company.  The use of the term "strategic alternatives" is pretextual, as the Board dominated by the Controlling Stockholders never seriously pursued anything, but a sale of the entire Company, violating their fiduciary duties to the Company's minority stockholders.  Moreover, D&P was well aware that it was working to fulfill the goals of the Controlling Stockholders, who were also Bowl America directors, to cash out their majority interest through the sale of the whole Company, even at a massive and unfair discount, so that they could also simultaneously retire from the Bowl America's director positions.

42

124.    Despite the unprecedented conditions of the COVID-19 pandemic, which had temporarily adversely impacted Bowl America's operations, along with the Company's stock price, D&P found a willing buyer (and another client), Bowlero, which presented an unfair offer. In order to be handsomely compensated, D&P only needed to conclude that Bowlero's offer was fair.  D&P set out with the objective of finding that the Merger's price was fair and selectively chose what information and data could be relied upon to achieve that goal for the Board that was working to fulfill its Controlling Stockholders' desire to cash out of their majority position through the sale of the entire Company, and then everyone on the aging Bowl America Board could also retire.  In the process, D&P failed to consider assets or employ other methods of valuation that would objectively show that the Merger is patently unfair.  Moreover, D&P knowingly made these choices to facilitate the improper sale of the Company at a massive discount to accomplish the Board's and the Company's Controlling Stockholders' mutual goal of liquidating their substantial stock holdings through the sale of the entire Company and retiring from the Bowl America positions shortly thereafter.

125.    Bowlero further knowingly helped to facilitate the unlawful Merger.  In this regard, Bowlero was Bowl America's biggest rival, and its management knew that the Bowl America's Board, in breach of its fiduciary duties, had abandoned their responsibilities to run the Company for the long-term.  For example, Bowlero knew that Bowl America's Board had not taken action to search for a permanent CEO to replace Goldberg (and Dragoo), in light of the obvious need for a new senior management team.  Moreover, Bowlero had a history of buying its rivals at discount prices, like AMF Bowling Centers, which it bought out of bankruptcy.  Bowlero, thus, followed its usual strategy by submitting an extremely lowball offer to acquire Bowl America at a time when the COVID-19 pandemic had temporarily closed its facilities and Bowl America's Controlling

Stockholders were eager to sell.  With D&P's facilitation and with almost no negotiation, the Board accepted Bowlero's offer of wholly unfair consideration to purchase the entire Company.  In addition, Bowlero then insisted upon terms in the merger agreement, to which the Bowl America Board readily agreed, including provisions such as an onerous 11.7% breakup fee, no-shop provisions, and a voting agreement that assured the Merger would be approved by the Controlling Stockholders.  The parties further conspired to oppress the minority stockholders' interests by failing to provide them (in the merger agreement) with the ability to vote their shares to stop the Merger through a majority of the minority provision.  As a result of Bowlero's work with D&P and Bowl America's Board to harm the Company's minority stockholders' interests by forcing through an unfair deal through the Controlling Stockholders' voting power while also completely foreclosing the Board from soliciting or negotiating a better offer, Bowlero thereby aided and abetted the Board members breach their common law and statutory fiduciary duties.

## CLASS ACTION ALLEGATIONS

126.    Plaintiffs repeat and reallege the paragraphs set forth above as if fully set forth herein.

127.    Plaintiffs bring this action individually and as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure on their own behalf and as a class action on behalf of all holders of Bowl America Class A stock whom, as of May 27, 2021, are entitled to vote on the Merger, and their successors in interest (the "Class").  Excluded from the Class are the Defendants named herein, their family members, heirs, and any person, firm, trust, corporation, or other entity related to, or affiliated with, any of the Defendants.

128.    This action is properly maintainable as a class action.

129.     The Class is so numerous that joinder of all members is impracticable.  As of May 27, 2021, there were 3,746,454 shares of Bowl America's Class A stock outstanding, most of which are held by the Company's minority shareholders.  Upon information and belief, there are over 700 members of the Class.

130.     There are questions of law and fact that are common to the Class, including, but not limited to:

      a.      Whether the Director Defendants breached their fiduciary duties of loyalty, good faith and/or due care with respect to Plaintiffs and other members of the Class in connection with the Merger;

      b.      Whether the Merger is entirely fair to the Class;

      c.      Whether the Director Defendants, in bad faith and for improper motives, agreed to sell the Company at a discount to its market and intrinsic value, and then impeded or erected barriers designed to discourage other potentially interested parties from making an offer to acquire the Company or its assets;

      d.      Whether Defendants D&P and Bowlero aided and abetted any of the other Defendants' breaches of fiduciary duties owed to Plaintiffs and the other members of the Class in connection with the Merger;

      e.      Whether Defendants made materially false and misleading statements in or omitted material information from the Merger Proxy; and

      f.      Whether Plaintiffs and the other members of the Class are entitled to damages as a result of Defendants' misconduct.

131.     Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.  Plaintiffs' claims are typical of claims of the other members of the Class, and Plaintiffs have the same interests as the other members of the Class. All members of the Class have suffered the same harm.

132.     Defendants caused the same harm and damages to the Class through their material misrepresentations and breaches of fiduciary duty.

133.    Accordingly, Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.

134.    The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudications with respect to the individual Class members that would establish incompatible standards of conduct for Defendants.  Adjudications with respect to individual Class members would, as a practical matter, be dispositive, or would substantially impair the interests of the Class members.

135.    The questions of law and fact common to the members of the Class predominate over any questions affecting only its individual members, such that a class action is superior to any other available method for fairly and efficiently adjudicating the controversy.

<u>**COUNT I**</u>
**Violation of Section 14(a) and Rule 14a-9**
**of the Securities and Exchange Act of 1934**
**(Against Bowl America and the Director Defendants)**

136.    Plaintiffs repeat and reallege the paragraphs set forth above as if fully set forth herein.

137.    Section 14(a) of the Exchange Act, 15 U.S.C. §78n (a), prohibits any person soliciting a proxy from doing so "in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

138.    SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to §14(a) of the 1934 Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact

necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

139.    Director Defendants prepared, reviewed and/or disseminated the false and misleading Merger Proxy which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  As stated herein, the Merger Proxy misrepresented and/or omitted material facts, including material information about the unfair consideration offered in the Merger and during the Company's sales process, the actual intrinsic value of the Company, the flawed and unfair sales process orchestrated by Defendants, and the conflicts of interest that burdened the process.

140.    The omissions and false and misleading statements made by Defendants in the Merger Proxy constitute violations of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder, because such statements are materially false and/or misleading and were provided in at least a negligent manner.  By virtue of their positions within the Company and/or roles in the process and in the preparation of the Merger Proxy, the Director Defendants were aware of this information and of their duty to disclose this information to the Company's minority stockholders.

141.    The omissions and false and misleading statements in the Merger Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote on the Merger.  In addition, a reasonable investor would view a full and accurate disclosure as having significantly altered the "total mix" of information made available in the Merger Proxy and in other information reasonably available to shareholders.

142.    By reason of the misconduct detailed herein, Plaintiffs have been damaged.  Bowl America and the Director Defendants are liable pursuant to §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.

## COUNT II
### Violation of Section 20(a) of the
### Securities and Exchange Act of 1934
### (Against the Director Defendants)

143.    Plaintiffs repeat and reallege the paragraphs set forth above as if fully set forth herein.

144.    The Director Defendants acted as controlling persons of Bowl America within the meaning of §20(a) of the 1934 Act.

145.    By virtue of their positions as officers and/or directors and/or controlling shareholders of Bowl America, and/or their participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Merger Proxy filed with the SEC, the Director Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.

146.    Each of the Director Defendants were provided with or had unlimited access to copies of the Merger Proxy and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

147.    The Merger Proxy details the Director Defendants' involvement in negotiating, reviewing and approving the merger and preparation of the Merger Proxy.

148.    The Merger Proxy contains the recommendation or authorization of each of the Director Defendants to approve the Merger.  They were thus directly involved in the making of this document.

149.    By reason of such conduct, Plaintiffs have been damaged.  The Director Defendants are liable pursuant to §20(a) of the 1934 Act.

4846-8005-5540, v. 1

<u>COUNT III</u>
**Breach of Fiduciary Duties**
**(Against the Director Defendants and the Controlling Stockholders)**

150.    Plaintiffs repeat and reallege the paragraphs set forth above as if fully set forth herein.

151.    The Director Defendants and the Controlling Stockholders stand in a fiduciary relationship to the Company, Plaintiffs, and other similarly situated shareholders in the context of the sale of Bowl America.  This fiduciary relationship imposes the common law duties of care, loyalty, candor, and good faith on the Director Defendants in the management and administration of the affairs of Bowl America and in the use and preservation of Bowl America's property and assets.  In addition, the fiduciary relationship between the Controlling Stockholders and the Company's minority stockholders, like Plaintiffs and the class, prohibited the Controlling Stockholders from using their voting power for an ulterior purpose adverse to the interests of the corporation and its minority stockholders.

152.    To fulfill their fiduciary duties, the Director Defendants must perform their acts in good faith, in a manner that is in the best interest of the corporation, with the care that an ordinarily prudent person in a like position would use under similar circumstances, and in a manner that maximizes shareholder value.

153.    To fulfill their fiduciary duties, the Director Defendants must, in the event of a proposed sale or merger, maximize shareholder value.  The Director Defendants cannot place their own personal self-interests or the interests of the Controlling Stockholders above the interests of the Company's minority shareholders.

154.    Based upon the actions and conduct set forth in this Complaint, including, but not limited to, agreeing to a sales price that was inadequate and unfair to Plaintiffs and Class members,

4846-8005-5540, v. 1

derived from incomplete data, and resulted from a grossly inadequate flawed and conflicted process, the Director Defendants, who were dominated by the Controlling Stockholders, have breached their fiduciary duty to the Company, Plaintiffs, and other similarly situated shareholders.

155.    The Director Defendants each had a fiduciary obligation to disclose all material information to Plaintiffs and the Class concerning the Merger.  The Director Defendants failed to adequately discharge their responsibility.

156.    Separately, the Controlling Stockholders (i.e., Defendants Macklin, Hull and Fabian) violated their fiduciary duties to the Class by using their Board positions to force the Company to run an expensive sales process at the most inopportune time – during the middle of a global pandemic – to satisfy their personal desire to liquidate their majority equity position in the Company through the sale of the whole Company, and then further used those Board positions to approve the self-dealing Merger for their own self-interests and at the expense of minority stockholders.

157.    Director Defendants and the Controlling Stockholders are directly liable to the Company's minority shareholders for their breach of fiduciary duties.

158.    As a result of the breaches of their fiduciary duties by the Director Defendants and the Controlling Stockholders, Plaintiffs and other similarly situated shareholders have been harmed and continue to be harmed in that they did not receive fair and adequate consideration for their Bowl America Class A stock.

## <u>COUNT IV</u>
### Breach of Md. Code Ann, Corp. & Ass'ns § 2-405.1(a)
### (Against the Director Defendants)

159.    Plaintiffs repeat and reallege the paragraphs set forth above as if fully set forth herein.

160.    Director Defendants owed the Company, Plaintiffs, and other similarly situated shareholders statutory fiduciary duties as set forth in Md. Code Ann., Corp. & Ass'ns § 2-405.1. Specifically, Section 2-405(c) states that "A director of a corporation shall act: (1) In good faith; (2) In a manner the director reasonably believes to be in the best interests of the corporation; and (3) With the care that an ordinarily prudent person in a like position would use under similar circumstances."

161.    Based upon the actions and conduct set forth in this Complaint, including, but not limited to, agreeing to a sale price that was inadequate and unfair to Plaintiffs and Class members, derived from incomplete data, and resulted from a grossly inadequate flawed and conflicted process driven by the Controlling Stockholders' personal desire to liquidate their majority position through the sale of the entire Company, the Director Defendants have breached their fiduciary duty to the Company, Plaintiffs, and other similarly situated shareholders.

162.    The Director Defendants are directly liable to shareholders for breach of fiduciary duties.

163.    As a result of the Director Defendants' breach of their fiduciary duties, Plaintiffs and other similarly situated shareholders have been harmed and continue to be harmed in that they did not receive fair and adequate consideration for their Bowl America Class A stock.

### COUNT V
**Against Bowlero for Aiding and Abetting the**
**Director Defendants' Breaches of Fiduciary Duty**

164.    Plaintiffs repeat and reallege the paragraphs set forth above as if fully set forth herein.

165.    The Director Defendants owed and owe fiduciary duties to the Company, which they breached for the reasons alleged herein.

166.    Bowlero was aware of the Director Defendants' fiduciary status.

167.    Bowlero knowingly aided and abetted, and provided substantial assistance to, the Director Defendants' in breaching their fiduciary duties to Class members by, among other things, entering into an unfair merger that included preclusive deal protections, and filing a false and misleading Merger Proxy.  In addition, Bowlero entered into voting agreements with certain of the Controlling Stockholders, who also served as Bowl America directors, to ensure the Merger was *a fait accompli*.

168.    By providing substantial assistance in the Director Defendants' breaches of fiduciary duties, including acting in concert with D&P, consummation of the Merger allowed Bowlero to acquire Bowl America at a grossly inadequate price that was far below its value, which caused Plaintiffs and other similarly situated public shareholders to sustain significant damages.

### COUNT VI
**Against D&P for Aiding and Abetting the
Board of Directors Breaches of Fiduciary Duty**

169.    Plaintiffs repeat and reallege the paragraphs set forth above as if fully set forth herein.

170.    Director Defendants owed and owe fiduciary duties to the Company, which they breached for the reasons alleged herein.

171.    D&P was aware of the Director Defendants' fiduciary status.

172.    D&P knowingly aided and abetted, and provided substantial assistance to, the Director Defendants' filing of a false and misleading Merger Proxy, which was in violation of the Board of Directors' fiduciary duties to the Company, and the other breaches of fiduciary duties by the Director Defendants made throughout the Company's tainted sales process, which was

designed to fulfill the Controlling Stockholders' goal to cash out of the majority position through a sale of the entire Company– even at a massively unfair discount, like the Merger.

173.    By providing substantial assistance in the Board's filing of a false and misleading Merger Proxy and its other breaches of fiduciary duties, the Merger was consummated, which allowed Bowlero to acquire Bowl America at a grossly inadequate price that is far below market value, causing Plaintiffs and other similarly situated public shareholders to sustain certain and significant damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment as follows:

A.    certifying the Class as set forth herein and designating Plaintiffs as the representatives thereof;

B.    declaring the Merger Proxy materially false and misleading in violation of Section 14(a) of the Securities and Exchange Act of 1934 and Rule 14a-9;

C.    finding that the Director Defendants violated Section 20(a) of the Securities and Exchange Act of 1934;

D.    finding that the Director Defendants and the Controlling Stockholders breached their fiduciary duties under Maryland common and statutory law;

E.    finding that D&P and Bowlero aided and abetted the Director Defendants' breaches of fiduciary duties owed to the Company and its minority stockholders,

F.    awarding Plaintiffs and the Class damages sustained as a result of Defendants' unlawful conduct for its violations of federal securities laws and Maryland state law;

G.    awarding Plaintiffs their reasonable attorneys' fees, expenses, expert fees and costs; and

H.    Such other and further relief as the Court deems just and equitable.

4846-8005-5540, v. 1

Dated: June 21, 2022

Respectfully submitted,

**COHEN MILSTEIN SELLERS & TOLL PLLC**

*/s/ Daniel S. Sommers*

DANIEL S. SOMMERS (Bar No. 15822)
1100 New York Ave. NW, Fifth Floor
Washington, D.C. 20005
Telephone: 202-408-4600
Fax: 202- 408-4699
Email:   dsommers@cohenmilstein.com

RICHARD A. SPEIRS (pro hac vice)
AMY MILLER (pro hac vice)
88 Pine Street, 14ᵗʰ Floor
New York, NY 10005
Phone: 212-838-7797
Fax: 212-838-7745
Email:   rspeirs@cohenmillstein.com
         amiller@cohenmillstein.com
*Counsel for Plaintiffs*

**KOHRMAN JACKSON & KRANTZ LLP**

BRETT S. KRANTZ (pro hac vice)
DEREK P. HARTMAN (pro hac vice )
One Cleveland Center, 29th Floor
1375 East Ninth Street
Cleveland, Ohio 44114
Phone: 216-696-8700
Fax: 216-621-6536
Email: bk@kjk.com; mdr@kjk.com; dph@kjk.com
*Co-Counsel for Plaintiffs*

## JURY DEMAND

Plaintiffs respectfully demands a trial by jury pursuant to Fed. R. Civ. P. 38.

*/s/ Daniel S. Sommers*

4846-8005-5540, v. 1

**CERTIFICATE OF SERVICE**

I hereby certify that on June 21, 2022, I electronically filed the foregoing with the Clerk of the Court using the ECF which sent notification of such filing to all parties of record.

/s/ *Daniel S. Sommers*
Daniel S. Sommers

4846-8005-5540, v. 1