## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| SHERYL COHEN FINE, *et al.*, <br><br> Individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> BOWL AMERICA, INC., *et al.*, <br><br> Defendants. | Case No. 1:21-cv-01967-SAG <br><br> **REDACTED** |

## MEMORANDUM OF LAW IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF
## DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

Benjamin D. Schuman (Bar No. 28829)
Meagan M. Pace (Bar No. 20765)
Alexa P. Ain (Bar No. 30563)
DLA Piper LLP (US)
650 S. Exeter St., Suite 1100
Baltimore, Maryland 21202
(410) 580-3000
ben.schuman@dlapiper.com
meagan.pace@dlapiper.com
alexa.ain@dlapiper.com

Jarren N. Ginsburg (Bar No. 19688)
Foley & Lardner LLP
3000 K Street NW, Ste 600
Washington, DC 20007
(202) 672-5300
jginsburg@foley.com

John A. Tucker (admitted *pro hac vice*)
Foley & Lardner LLP
One Independent Drive, Suite 1300
Jacksonville, FL 32202-5017
(904) 359-2000
jtucker@foley.com

Jonathan H. Friedman (admitted *pro hac vice*)
Foley & Lardner LLP
90 Park Avenue
New York, NY 10016
(212) 682-7474
jfriedman@foley.com

*Counsel for Defendants*

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

RELEVANT FACTUAL BACKGROUND.........................................................................3

   A.   Background of Bowl America and the Director Defendants .............................3

   B.   The Board Considered Strategic Alternatives Through the Years ...................5

   C.   The Board Begins an Exhaustive Sale Process In 2019 ...................................6

   D.   The Board and Transaction Committee Remain Personally Engaged in the Sale Process with the Assistance of D&P ................................................................8

   E.   The COVID-19 Pandemic Causes the Board and its Advisors to Pause the Sale Process ...................................................................................................................9

   F.   Despite the Paused Sale Process, Sale Activity Continues in the Summer and Fall of 2020................................................................................................................12

   G.   Bowlero and a New Bidder Re-Engage in the Sale Process in Late 2020....................13

   H.   Bowl America Obtains "Best and Final" Bids and Proceeds with an Exclusive Transaction Process with Bowlero ................................................................14

   I.   The Board's Advisors Negotiate the Terms of the Merger Agreement with Bowlero...15

LEGAL STANDARD ...........................................................................................................20

ARGUMENT .........................................................................................................................21

   I.   The Court Should Deny PlaintiffS' Motion for Summary Judgment ........................22

      A.   Genuine Issues of Material Fact Exist Regarding the Reasonableness of Defendants' Approval of the Termination Fee .......................................................24

      B.   The Propriety of a Termination Fee Is Based on The Facts and Circumstances Facing Directors, not a Bright Line Test Based Solely on the Fee Percentage......29

   II.   The Court Should Grant Defendants' Cross-Motion for Summary Judgment...........33

      A.   Plaintiffs' Claims Against the Director Defendants Are Exculpated by the Company's Charter ...................................................................................................33

         1.   There is No Evidence that the Defendants Received an Improper Benefit Through the Sale Process................................................................................35

         2.   There is No Evidence that the Defendants Acted with Active and Deliberate Dishonesty During the Sale Process ...........................................................36

      B.   The Defendants' Approval of the Termination Fee is Protected by the Business Judgment Rule ........................................................................................................37

CONCLUSION.......................................................................................................................40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Comverge, Inc.*,
    No. CV-7368-VCP, 2014 WL 6686570 (Del. Ch. Nov. 25, 2014) .......................................30

*Courtney-Pope v. Bd. of Educ. of Carroll Cnty.*,
    304 F. Supp. 3d 480 (D. Md. 2018) ...............................................................................21

*Frederick v. Corcoran*,
    No. 370685, 2013 WL 10069700 (Md. Cir. Ct. Aug. 15, 2013) (Rubin, J.) ..........................24

*Golden Cycle, LLC v. Allan*,
    No. CIV.A.16301, 1998 WL 892631 (Del. Ch. Dec. 10, 1998) .............................................30

*Goldstein v. Berman*,
    No. 12-2507, 2014 WL 824050 (D. Md. Feb. 28, 2014) (Quarles, Jr., J.) ............................37

*Green v. The Wills Grp., Inc.*,
    161 F. Supp. 2d 618 (D. Md. 2001) ...............................................................................24

*Grill v. Hoblitzell*,
    771 F. Supp. 709 (D. Md. 1991) (Motz, J.) ................................................................35, 38

*Hayes v. Crown Cent. Petroleum Corp.*,
    78 F. App'x 857 (4th Cir. 2003) ...................................................................................37

*Jasinover v. Rouse Co.*,
    No. 13-C-04-59594, 2004 WL 3135516 (Md. Cir. Ct. Nov. 4, 2004)
    (Sweeney, J.).............................................................................................................24

*Jolly Roger Fund LP v. Sizeler Prop. Inv., Inc.*,
    No. 05-841, 2005 WL 2989343 (D. Md. Nov. 3, 2005) (Bennett, J.) .....................................24

*Lyons v. Shoppers Food Warehouse Corp.*,
    No. 16-3322, 2017 WL 3129391 (D. Md. July 24, 2017) (Gallagher, J.) ...............................29

*Minter v. Wells Fargo Bank, N.A.*,
    593 F. Supp. 2d 788 (D. Md. 2009) ...............................................................................21

*In re Nationwide Health Props., Inc.*,
    No. 24-C-11-001476, 2011 WL 10603183 (Md. Cir. Ct. May 27, 2011)
    (Berger, J.) ...........................................................................................................24, 39

*Phelps Dodge Corp. v. Cyprus Amax Mins. Co.*,
    No. CIV.A.17383, 1999 WL 1054255, at *2 (Del. Ch. Sept. 27, 1999)...........................26, 30

*Ret. Sys. v. Crawford*,
    918 A.2d 1172 (Del. Ch. 2007)...............................................................................30, 31

*In re Terra Indus., Inc. S'holder Litig.*,
    No. 24-C-10-001302, 2010 WL 5412283 (Md. Cir. Ct. July 14, 2010)
    (Cannon, J.)...............................................................................24, 35, 37, 38

*In re Toys "R" Us, Inc. S'holder Litig.*,
    877 A.2d 975 (Del. Ch. 2005)...............................................................................23, 31, 32

*Weisner v. Liberty Life Assurance Co. of Bos.*,
    192 F. Supp. 3d 601 (D. Md. 2016)...............................................................................21

*Wiebe v. Nat'l Sec. Agency*,
    No. 11-3245, 2012 WL 4069746 (D. Md. Sept. 14, 2012) (Bennett, J.)................................25

*Witchko v. Schorsch*,
    No. 15-CIV-6043, 2016 WL 3887289 (S.D.N.Y. June 9, 2016)......................................35, 38

*Wittman v. Crooke*,
    120 Md. App. 369 (1998)...............................................................................39

*Zucker v. Bowl America, Inc.*,
    No. 21-1967, 2022 WL 7050991 (D. Md. Oct. 11, 2022) (Gallagher, J.)...............................35

**Statutes**

Md. Code, Corps. & Ass'ns § 2-405.1...............................................................................3, 28, 39

Md. Code, Corps. & Ass'ns § 2-405.2...............................................................................34

Md. Code, Cts. & Jud. Proc. § 5-418(a)...............................................................................3, 34

**Rules**

Fed. R. Civ. P. 56...............................................................................1, 21

**Other Authorities**

*About Bowlero Corp*, BOWLEROCORP, https://www.bowlerocorp.com/about-
    bowlerocorp (last visited Feb. 27, 2024)...............................................................................7

█████████████████████████████████████████████████████

*Anita Zucker*, FORBES, https://www.forbes.com/...............................................................................8

*CDC Museum COVID-19 Timeline*, CENTERS FOR DISEASE CONTROL AND
PREVENTION, https://www.cdc.gov/museum/timeline/covid19.html (last
visited Jan. 17, 2024) ..................................................................................................9

James J. Hanks, Jr., MARYLAND CORPORATION LAW § 6.6[b] (2018 Supp.) ..............28, 35, 39, 40

Bowl America, Inc., Annual Report (Form 10-K) (Sept. 24, 2020), UNITED
STATES SECURITIES AND EXCHANGE COMMISSION,
http://edgar.secdatabase.com/2835/ 143774920020178/filing-main.htm (last
visited Feb. 27, 2024)....................................................................................................10

WORLD HEALTH ORGANIZATION, https://covid19.who.int/region/amro/country/us
(last visited Jan. 17, 2024) ......................................................................................9, 10

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants Cheryl A. Dragoo, Allan L. Sher,[1] Merle Fabian, Gloria M. Bragg, and Nancy E. Hull (the "Director Defendants" or "Defendants") respectfully submit this memorandum in opposition to Plaintiffs' Motion for Summary Judgment ("Motion")[2] and in support of their Cross-Motion for Summary Judgment.

## INTRODUCTION

This case arises out of the 2021 acquisition of Bowl America, Inc. ("Bowl America" or the "Company") by Bowlero Corporation ("Bowlero") for a purchase price of $44 million plus a special dividend of $0.60 per share, representing total consideration to stockholders of approximately $47.1 million. Courts are hesitant to second-guess the complex business decisions made by boards of directors, and Plaintiffs' fiduciary duty claim represents precisely the sort of Monday-morning-quarterbacking that courts generally do not entertain. Bowl America's directors succeeded in selling the Company after an exhaustive two-year sale process – interrupted by a global pandemic – for a price higher than the value calculated by the Company's financial advisor in its fairness opinion. Nevertheless, Plaintiffs claim that the Defendants violated their fiduciary duties by agreeing to an allegedly unreasonable termination fee provision in the merger agreement. Plaintiffs assert that the termination fee may have chilled other bidders, despite the fact that 132 potential bidders were contacted during the two-year sale process and no higher bidder had been identified. In exercising their business judgment, directors must grapple with competing factors, and must weigh the likelihood of downsides like termination fees against factors like deal certainty and other benefits. Plaintiffs' attempt to insert their own judgment into the board room should be rejected, and deference should be given to Defendants' business judgment.

---

[1] Mr. Sher died on June 26, 2022. ECF No. 37. As of the date of this motion, Plaintiffs have taken no action to dismiss the decedent or attempt to substitute any party for the decedent. Mr. Sher is included in this memorandum for the sake of completeness pending resolution of his role in this action.

[2] All citations to Plaintiffs' Motion for Summary Judgment (ECF No. 127) are in the form "Mot. at __."

Plaintiffs' Motion should be denied because material facts are disputed, which precludes a finding that Defendants breached their duties as a matter of law.  To the contrary, Defendants acted consistent with their fiduciary duties.  Nevertheless, notwithstanding Plaintiffs' selective cherry-picking of the record, numerous disputes of material fact prevent the Court from determining at summary judgment that Defendants failed to act reasonably and in the best interests of the Company when approving the termination fee.  Courts have held that approval of a termination fee provision must be viewed in light of all relevant facts and circumstances, and no bright-line percentage exists above which a fee is unreasonable.  This is a highly fact-intensive inquiry, and thus Plaintiffs' Motion should be denied.  In addition, Plaintiffs' Motion should be denied because it wholly fails to address and overcome Defendants' affirmative defenses related to the Company's exculpatory provision and their broad discretion under the business judgment rule which ground Defendants' cross-motion for summary judgment.

Defendants' cross-motion for summary judgment, however, should be granted because Plaintiffs cannot present facts sufficient to (a) prevent application of the exculpation provision in the Company's charter, which limits directors' liability except in narrow circumstances not found here, or (b) rebut the business judgment rule, pursuant to which directors are presumed to act consistent with their fiduciary duties.  Unlike Plaintiffs' Motion, the Court need not address the reasonableness of the termination fee in deciding Defendants' motion.  First, pursuant to the exculpation clause in the Company's charter and Maryland statute, *even if the Defendants arguably breached their fiduciary duties*, which they did not, Plaintiffs' claims are barred unless Plaintiffs can adduce evidence that the Defendants received "an improper benefit or profit in money, property, or services" or acted with "active and deliberate dishonesty."  Md. Code, Cts. & Jud. Proc. § 5-418(a).  Discovery is complete and the record is uncontroverted that Defendants received

no improper benefit nor acted dishonestly when approving the merger and termination fee. As such, Defendants are entitled to summary judgment as a matter of law.

Second, the statutory business judgment rule protects Defendants in their role as directors and entitles them to a presumption that they acted consistent with their fiduciary duties. Md. Code, Corps. & Ass'ns § 2-405.1(g). Plaintiffs may rebut this presumption only by showing fraud, self-dealing, or unconscionable conduct. Again, no such evidence exists. To the contrary, the evidence establishes that Defendants engaged in a thorough and exhaustive sale process over a two-year period, guided by financial and legal advisors upon whom they reasonably relied, and at the conclusion of this process, obtained the best deal available for Bowl America stockholders. Under these circumstances, and absent evidence of fraud, self-dealing, or unconscionable conduct, whether the Defendants were right or wrong to accept the termination fee is irrelevant to the issue of Defendants' liability under the business judgment rule analysis. All that matters – and controls as a matter of law – is the statutory presumption that Defendants acted in compliance with their fiduciary duties. By reason of this presumption, which Plaintiffs have not rebutted, Defendants are entitled to summary judgment as a matter of law.

## RELEVANT FACTUAL BACKGROUND

### A.  Background of Bowl America and the Director Defendants

The Director Defendants were all intimately involved with Bowl America for many years and brought varied expertise and experience to their director roles. Cheryl Dragoo started working for Bowl America in 1972 at one of its bowling centers and worked in "pretty much every position" in the finance and accounting department until becoming the Company's CFO. *See* Ex. 1,

Transcript of Deposition of Cheryl Dragoo dated June 20, 2023 ("Dragoo Tr."), 16.[3]  She later became the Company's president in October 2019.  *Id.* at 16-18, 29.

Merle Fabian is the daughter of Bowl America founder Edward Goldberg and sister of its long-time CEO, Leslie Goldberg.  *See* Ex. 2, Transcript of Deposition of Merle Fabian, dated June 27, 2023 ("Fabian Tr."), 26, 47.  She made a career as a librarian in management roles at various institutions, but also grew up in the Company's bowling centers and has been familiar with the business since she was two years old.  *Id.* at 22-23, 37, 47.  As she describes it, Bowl America was "[her] life."  *Id.* at 37.  She joined the board of directors ("Board") at her brother's request in 1990 after her father passed away.  *Id.* at 19-23, 26, 37.

Nancy Hull is a descendant of another Bowl America founder, Howard Katzman, and, as a member of the Board, represented the Katzman family stockholders' interests.  *Id.* at 50; Ex. 3, Transcript of Deposition of Nancy Hull, dated June 28, 2023 ("Hull Tr."), 21-22.  Ms. Hull has a bachelor's degree in consumer economics, a master's degree in health care administration, ran a nursing home for nearly a decade in the 1990s and, for the last 18 years, has run her own business, which provides accounting services to small businesses.  *Id.* at 17-18, 34-35.  Ms. Hull joined the Board in 2014 after her uncle Stan Katzman passed away.  *Id.* at 21, 34-35.

Gloria Bragg was the newest member of the Board, having joined in September 2020 when the sale process was already underway.  Ex. 4, Transcript of Deposition of Gloria Bragg, dated June 21, 2023 ("Bragg Tr."), 13-14.  Prior to joining the Board, Ms. Bragg had nearly thirty years of commercial banking experience, had been Bowl America's commercial banker at BB&T for several years, and knew the Company's finances well.  *Id.* at 9-10, 13-15.

---

[3] All Exhibits to the Schuman Declaration are cited herein as "Ex. __".  Documents with citations to four-digit page numbers signify the Bates number of the specific page to which Defendants reference.

Allan Sher was also a member of the Board for decades and a veteran of the financial industry, having served as the Executive Vice President of Merrill Lynch and Vice Chairman of Drexel, Burnam, and Lambert.  Ex. 5, Bowl America, Inc., Proxy Statement ("Proxy") at 13.

**B.     The Board Considered Strategic Alternatives Through the Years**

Throughout its history, Bowl America's Board and management were approached from time to time by parties either interested in purchasing the business or, more often, purchasing certain real estate locations where the Company operated its bowling centers.  Ex. 3, Hull Tr., 59 ("[A]t board meetings, Les would bring up opportunities that came our way since I became a board member….Those were part of the board discussion….Over the years, [the opportunities were] mostly real estate."); Ex. 6, Transcript of Deposition of Brett Parker dated October 10, 2023 ("Parker Tr."), 23 ("We had spoken to them over the years about being interested in buying the business…").  The Board concluded each time not to sell.  Ex. 5, Proxy at 12; Ex. 1, Dragoo Tr., 219.

In 2018, the Board decided to consider more formally its strategic options for the future, including whether to sell the Company or its real estate, or to invest substantial monies into the business to modernize its facilities and business operations.  Ex. 1, Dragoo Tr., 50-51.

To assist in this process, the Board interviewed two investment banking firms, PJ Solomon and Duff & Phelps Securities LLC ("D&P"), in early 2019.  *Id.* at 50, 80-81; Ex. 7, March 28, 2019 Special Meeting Minutes.  On May 7, 2019, the Board engaged D&P based on its extensive experience and knowledge of the industry.  Ex. 8, D&P's Engagement Letter; Ex. 7; Ex. 5, Proxy at 13; Ex. 1, Dragoo Tr., 97; Ex. 2, Fabian Tr., 69.  Notably, both D&P and PJ Solomon told the Board in their early-2019 interviews that they estimated that the Company would sell for approximately $8 to $9 per share.  Ex. 1, Dragoo Tr., 115 ("A. [D&P] expected between $8 and $9 a share.  Q. And it sold right between that number, correct?  A. Yes, it did."); Ex. 3, Hull Tr.,

152-53 ("I do recall that they talked about a price per share…[of] eight to nine dollars a share."); Ex. 9, Transcript of Deposition of Duff & Phelps (Christopher Janssen) dated October 11, 2023 ("Janssen Tr."), 31 (stating that the "range of enterprise values" given during D&P's pitch was "approximately 30 million to 40 million").

Shortly thereafter, the Board created a Transaction Committee made up of Ms. Dragoo and Mr. Sher.  Ms. Dragoo was selected because of her intimate knowledge of the Company's operations, and Mr. Sher was selected because of his M&A experience as a former Executive Vice President of Merrill Lynch and Vice Chairman of Drexel, Burnam, and Lambert.  Ex. 5, Proxy at 12; Ex. 1, Dragoo Tr., 53.  They also were considered "the most independent of the directors" because they were "not major shareholders."  Ex. 1, Dragoo Tr., 118.

## C.    The Board Begins an Exhaustive Sale Process In 2019

From May to October 2019, D&P conducted diligence and prepared to market the Company.  Ex. 5, Proxy at 12; Ex. 10, D&P Project Kingpin Kickoff Materials; Ex. 11, D&P Fall 2019 Confidential Information Memorandum; Ex. 9, Janssen Tr., 43, 68-69.  Between November 2019 and February 2020, D&P contacted 132 entities across a broad spectrum of industries to gauge interest in a transaction with the Company.  Ex. 5, Proxy at 12-13.[4]  From this outreach, 35 entities identified an interest and signed confidentiality agreements to obtain more information on the Company.  Thereafter, the following four entities submitted non-binding written expressions of interest in purchasing the Company:

**Bowlero Corporation ("Bowlero")**.  Bowlero is "a global media company and the largest owner and operator of bowling centers in the world." *About Bowlero Corp*, BOWLEROCORP,

---

[4] Plaintiffs' expert J.T. Atkins confirmed that contacting 132 potential buyers is "more than [he would] typically do."  Ex. 12, Transcript of Deposition of J.T. Atkins, dated January 19, 2024 ("Atkins Tr."), 53-54.

https://www.bowlerocorp.com/about-bowlerocorp (last visited Feb. 27, 2024).  It operates over 12,000 bowling lanes across North America.  *Id.*   Bowlero sent a letter to D&P confirming its interest in acquiring Bowl America on November 29, 2019.  Ex. 13, Bowlero Indication of Interest ("IOI") Letter. ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████

        ████████████████████████████████ Adams is a real estate investment and development firm focused on residential and hospitality properties across the Washington D.C. area. ██████ ███████████ ████████████████████████████████████████

██████████████████ On January 8, 2020, ██████ sent a non-binding indication of interest to purchase the entire company for ███████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████

        ████████████████████████████████ Fireside is a New York-based private equity firm   focused   on   real   estate   investments. ████████████████████████████ On January 8, 2020, ██████ sent a non-binding indication of interest to purchase Bowl America for

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████

██████████████████████████   Intertech is a holding company that invests in a variety of industries, including leisure and entertainment.  ██████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████   On February 5, 2020,

████████  sent a non-binding indication of interest to purchase the Company for ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████

**D.**     **The Board and Transaction Committee Remain Personally Engaged in the Sale Process with the Assistance of D&P**

Throughout the sale process, the Transaction Committee had regular meetings and discussions with D&P, and in turn, kept the Board informed.  Ex. 17, December 11, 2019 Special Meeting Minutes; Ex. 18, December 19, 2019 Special Meeting Minutes; Ex. 19, January 10, 2020 Special Meeting Minutes; Ex. 20, January 28, 2020 Special Meeting Minutes.  ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[5] Although the Court dismissed Plaintiffs' claims alleging deficiencies in the sale process and the price obtained, (ECF No. 32, Memorandum Opinion dated May 27, 2022 ("Memo Op.") at 19, 22-23), information regarding the process and the other bidders provides context to the Director Defendants' reasonable conclusion that the termination fee was acceptable because the sale process had exhausted the universe of potential bidders.



**E.     The COVID-19 Pandemic Causes the Board and its Advisors to Pause the Sale Process**

As the Company's sale process progressed, the Board – along with the rest of the world – was forced to adjust because of the rapidly escalating COVID-19 pandemic.  On February 24, 2020, when Bowlero made its ███████████████ there were 48 COVID cases in the United States and zero deaths.  *WHO COVID-19 dashboard*, WORLD HEALTH ORGANIZATION, https://covid19.who.int/region/amro/country/us (last visited Jan. 17, 2024).  Two weeks later, there were over 1200 COVID cases and 32 deaths in the United States, and the World Health Organization declared COVID-19 to be an international pandemic; two days later, the United States declared it to be a national emergency.  *Id.*; *CDC Museum COVID-19 Timeline*, CENTERS FOR DISEASE CONTROL AND PREVENTION,  https://www.cdc.gov/museum/timeline/covid19.html (last visited Jan. 17, 2024).  On March 18, 2020, there were nearly 10,000 COVID cases and over 100 deaths in the United States.  *WHO COVID-19 dashboard*, WORLD HEALTH ORGANIZATION.

As a result of the pandemic, the Company was forced to shut down its bowling centers and furlough the majority of the Company's employees, which brought an abrupt halt to the Company's

operating revenue.  Ex. 3, Hull Tr., 94; Ex. 2, Fabian Tr., 34, 43.  The Company also had to liquidate several million dollars' worth of its investment securities in order to pay its regular historical dividend, and then later had to suspend the dividend to avoid further erosion of the Company's liquid assets.  Bowl America, Inc. Form 10-K dated September 24, 2020, UNITED STATES SECURITIES AND EXCHANGE COMMISSION, http://edgar.secdatabase.com/2835/ 143774920020178/filing-main.htm (last visited Feb. 27, 2024) at 1.  Simply put, the pandemic caused a substantial adverse impact to the Company's operations and finances and created great uncertainty regarding the continuing impact of the pandemic on future operations.  *Id.*; Ex. 5, Proxy at 13-14; Ex. 2, Fabian Tr., 43 ("[A]t the time of COVID, it became really clear that we were in – in difficulty to continue operating."); Ex. 3, Hull Tr., 94 ("...due to strict restrictions on capacity most [bowling alleys] will have a difficult time surviving through the fall if operations don't return to normal by then.  I agree to that...."); Ex. 1, Dragoo Tr., 130-32 (noting that some bowling centers started to reopen in September of 2020 and "[t]hen there was another shutdown.").

At or around that time, each of the four entities that had previously expressed interest in buying the Company reduced or backed away from their initial non-binding indications of interest. As noted above, Bowlero reduced its proposed price in February 2020, even before the pandemic's effects were felt.  Ex. 22.  ███████ communicated in early March 2020 that it was no longer interested in or able to purchase the entire Company, but was instead only interested in purchasing five locations for ██████.  Ex. 5, Proxy at 13; Ex. 24, March 11, 2020 Transaction Committee Minutes.  Intertech declined to submit a revised indication of interest "due to coronavirus impacts on its business."  Ex. 24.  ██████ revised its initial offering price down to ████████ following preliminary due diligence.  *Id.*; Ex. 5, Proxy at 13.  The Transaction Committee discussed ███

██████████████████████████████████████████████████████████████████

10

███████████████████████████████████████████████████████████

████████ Ex. 24; Ex. 5, Proxy at 13.

On March 25, 2020, D&P informed the Transaction Committee that "(i) ████████ had provided no real update on its prior status and was unsure of timing; (ii) Bowlero…indicated [it] was still very interested in an acquisition…; and (iii) ████████ also indicated that it had access to capital in order to complete an acquisition…." Ex. 25, Special Meeting Minutes. ████████

███████████████████████████████████████████████████████████

████████████████████████ *Id.* D&P and the Transaction Committee informed the full Board of the status of the transaction process in light of the pandemic at the Board's quarterly meeting on March 30, 2020. Ex. 26, Quarterly Board Meeting Minutes; Ex. 27, March 30, 2020 D&P Project Kingpin Process Overview and Update.

By April 10, 2020, the COVID pandemic had grown exponentially, with over 500,000 confirmed cases in the United States and over 24,000 deaths. *WHO COVID-19 dashboard*. At a Transaction Committee meeting that day, D&P informed the Committee that ████████ was now only willing to move forward at a price in the ████████ range given ████████ difficulty in obtaining bank financing for the deal. Ex. 28, April 10, 2020 Special Meeting Minutes; Ex. 5, Proxy at 14. ███████████████████████████████████████ Ex. 28. D&P advised the Transaction Committee "that Bowlero wanted more visibility into the market as a result of the coronavirus and the uncertainty created thereby, and [] were standing down at th[at] time." *Id.* D&P informed the Transaction Committee that "the closure of the centers combined with the economic environment in commercial real estate has caused a lot of uncertainty with respect to the Corporation and the environment in general." *Id.* On April 13, 2020, following

consultation with D&P, the Board unanimously decided to pause the sale process given the uncertainty caused by the pandemic. Ex. 29, Board Meeting Minutes; Ex. 5, Proxy at 14.

**F.      Despite the Paused Sale Process, Sale Activity Continues in the Summer and Fall of 2020**

D&P maintained contact with the four entities that had previously submitted indications of interest, and in June, D&P updated Ms. Dragoo on the status of the offers.[6]  Ex. 30, June 23, 2020 Email from Vijay Sampath to Cheryl Dragoo:

- Bowlero's offer was "[o]n hold…in light of a potential Q3/Q4 resurgence of COVID-19;"
- ██████ "[r]emain[ed] interested in properties from their last offer;"
- ██████ "[r]emain[ed] interested but subject to performance once business resumes operations in totality;" and
- ██████ "[r]emain[ed] interested but have not done any work.  Would want to see a good amount of post-COVID opening data to get comfortable on proceeding."

*Id.*  D&P further communicated that a number of real estate buyers also had submitted bids for individual properties. *Id.*  Most notably, on June 30, 2020, ██████ submitted a formal non-binding letter of interest offering $37 million for Bowl America's entire real estate portfolio. Ex. 31, ██████ IOI Letter.

Following this update, on July 13, 2020, the Board met "to discuss the strategic direction of the Corporation in light of the COVID-19 concerns, including selling the entire Corporation or one or more of its specific locations or operating the Corporation."  Ex. 33, Board Meeting Minutes.  Specifically, the Board discussed "the potential timing of the sale and whether now was the appropriate time moving forward."  *Id.*  To that end, they discussed considerations for continuing to run the Company, including the Company's profitability for the year. *Id.*  Following their "thorough discussion," the Board "decided that the ██████ offer should be rejected, that the

---

[6] The Company also continued to receive offers for individual centers during 2020, but the Board concluded that it was not interested in "piecemeal" sales if there were still a possibility of effectuating a sale of the Company as a whole.  Ex. 32, June 2, 2020 Email from Cheryl Dragoo to Merle Fabian.

sale process would remain on pause and that the Corporation would take steps to implement a succession plan with respect to both its officers and directors." *Id.*

Thereafter, D&P maintained periodic contact with potentially interested purchasers and reported to the Board via the Transaction Committee.  Ex. 1, Dragoo Tr., 133-134 (D&P "had been keeping touch with bidders throughout the summer…at least reaching out to them."). ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████  The Board met on September 24, 2020 and discussed the outstanding offers to purchase individual properties, and decided not to sell individual properties, noting that the real estate locations the Board might be inclined to sell were the less profitable ones, and the offers were for the more profitable locations.  Ex. 35, Board Meeting Minutes.

**G.**    **Bowlero and a New Bidder Re-Engage in the Sale Process in Late 2020**

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████  On December 7, 2020, Ms. Dragoo received an unsolicited non-binding purchase offer from real estate acquisition and development fund ███████████████ to purchase the Company for ████████████████████████████████████████ Ex. 1, Dragoo Tr., 139; Ex. 5, Proxy at 14; ████████████████  On December 11, 2020, Bowlero sent a new non-binding indication of interest letter to D&P to purchase the Company for ████████, noting that the purchase would be in "all cash with no contingencies."  Ex. 38, Bowlero IOI Letter.

On December 15, 2020, the Board and its counsel discussed the two proposals, "including the price offered, the treatment of employees and the value of the business, especially in light of

COVID and other matters."  Ex. 39, Board Meeting Minutes.  The Board considered "whether the time was right to sell and the general economic and social uncertainly [*sic*].  It was discussed that it could be a long time before the business improved to pre-pandemic levels" and that "there was a lot of uncertainty regarding the business at this time."  *Id.*  After contemplating whether "it was possible to obtain an increase in the purchase price as a result of various proposals," the Board decided to "proceed with exploring a potential transaction and to instruct Duff and Phelps to continue negotiating with the bidders in order [to] obtain the highest price in the transaction for all shareholders."  *Id.*

## H.    Bowl America Obtains "Best and Final" Bids and Proceeds with an Exclusive Transaction Process with Bowlero

Following the Board's instructions, D&P engaged with the bidders to seek a higher price. ▮▮▮ maintained that ▮▮▮▮▮ was its best and final offer.  Ex. 5, Proxy at 14.

Following further negotiations, on January 7, 2021 Bowlero raised its bid in a non-binding letter of intent from ▮▮▮▮▮ to $44 million, equivalent to $8.53 per share, to be paid in cash with no financing contingencies.  Ex. 40, Bowlero Letter of Intent; Ex. 6, Parker Tr., 53 ("I know we had gone back at ▮, not 44….Then subsequently we went back at ▮▮.  And then they would have come back again because we went higher."); Ex. 34, January 4, 2021 Email at 2832 (D&P contacting Brett Parker and asking him to make an offer that week because the Company has other offers to which it needed to respond).  There were no other serious bidders at this time.  The Board determined that a sale to Bowlero at the $44 million price was in the stockholders' best interest and that it should pursue the transaction.  Ex. 2, Fabian Tr., 60-61 ("We had offers to buy individual centers for real estate purposes.  We had to consider whether that was in our best interest or not. So there were other…choices, but we felt that [accepting Bowlero's offer] was the best choice for everybody.…[I]n every case [with the various real estate offers], there was something wrong with

the offer.  Either they didn't have the money, or they were presenting themselves in a way that was not persuasive."); Ex. 3, Hull Tr., 158-59 ("COVID affected the bowling business, not a whole lot of offers can be compared with the offer we received late December.…[T]he bowling business was also in a declining numbers, so whether that was factored in to -- [Bowlero's] assessment, I'm sure it was.").  After additional negotiation of certain terms in the letter of intent, Bowl America and Bowlero signed a revised letter of intent on January 13, 2021, agreeing to 90 days of exclusivity so that Bowlero could conduct due diligence and the parties could negotiate the deal's remaining terms.  Ex. 1, Dragoo Tr., 141; Ex. 41, Bowlero Letter of Intent.

**I.      The Board's Advisors Negotiate the Terms of the Merger Agreement with Bowlero**

From late February to late May 2021, the Board's advisors negotiated the terms of a formal merger agreement with Bowlero and its advisors and kept the Transaction Committee fully informed of those negotiations.  Ex. 5, Proxy at 15-16; Ex. 4, Bragg Tr., 94-95.  During this time, the Board continued to discuss and also consider "various potential alternatives to a transaction with Bowlero," including the possibility of walking away from the deal if they could not get the terms they sought.  Ex. 42, March 23, 2021 Board Meeting Minutes.  In late May 2021, two main points remained for negotiations: (1) the special dividend and (2) the termination provisions. Affidavit of Gardner F. Davis ("Davis Aff.") ¶¶ 3-16.

As part of the proposed transaction, Bowl America wanted stockholders to receive, in addition to the $8.53 per share purchase price, a "special dividend" representing the value of the Company's cash and marketable securities.  Ex. 6, Parker Tr., 55-56; Ex. 4, Bragg Tr., 42, 52. Initially, the parties discussed a structure with a cash dividend of $0.50 per share and a "second contingent dividend based on the amount of excess cash," (Ex. 43, March 16, 2021 Email between DLA Piper and Foley Attorneys, at 2921), but the Board wanted the entire amount of the special dividend to be fixed rather than contingent in order to provide "certainty for the shareholders."

Ex. 1, Dragoo Tr., 154.  Negotiations regarding the special dividend also included the amount of the special dividend, how it would be paid, and whether one or multiple distributions would be made.  *Id.* at 143-144; *see* Davis Aff. ¶¶ 7-10, 14-16.

With regard to the termination fee, permitting a target to terminate the agreement upon receipt of a superior offer was already a departure from Bowlero's usual practice.  Ex. 6, Parker Tr., 73 ("[T]he overwhelming majority of acquisitions that we do don't have a termination provision at all because once they are signed, they are fully hard…. So even entertaining the idea of a termination fee was a step of sort of less good than where we would want to be…."); *id.* at 75 ("[A]sking about the amounts is one thing, but they had to negotiate hard to even get us to agree for the deal to work this way….").  Nevertheless, Bowl America insisted on that right, and on May 24, 2021, Bowlero proposed a termination fee of $1,645,000 plus expenses.  Davis Aff. ¶¶ 11-12.  The $1.645 million termination fee represented 3.5% of the aggregate $47.1 million consideration to Bowl America stockholders.  *Id.* ¶ 12.  In response, Bowl America sought to include a go-shop provision and to reduce the termination fee and cap the potential expense reimbursement as low as possible.  *Id.* ¶¶ 12-14.

Between May 24 and May 26, 2021, counsel for Bowlero and counsel for Bowl America negotiated these terms, largely by phone; while Bowlero did not agree to a go-shop provision or a reduction in the 3.5% termination fee, it did agree to cap potential reimbursement of expenses at $3.5 million and a fixed dividend of $0.60 per share.  *Id.* ¶¶ 12-15; Ex. 5, Proxy at 16; Ex. 1, Dragoo Tr., 154, 167, 205; Ex. 4, Bragg Tr., 52; Ex. 6, Parker Tr., 77.

With regard to the amount of the termination fee, Bowlero considered the actual dollar amount to be a more important metric than the percentage of the transaction price.  Ex. 6, Parker Tr., 73-74 ("[O]n a deal of this size, percentage doesn't really make any sense because you are

talking about huge opportunity costs and time and effort and it's a matter of coming to a number of dollars that is adequate to make sense. That's where the 1.645 comes from."); *id.* at 78 ("[Y]ou couldn't use a percentage of purchase price as a basis…because on the smaller end, the dollars just get so insignificant that it doesn't have any impact."). With regard to the reimbursement of expenses, Bowlero insisted on such because "we were five months in on diligence and documentation from the LOI timeline, so we were heavily invested," but did, as part of Bowl America's negotiations, agree to a cap. *Id.* at 71.

Thus, contrary to Plaintiffs' assertion (Mot. at 17), the Defendants did not "passively accept[] the Termination Fee," but rather "tr[ied] to get [it] reduced as much as possible." Ex. 1, Dragoo Tr., 231-32; *see also id.* at 167 (stating that she "believe[d] we did" try to get the "1.645 number lowered"); *id.* at 205 ("[O]ur thought was a reduction…in a fee, would be helpful."); *see generally* Ex. 5, Proxy at 18. While Bowl America's negotiation efforts to reduce the termination fee and lower the expense cap were unsuccessful, the efforts did result in agreement on the special dividend amount, which the Board considered as providing great value and benefit to the stockholders directly. Ex. 4, Bragg Tr., 50, 52, 94-95 (stating that the Company's advisors "went back to Bowlero to try and reduce the fees" and that while they were not successful in that endeavor, "they were successful in gaining an additional dividend.").

Following these negotiations, the Board met on May 27, 2021 and considered the merger terms. *Id.* at 63; Ex. 44, Board Meeting Minutes; Ex. 1, Dragoo Tr., 155, 163-64. At that time, the Board considered the Bowlero offer to be a "take it or leave it" offer. Ex. 44. The Board also reasoned that, after the two-year sale process, there were no other pending offers on the table or potential bidders that were likely to top the Bowlero bid. The Board specifically discussed the amount of the termination fee and its implications. Ex. 1, Dragoo Tr., 164 (stating that "[e]very

17

single board member made a comment" about the termination fee).  The Board considered the fact

that the sale process had been going on for nearly two years, and they had yet to receive a higher

bid (not including non-binding indications of interest in late 2019 and early 2020) since the

COVID-19 pandemic had begun.  The Board felt confident that, given the thoroughness of the

transaction process, no other bidder would come forward with an offer higher than Bowlero's

offer.  As the record demonstrates, the Board valued the certainty of signing and closing the deal

more than the unlikely hypothetical possibility of another bidder later offering to buy the Company

at some amount between $44 million and $49,145,000.[7]

- "[W]e discussed what the termination fee was.  We discussed the expenses, as we talked about earlier.  We discussed the fact that we had had no other bidders.  We discussed that there had not been anything serious, and as far as the real estate side went, nobody had offered us anything higher than 40 million.  We thought that we had the best bid that we were going to get, but that if there was somebody out there that wanted to come in and make it worth our while, we'd certainly look at their offer."  Ex. 1, Dragoo Tr., 197-98;

- "I remember talking about the termination fee [at the board meeting], that we tried to negotiate it down, and we were unsuccessful in negotiating it down, and that we assumed it was not going to happen, since this was the only offer I knew about, at the time.  So we went forward with the [agreement] with the termination fee in it."  Ex. 3, Hull Tr., 105;

- "The termination fee only applied if somebody came in substantially over the Bowlero agreement.  We did not think that it was going to even come into play because we had already interviewed everybody who was remotely interested in the company.  So, the idea that somebody would come in at the 24th hour and offer more money, and under better circumstances seemed so remote that the termination fee seemed immaterial."  Ex. 2, Fabian Tr., 117-18;

- "We had gone through everything.  We had done the pros and the cons.  We believed we were going to close 99 percent.  It was [a] hypothetical basically."  Ex. 4, Bragg Tr., 46.

The Board also discussed the reimbursable expenses, acknowledged that Bowlero had

incurred significant costs during the process, and concluded that it was reasonable for Bowlero to

---

[7] A topping bidder would only be deterred from making a bid if it thought the Company's value was between the $44 million purchase price and $49.145 million (the $44 million purchase price *plus* the $1.645 million termination fee *plus* the $3.5 million maximum expense reimbursement amount).  *See* Ex. 45, Expert Report of Laura Smith, CVA, MVA, CFE dated December 1, 2023 ("Smith Report") at 21.

demand reimbursement of those expenses in the unlikely event that a superior bidder emerged. Ex. 1, Dragoo Tr., 167-68 ("We discussed that there were lawyers and accountants, and we knew how much work -- many hours we had put into it, and multiplying that by however many lawyers and accountants there were. But we also said these are reimbursements, not just, give us this much money; that there would have to be documentation.").  The Board was assisted in their discussions and decision-making by counsel and D&P.  Ex. 2, Fabian Tr., 148-49; Ex. 3, Hull Tr., 105; Ex. 39; Ex. 44; Ex. 26.   John Wolfel, the Board's counsel from Foley & Lardner LLP ("Foley"), "highlight[ed] major sections" of the draft merger agreement, "including the price, the extraordinary dividend, ability to terminate in case of a superior offering, the amount of the break-up fee (including expense reimbursement), closing conditions, termination provisions, indemnification and other matters."  Ex. 44 at 4601  More specifically, he discussed "the potential for another possible buyer to emerge after public announcement of the transaction, the Board's so-called 'fiduciary out,' the limitations of affirmatively shopping the company and the amount of the breakup fee and expense reimbursement if the Board chose to pursue a superior offer."  *Id.*  The Board followed up with clarifying questions.  *Id.*

Chris Janssen of D&P delivered an oral presentation of D&P's fairness opinion at the May 27, 2021 board meeting.  *Id.*  D&P analyzed the fairness of Bowlero's $44 million price by comparing it to the Company's value under two scenarios – continuing to operate the Company under the status quo, or considering a hypothetical capital investment of $20-25 million to modernize the Company's centers.  *Id.*; Ex. 5, Proxy at 29-30.  D&P estimated the Company's value to be $29.3 million to $34.2 million under the first scenario and $33.4 million to $39.3 million under the second scenario.  Ex. 44 at 4601; Ex. 5, Proxy at 29-30.  Consequently, under

either scenario, D&P opined that "the $8.53 per share stockholders were to receive in the merger was fair from a financial point of view." Ex. 44 at 4601.

What followed was a "lengthy discussion among the Board, management and the professional advisors" of the terms of the deal, the fairness opinion, and "the condition of the Company's business and the prospects going forward if the Board did not approve the merger." *Id.* at 4602; Ex. 2, Fabian Tr., 112-13 ("When we had the agreement, we discussed everything that was in it."). These discussions included consideration of a host of factors that were later identified in the Proxy, including "the uncertainties regarding the Company's operations and financial performance after re-opening from COVID." Ex. 44 at 4602. As noted above, they also discussed the termination fee. Following these discussions, the Board exercised its business judgment and approved the merger agreement, including the termination fee – "all of the directors reached the conclusion that the proposed merger was in the best interest of the Company and its stockholders and represented the best option to maximize stockholder value." *Id.* The Company signed the Merger Agreement with Bowlero that day. Ex. 46, Execution Version of the Merger Agreement dated May 27, 2021, at 3701-02.

Bowl America issued its Proxy statement on July 13, 2021. *See generally* Ex. 5, Proxy. On August 11, 2021, the stockholders, who were fully informed by the Proxy of the termination fee, the negotiation history, and the other factors the Board had considered in recommending approval of the merger, overwhelmingly approved the transaction, with 83.5% of stockholders that submitted a vote (not including the Defendants) voting in favor. ECF No. 73-2 (Dragoo Declaration). The transaction closed on August 16, 2021. Ex. 47, Closing Certificate.

## LEGAL STANDARD

Summary judgment may only be granted where no genuine dispute exists as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Courtney-Pope*

*v. Bd. of Educ. of Carroll Cnty.*, 304 F. Supp. 3d 480, 488 (D. Md. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986)).  A material fact is one that "might affect the outcome of the suit under the governing law."  *Courtney-Pope*, 304 F. Supp. 3d at 488 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "Unsupported speculation is insufficient to defeat a motion for summary judgment."  *Minter v. Wells Fargo Bank, N.A.*, 593 F. Supp. 2d 788, 791 (D. Md. 2009).  A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading but must instead set out specific facts, supported by evidentiary material, showing a genuine dispute for trial."  *Weisner v. Liberty Life Assurance Co. of Bos.*, 192 F. Supp. 3d 601, 608 (D. Md. 2016).

## ARGUMENT

Plaintiffs' Motion fails because (a) many material facts are disputed and (b) there is no bright-line rule that establishes a maximum percentage for when a termination fee is unreasonable, permitting the Court to circumvent the fact-intensive inquiry into whether the termination fee is reasonable under the unique facts and circumstances of this case.   When Plaintiffs' mischaracterization of Defendants' motives and other disputed facts are removed, Plaintiffs' claim is essentially that the termination fee – when expressed as a percentage of the purchase price – is higher than percentages generally found to be reasonable by Delaware courts.  Plaintiffs forget, however, that the reasonableness of a termination fee depends on the circumstances of the specific transaction and is not simply a mathematical calculation.  The Board engaged in an exhaustive two-year process affected by the COVID-19 pandemic and resulting continuing uncertainty, and still managed to negotiate a sale of the Company at a price higher than the fair market value determined by its financial advisors.  In this light, and given that no other potential superior bidders emerged, Defendants' decision to approve the merger and the termination fee cannot be deemed unreasonable *as a matter of law based simply on the percentage*.  Plaintiffs' Motion should be

denied for that reason, as well as the fact that the motion does not address or overcome Defendants' affirmative defenses of the Company's exculpatory provision and the business judgment rule which afford great protection to Defendants.

Unlike Plaintiffs' Motion, the Court need not determine the "reasonableness" of the termination fee to grant Defendants' cross-motion. Rather, Defendants' cross-motion for summary judgment should be granted because (a) Defendants' potential liability has been exculpated by the Company's charter, as permitted by Maryland statute, and (b) Plaintiffs cannot rebut the Maryland statutory business judgment rule presumption that Defendants acted consistent with their fiduciary duties. Each of these doctrines affords great deference and legal protection to the decisions of the Director Defendants at issue here. Plaintiffs bear the burden to rebut each of these protections, and on the evidence in this record, cannot carry this burden in either respect. To circumvent either the exculpatory provision or the business judgment rule, Plaintiffs must show a level of malintent and dereliction of duty by Defendants that simply does not exist in the record. Instead, the record shows that Defendants conducted a robust transaction process, with the aid of reputable, competent advisors, and they informed themselves of the various options and made a decision in what they reasonably believed to be the best interests of the Company and its stockholders. While Plaintiffs may disagree with their decision, Defendants' decision-making process is entitled to the statutory protections meant to avoid Monday-morning-quarterbacking by disgruntled stockholders, and Plaintiffs' disagreement is insufficient to rebut either the exculpation clause or the business judgment rule. Defendants are entitled to summary judgment as a matter of law.

## I. THE COURT SHOULD DENY PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs' Motion should be denied because it is based on statements of fact that are at best misleading and in dispute, and at worst, simply wrong or irrelevant to the narrow remaining claim.

Determining whether a director has acted consistent with her fiduciary duties in approving a termination fee is a highly fact-specific inquiry and Plaintiffs' characterization of the process undertaken by the directors is far from undisputed.  *See In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1015 (Del. Ch. 2005) (noting that courts take a "nuanced, fact-intensive inquiry" when evaluating deal protection measures).   Defendants are unaware of a single case in Maryland or Delaware where a court has granted a motion for summary judgment based on a theory that directors breached their fiduciary duties by approving a termination fee, much less a case where this decision was made based solely upon the termination fee percentage as Plaintiffs ask this Court to do.  This is because the courts recognize that the reasonableness of a termination fee is a fact-intensive inquiry, and here too many material facts are disputed for Plaintiffs to demonstrate an entitlement to judgment as a matter of law.[8]

Plaintiffs also make no attempt to address the broad liability protections the Director Defendants are afforded under Maryland law by reason of the Company Charter's exculpatory provision and the business judgment rule, both of which must be considered in any motion for summary judgment that seeks to establish the Defendant directors' liability.[9]   The Court cannot

---

[8] Plaintiffs erroneously claim that "[i]t appears that there is no Maryland case law addressing the reasonableness of a termination fee in a merger transaction." Mot. at 15 n.66.  This assertion is demonstrably untrue.  *See, e.g.*, *Jasinover v. Rouse Co.*, No. 13-C-04-59594, 2004 WL 3135516, at *10 (Md. Cir. Ct. Nov. 4, 2004) (Sweeney, J.) (denying motion to enjoin transaction); *Frederick v. Corcoran*, No. 370685, 2013 WL 10069700, at *11 (Md. Cir. Ct. Aug. 15, 2013) (Rubin, J.) (granting motion to dismiss and holding that "termination fees protect the usually substantial investment of the first bidder against 'free riding' by another bidder"); *In re Terra Indus., Inc. S'holder Litig.*, No. 24-C-10-001302, 2010 WL 5412283, at *10 (Md. Cir. Ct. July 14, 2010) (Cannon, J.) (granting motion to dismiss where topping bidder agreed to pay $123 million termination fee); *In re Nationwide Health Props., Inc.*, No. 24-C-11-001476, 2011 WL 10603183, at *17 (Md. Cir. Ct. May 27, 2011) (Berger, J.) (granting motion to dismiss and noting that a board may "act decisively to preserve the one definite offer it had on the table").  While Delaware law may be instructive, Maryland law controls.  *Jolly Roger Fund LP v. Sizeler Prop. Inv., Inc.*, No. 05-841, 2005 WL 2989343, at *3 (D. Md. Nov. 3, 2005) (Bennett, J.) (courts "will make reference to Delaware law in the absence of applicable Maryland law" on corporate governance issues).

[9] In fact, Plaintiffs admit in footnote 75 of their Motion that their motion does not address or overcome the exculpatory provision, saying that while they "anticipate" Defendants will raise the issue, it is "not part of this motion." Mot. at 22, n. 75.  They fail to mention the business judgment rule entirely.

grant Plaintiffs' Motion without the Plaintiffs establishing as a matter of law that these affirmative defenses do not bar their claims. *See Green v. The Wills Grp., Inc.*, 161 F. Supp. 2d 618, 623 (D. Md. 2001) (quoting *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 614 (4th Cir. 1999)) ("Once the moving party has successfully produced evidence to establish its affirmative defense, 'the burden of production shifts back to the plaintiff who must come forward with specific facts showing that there is a genuine issue for trial.'"). As Plaintiffs clearly have not made such showing, their Motion must be denied.

### A.    Genuine Issues of Material Fact Exist Regarding the Reasonableness of Defendants' Approval of the Termination Fee

Plaintiffs' Motion should be denied because numerous disputes of material fact exist. A comparison of the fact sections in the two briefs demonstrates that Plaintiffs believe that the Board's consideration of the termination fee was slapdash and arbitrary, while Defendants assert that their process was thorough and thoughtful and aimed at reaching the best possible deal for the stockholders. The Court cannot simply accept Plaintiffs' characterization of the record – rather, when considering Plaintiffs' Motion, "this Court must consider the facts and all reasonable inferences **in the light most favorable to the nonmoving party**." *Wiebe v. Nat'l Sec. Agency*, No. 11-3245, 2012 WL 4069746, at *2 (D. Md. Sept. 14, 2012) (Bennett, J.) (emphasis added). When considered in the light most favorable to Defendants, the record demonstrates that the Board acted with due care in exercising its business judgment. This alone is sufficient to deny Plaintiffs' summary judgment motion.

Plaintiffs list what they believe are "[t]he indisputable facts that support [Plaintiffs'] Motion," but each of those facts are either disputed or do not support Plaintiffs' arguments. Mot. at 1-2. For example, Plaintiffs claim that it is "undisputed" the Board "knowingly" approved an unreasonable termination fee, and in support, Plaintiffs rely heavily on ABA guidance circulated

between counsel (with a copy to Ms. Dragoo) days before the merger was approved.  Mot. at 8-9.

Plaintiffs, however, wholly mischaracterize that document, which provides guidance on

termination fee provisions but expressly notes that "the Delaware courts have ***declined*** to adopt a

'per se' rule of reasonableness" and "rely on their ability to assess the reasonableness of such fees

in particular circumstances."  Ex. 48, ABA Model Merger Agreement for the Acquisition of a

Public Company Excerpt at 3824 (emphasis added).  Contrary to Plaintiffs' mischaracterization,

the ABA document does *not* say that any termination fee above 6% is "deemed by itself to be

unreasonable."  Mot. at 9.  Rather, the ABA document cites *Phelps Dodge Corp. v. Cyprus Amax*

*Mins. Co.*, in which the Delaware Chancery Court declined to enjoin a transaction and therefore

stated that "I do not take up plaintiffs' challenge to the termination fee as being unduly coercive."

No. CIV.A.17383, 1999 WL 1054255, at *2 (Del. Ch. Sept. 27, 1999).  It then stated in dicta that

a 6.3 percent termination fee "certainly seems to stretch the definition of range of reasonableness,"

but acknowledged that it "need not reach" the issue.  *Id.*  This is a far cry from Plaintiffs' suggestion

that Ms. Dragoo read the ABA guidance and ***knew*** that a termination fee above 6% was *per se*

unreasonable.

Further, and also contrary to Plaintiffs' assertions, neither Defendants nor Bowlero viewed

the termination fee as representing 10.9% of the transaction value – they viewed it as a 3.5%

termination fee plus reimbursement of reasonable expenses.  Davis Aff. ¶¶ 12, 18.  Therefore,

Plaintiffs' assertion that the Board approved the termination fee "knowing that it was far beyond

the accepted norm in public company acquisitions" is wholly untrue.[10]

---

[10] Moreover, as explained in further detail below, no bright-line rule exists beyond which a termination fee
is *per se* unreasonable as a matter of law.  *See infra* at 29-33.  Accordingly, expressing the termination fee
and expense reimbursement as a percentage of the transaction price is insufficient to find a breach of
fiduciary duty as a matter of law, and no Maryland or Delaware court has held otherwise.

Next, Plaintiffs claim that it is undisputed that the "Board did not discuss or negotiate the Termination Fee with Bowlero…." Mot. at 2, 10-11. This is demonstrably incorrect, and the Court need look no further than the Proxy, which clearly states that "[t]he Company also attempted to negotiate for more favorable termination provisions, including a 'go-shop *and a lower expense reimbursement in connection with a termination*, but was not successful." Ex. 5, Proxy at 16 (emphasis added). Moreover, Plaintiffs themselves cite to Ms. Dragoo's deposition where she stated that the Company "tr[ied] to get the 1.645 number lowered" in negotiations prior to the Board vote. Ex. 1, Dragoo Tr., 167, 231. Ms. Dragoo's testimony further demonstrates a dispute of fact with Plaintiffs' contention that there was no negotiation over the termination fee. *See also* Ex. 4, Bragg Tr., 52 (describing negotiations related to the termination fee); Davis Aff. ¶¶ 3-16 (same).

Nor is it true that the "Termination Fee was added to the merger agreement after all other substantive terms had been agreed to…." Mot. at 2. Plaintiffs forget that much negotiation of M&A transactions occurs between counsel over the telephone, meaning that not every discussion is reflected in a document. Davis Aff. ¶¶ 12, 17 (noting telephone calls to negotiate the termination fee and special dividend over several days). Plaintiffs also ignore the deposition testimony of Bowlero Chairman Brett Parker stating that the termination fee was indeed the product of negotiation between the parties. Ex. 6, Parker Tr., 87 ("[T]here was back and forth in getting to these numbers….There were multiple discussions in getting to that number."). In any event, when the termination fee was added to the merger agreement has no bearing on whether the Board's analysis of that termination fee was reasonable under the circumstances.[11]

---

[11] Plaintiffs' reference to other deal protection devices and the controlling stockholder's voting agreement are irrelevant to the Court's determination of these motions. Mot. at 2. The Court has already held that Plaintiffs' allegations regarding other deal protections were insufficient to state a claim. Memo. Op. at 16-

Plaintiffs' sole remaining "indisputable fact" is that Defendants "thought the Termination Fee was irrelevant because it was a 'done' deal with Bowlero and they believed no other bidder was going to come forward."  Mot. at 2.  Far from suggesting an abdication of fiduciary duties, this fact demonstrates that the directors were weighing a variety of factors, including the possibility that no other bidders remained and therefore the termination fee was unlikely to matter from a practical standpoint.  This is precisely the sort of process that directors are expected to undertake pursuant to Section 2-405.1 of the MGCL.  *See* James J. Hanks, Jr., MARYLAND CORPORATION LAW § 6.6[b], at 185 (2018 Supp.) ("As a general rule, directors should have available to them information material to the decision and should have some opportunity to ask questions of management and to meet and discuss the matter among themselves.").  As the record demonstrates, the directors were considering the termination fee in light of (1) the two-year sale process, (2) the few other bids they had received and how they stacked up against Bowlero's $44 million all-cash, no-contingency offer, and (3) how pushing too hard on this provision – which was unlikely to come into play – might become an impediment to closing an otherwise beneficial deal.  Ex. 1, Dragoo Tr., 176-177 (stating that the Board considered "[t]he fact that we had no other bidders, the fact that we'd been doing this process, the fact that we hadn't had anybody seriously offer that much …"); *see also* Ex. 44 at 4601 ("Mr. Wolfel reviewed the draft merger agreement with the Board, highlighting major sections, including the…ability to terminate in case of a superior offering, the amount of the break-up fee (including expense reimbursement)….")  When viewing

---

17, 23.  The voting agreements are a red herring because the agreements did not require the stockholders to *approve* the merger in their capacity as directors.  Exs. 49-51, Voting and Support Agreements.  Instead, the voting agreement would apply only if "[t]he Board of Directors of the Company has unanimously approved the Merger Agreement and the transactions contemplated thereby."  Exs. 49-51; Davis Aff. ¶ 22.  Further, Ms. Fabian signed her voting agreement at an earlier date solely for logistical reasons given that the Board meeting was not in person but counsel wanted the signed agreement in hand if the Board approved the transaction.  Davis Aff. ¶ 22.

the evidence and applying inferences in the light most favorable to Defendants, the record demonstrates that the Board acted consistently with their fiduciary duties and precludes the relief sought by Plaintiffs.[12]

Importantly, Plaintiffs cannot establish a lack of genuine disputes of material fact because Scott Wilson, Defendants' expert on the subject of the customs and practices of Maryland directors, concluded that the termination fee and expense reimbursement "were (i) consistent with fees and reimbursements included in similar transactions involving Maryland corporations; (ii) approved in reliance upon the advice of outside counsel and the Company's financial advisor; (iii) fair and reasonable based upon the facts and circumstances confronting the Board of Directors; and (iv) consistent with the standard of conduct governing actions of directors of Maryland corporations." Ex. 52, Expert Report of Scott R. Wilson, dated December 1, 2023 ("Wilson Report"), ¶ 11(e). Given the presence of expert testimony bearing on material facts that disputes Plaintiffs' theory, summary judgment is inappropriate.

These are not merely minor or immaterial differences in interpretation of the record. Plaintiffs' supposed "undisputed facts" go directly to the central issues of Plaintiffs' claims, and

---

[12] There is not enough space in this brief to detail Plaintiffs' other mischaracterizations of the record. As an example, Plaintiffs' assertion that D&P "reaffirmed" its September 2019 real estate valuation of Bowl America "[d]uring COVID," (Mot. at 5), is based on board minutes from **March 11, 2020**, the very beginning of the pandemic, when the world thought lockdowns would be over in two weeks' time. Ex. 24. Regardless, D&P also stated at the same meeting that the pandemic was likely to have a "negative impact on credit markets and the Corporation's business." *Id.* As another example, Plaintiffs baldly assert without a citation that Ms. Fabian testified that "no one ever told the Board that the Termination Fee was reasonable…." Mot. at 13. This is likely a distortion of the colloquy in which Plaintiffs' counsel asked, "Did anyone ever tell you what might be considered a reasonable termination fee for a merger agreement?" and Ms. Fabian responded, "No. You know, *we had lawyers and we trusted that they were telling us the right thing*." Ex. 2, Fabian Tr., 116; *see also* MGCL § 2-405.1(d)(1)(ii) (directors are entitled to rely on information provided to them by lawyers). Perhaps most egregiously, Plaintiffs assert without support that "Bowl America was a healthy company emerging from post-pandemic COVID-19 world in May 2021," (Mot. at 19), while completely ignoring the significant adverse financial impact the pandemic had caused the Company, and the continuing uncertainty faced by the Company and the world at that time. Ex. 5, Proxy at 12-13. These are three examples of many. Defendants encourage the Court not to accept Plaintiffs' other characterizations of the record at face value.

the genuine disputes concerning those facts mandates denial of Plaintiffs' Motion.  *Lyons v. Shoppers Food Warehouse Corp.*, No. 16-3322, 2017 WL 3129391, at *1 (D. Md. July 24, 2017) (Gallagher, J.) (quoting *Anderson*, 477 U.S. at 247-48) ("A genuine issue of material fact exists where 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'").

### B.    The Propriety of a Termination Fee Is Based on The Facts and Circumstances Facing Directors, not a Bright Line Test Based Solely on the Fee Percentage

Plaintiffs cannot establish that the termination fee was unreasonable as a matter of law – and that Defendants breached their fiduciary duties in approving it – because no court to date has held on summary judgment that a termination fee above a certain acceptable percentage is *per se* unreasonable.   To the contrary, courts have declined to create a bright-line test that sets a percentage limit above which a termination fee is unreasonable as a matter of law, recognizing that the reasonableness of a termination fee and its approval is a fact-intensive inquiry based upon the facts and circumstances available to directors.  *See La. Mun. Police Emp.'s Ret. Sys. v. Crawford*, 918 A.2d 1172, 1181 n.10 (Del. Ch. 2007) ("Nor may plaintiffs rely upon some naturally-occurring rate or combination of deal protection measures, the existence of which will invoke the judicial blue pencil.").  Plaintiffs instead rely on caselaw at the preliminary injunction or motion to dismiss stage.  Mot. at 15-16.[13]  At that early stage of litigation, without the benefit of a full record and

---

[13] *See Phelps Dodge Corp.*, 1999 WL 1054255 at *2 (denying the plaintiff's motion for preliminary injunction); *In re Comverge, Inc.*, No. CV-7368-VCP, 2014 WL 6686570, at *1, *14 (Del. Ch. Nov. 25, 2014) (denying the directors motion to dismiss because "the plaintiffs **could show** that the termination fee structure … was unreasonable") (emphasis added); *Golden Cycle, LLC v. Allan*, No. CIV.A.16301, 1998 WL 892631, at *17 (Del. Ch. Dec. 10, 1998) (denying a motion for preliminary injunction where the termination fee was "no impediment to either the existing directors or any other board of directors entering into a higher price transaction" with the plaintiff); *Crawford*, 918 A.2d at 1181, n. 10 (denying a motion for preliminary injunction because the plaintiffs "are not subject to any irreparable harm so long as shareholders are given the opportunity to exercise a fully-informed vote…").

applying different inferences, courts use percentages solely as a shorthand to determine whether an allegation fails to state a claim or requires further scrutiny.  *See* Memo Op. at 23-24 (holding that Plaintiffs stated a claim on the termination fee issue "at the motion to dismiss stage, drawing all reasonable inferences in favor of Plaintiffs….")  Plaintiffs ask the Court to make new law and rule that a termination fee above a certain percentage is unreasonable as a matter of law notwithstanding the circumstances of the transaction and the process undertaken by the directors to arrive at the decision to approve it.  Other courts have consistently declined to create such a bright-line rule, and this Court should do the same.  *See Crawford*, 918 A.2d at 1181, n.10 ("The inquiry, by its very nature fact intensive, cannot be reduced to a mathematical equation.  Though a '3% rule' for termination fees might be convenient for transaction planners, ***it is simply too blunt an instrument, too subject to abuse, for this Court to bless as a blanket rule***.") (emphasis added).

Instead, courts have consistently recognized that the reasonableness of a termination fee is a "nuanced fact-intensive inquiry," and courts do not "presume that all business circumstances are identical or that there is any naturally occurring rate of deal protection, the deficit or excess of which will be less than economically optimal."  *In re Toys "R" Us, Inc., S'holder Litig.*, 877 A.2d at 1016.  Rather, courts focus upon "the real world risks and prospects confronting [directors] when they agreed to the deal protections."  *Id.*  Courts "examine[] whether the board granting the deal protections had a reasonable basis to accede to the other side's demand for them in negotiations."  *Id.* at 1016.  They consider the "tradeoff" between getting the highest price they could from a potential buyer "right then and there, and the limited opportunity of receiving a higher bid from a well-canvassed market by reducing the termination fee."  *Id.* at 1017.  In considering the reasonableness of a termination fee, courts consider factors like "the overall size of the termination fee, as well as its percentage value" and "the degree to which a counterparty found such protections

to be crucial to the deal." *Crawford*, 918 A.2d at 1181, n.10.  Plaintiffs here cannot succeed at summary judgment because, as noted above, too many of the facts relevant to this inquiry are, at best, disputed, and at worst, misrepresented by Plaintiffs.

The court in *Toys "R" Us*, in an instructive example, considered it reasonable that the board in that case approved the merger at issue without attempting to negotiate a lower termination fee for a number of reasons.  For one, it recognized "the limited opportunity of receiving a higher bid from a well-canvassed market by reducing the termination fee."  877 A.2d at 1017.  For another, it recognized that a board must weigh the deal in hand with the possibility that, if it rejects the termination fee, the deal might change in ways less beneficial to stockholders or evaporate altogether.  *Id.* at 1016-17.  Ultimately, the court determined that "the board could legitimately give more weight to getting the highest value bid out of [purchaser], and less weight to the fear that an unlikely higher-value bid would emerge later." *Id.* at 1018.

Like the *Toys "R" Us* directors, Defendants here faced a situation where (1) they had engaged in a nearly two-year-long sale process where the market had been "well-canvassed" by their investment banker; (2) the Company and its future revenue streams faced great uncertainty in the face of the COVID-19 pandemic; and (3) there was a fair, all-cash, no-contingency $44 million purchase offer from Bowlero on the table with no other competitive bidders in sight.  Ex. 5, Proxy at 17-20; Ex. 1, Dragoo Tr., 197-98; Ex. 2, Fabian Tr., 117-18; *supra* pages 6-20.  If the Court needed to determine the reasonableness of the Defendants' approval of the termination fee – which it does not because of the protections afforded to them by the exculpation provision and business judgment rule, *see infra* at 33-40 – it would need to consider these facts and circumstances at trial, and *cannot* simply consider a mathematical calculation of the termination fee as a percentage of the purchase price.

Indeed, the Court will need to consider that the parties placed a cap on the amount of reimbursable expenses and the Company tried to negotiate a smaller cap, (Gardner Aff. ¶¶ 11-16), when the parties could have left the expense amount uncapped, in which case the expenses would not have counted towards an overall percentage of the transaction price.  Defendants' expert Scott Wilson noted a 2021 transaction involving a Maryland entity in which the parties agreed to a 4% termination fee plus *uncapped* expense reimbursement.  *See* Ex. 52, Wilson Report, ¶¶ 107-12).  If the expenses in that transaction had been capped at the $3.5 million amount approved by the Defendants in this case, the aggregate termination fee in that transaction would exceed 10%.  *Id.* at ¶ 110.  It cannot be the case that a Board's approval of a capped reimbursement amount is a fiduciary duty violation while approval of the same fee with an uncapped reimbursement would be acceptable, since applying a cap represents directors' efforts to reduce the potential amount a topping bidder would have to pay.  Even Plaintiffs' expert J.T. Atkins agreed that "termination fees that include an uncapped reimbursement for expenses" are "appropriate and reasonable."  Ex. 12, Atkins Tr., 124.  In fact, Atkins agreed that the termination fee *in this case* would be reasonable if the directors had left the expense reimbursement amount uncapped:

> Q. [W]ould it have been unreasonable for the board of directors, in your opinion, to agree to a termination fee of $1,645,000 and to reimburse for reasonable and documented expenses without having a cap saying capped at $3.5 million?  ***Would that be reasonable?***
>
> A. ***Yes.***

*Id.* at 129 (emphasis added).  This admission demonstrates the error of creating the bright-line maximum percentage for which Plaintiffs advocate, and the Court should deny Plaintiffs' Motion.[14]

---

[14] Plaintiffs also improperly attempt to use their motion as a means to revive claims already dismissed by this Court.  Most notably, Plaintiffs' argument that the termination fee is "further supported by the

## II.     THE COURT SHOULD GRANT DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

Defendants' cross-motion for summary judgment does not merely argue the reverse of Plaintiffs' Motion.  Defendants' cross-motion does not depend on whether the termination fee, or Defendants' approval of the termination fee, was reasonable or consistent with the standard of care for Maryland directors.  Rather, Defendants are entitled to summary judgment for two separate legal reasons.  First, *even if Defendants breached their fiduciary duties*, Plaintiffs' claims are exculpated by the Company's Charter.  Second, *even if approving the termination fee was the "wrong" choice*, Defendants' decisions are protected by Maryland's statutory presumption of the business judgment rule.  On the record before this Court, Plaintiffs have not and cannot present evidence to rebut either the application of the exculpation provision or the business judgment rule, and thus Defendants are entitled to judgment as a matter of law.

### A.     Plaintiffs' Claims Against the Director Defendants Are Exculpated by the Company's Charter

The Company's exculpation provision strictly limits the directors' liability to instances where there is evidence that the directors received an improper benefit or acted with active and deliberate dishonesty, which does not exist here and which Plaintiffs must establish to prevent operation of the exculpation provision.  Section 2-405.2 of the MGCL states that "[t]he charter of the corporation may include any provision expanding or limiting the liability of its directors and officers to the corporation or its stockholders as described under § 5-418 of the Courts and Judicial Proceedings Article."  Md. Code, Corp. & Ass'ns. § 2-405.2.  Section 5-418 provides that a

---

undisputed fact that the merger's consideration was a negative premium to the Company's stock price," (Mot. at 18), is an improper attempt to argue that the Board allegedly failed to obtain the best price for the Company.  *See* Memo. Op. at 19 (holding that "courts have routinely rejected claims based on a board's acceptance of an offer below market trading price" and that "Plaintiffs may not proceed on a claim based on an alleged failure to maximize the sale price of the Company.").

Maryland corporation may limit the liability of its directors and officers for breach of fiduciary duty unless such director or officer received "an improper benefit or profit in money, property, or services" or acted with "active and deliberate dishonesty."  Md. Code, Cts & Jud. Proc. § 5-418(a). Bowl America's Charter contains such an exculpation provision in Article 8, Section A, which states "[t]o the fullest extent that limitations on the liability of directors and officers are permitted by the Maryland General Corporation Law, no director or officer of the Corporation shall have any liability to the Corporation or its stockholders for damages."  Ex. 53, Bowl America Articles of Incorporation at 512.[15]

Thus, Bowl America's exculpation provision bars Plaintiffs' claims unless Plaintiffs can adduce evidence of conduct falling within one of the two exceptions to the provision: (1) the Defendant Directors' receipt of "an improper benefit" or (2) engaging in conduct evincing "active and deliberate dishonesty."  Hanks, *supra*, § 6.9, at 220-220.1; *see also Zucker v. Bowl America, Inc.*, No. 21-1967, 2022 WL 7050991, at *3 (D. Md. Oct. 11, 2022) (Gallagher, J.) ("Consistent with Maryland law, that exculpation provision precludes Bowl America or its stockholders from recovering money damages from the company's directors, unless the directors received an improper benefit or acted with deliberate dishonesty.").

Defendants previously raised the exculpation defense in their motion to dismiss the Third Amended Complaint because the Court had dismissed Plaintiffs' prior claims alleging that Defendants received an improper benefit.  The Court declined to dismiss the claim at that time prior to discovery, but noted that Defendants "can of course re-raise the exculpation provision as

---

[15] Maryland courts regularly enforce such exculpatory provisions.  *See In re Terra*, 2010 WL 5412283, at *10 (holding that exculpatory clause precluded damages claim against director-defendants); *Grill v. Hoblitzell*, 771 F. Supp. 709, 712 (D. Md. 1991) (Motz, J.) (dismissing complaint where company adopted exculpation clause and plaintiffs failed to allege improper benefit or dishonesty); *Witchko v. Schorsch*, No. 15-CIV-6043, 2016 WL 3887289, at *8 (S.D.N.Y. June 9, 2016)  (applying Maryland law) (dismissing claims against outside directors as a result of exculpation clause).

an affirmative defense on a more fulsome factual record later in the proceeding." *Id.* at *4. Defendants do so now because the full factual record confirms that Bowl America's Charter includes an exculpatory provision, (*see* Ex. 53, Articles of Incorporation) and that Defendants did not receive an improper benefit or act dishonestly, deliberately or otherwise when approving the termination fee.

### 1.   *There is No Evidence that the Defendants Received an Improper Benefit Through the Sale Process*

Simply stated, the record is devoid of any evidence that the Defendants received any improper benefit from the sale of the Company to Bowlero.  In its prior Memorandum Opinion, the Court dismissed all of Plaintiffs' claims that alleged Defendants received any benefits not received by the rest of the stockholders.  *See* Memo Op. at 16-17, 19-21.  Plaintiffs' primary theory at the motion to dismiss stage was that the "Controlling Stockholders" – because of their allegedly advanced age – wanted to "cash out" and therefore sold the Company at a "fire-sale price."  Pls.' Opp. to Mot. to Dismiss (ECF No. 29) at 12-14, 20.  The Court rejected this "liquidity-driven conflict" theory in its entirety:

> Liberally construed, the Complaint attributes the Controlling Stockholders' liquidity-driven conflict to two circumstances: (1) Fabian's and Macklin's advanced ages; and (2) the illiquidity of their stock holdings….Taken as true, these allegations fall far below the threshold of showing that the interests of the Controlling Stockholders diverged from fellow stockholders who stood to receive the same consideration from their respective shares. The Complaint lacks any factual allegations suggesting that the Controlling Stockholders were cash-strained, aggressively advanced the Merger, labored under immense debt loads, or otherwise had some immediate or exigent need for liquidity.  Absent some indication that the Controlling Stockholders had a unique or distinct interest in cashing out their shares, their generalized desire to exit a relatively illiquid investment does not constitute a conflict of interest; ***to the contrary, it suggests that their interests are aligned with that of fellow stockholders***.

Memo. Op. at 16-17 (emphasis added); *see also* Ex. 2, Fabian Tr., 99 ("My view is that I was going to get exactly the same payout as every other shareholder.  There would be no premium for

me.…We were all in it together.  So I didn't think that if it was in my interest, it wasn't in their interest.").

The Court similarly held that a change-in-control payment to Ms. Dragoo on the completion of the transaction did not amount to a breach of the duty of loyalty because, even if Ms. Dragoo was conflicted, Plaintiffs could not establish "that a ***majority*** of the Board—not merely a single director—was compromised."  Memo Op. at 20 (emphasis added).  These alleged conflicts therefore are no longer part of Plaintiffs' case.  In short, nothing in the record evidences any improper benefit to the Director Defendants.[16]

### 2.    *There is No Evidence that the Defendants Acted with Active and Deliberate Dishonesty During the Sale Process*

The record is also devoid of any evidence of active and deliberate (or any) dishonesty by Defendants.  Indeed, Plaintiffs do not even allege that the Defendants acted with active and deliberate dishonesty.  Instead, Plaintiffs at most allege only breach of fiduciary duty, and the Maryland courts have held repeatedly that generalized allegations of breaches of fiduciary duty are insufficient to establish active and deliberate dishonesty.  *See, e.g.*, *In re Terra*, 2010 WL 5412283, at *6 (statements by defendants to a potential bidder that the company was "not for sale" while they were negotiating with another party were too vague to constitute fraud or material dishonesty); *Goldstein*, 2014 WL 824050, at *4 ("[C]onclusionary allegations that the Defendants did not act in the best interests of [the company] do not plead active and deliberate dishonesty.  Allegations of breaches of fiduciary duties alone are not sufficient."); *Hayes v. Crown Cent.*

---

[16] Where this Court has found allegations of an improper benefit sufficient to survive a motion to dismiss, it has been on facts far different from those here.  *See, e.g.*, *Goldstein v. Berman*, No. 12-2507, 2014 WL 824050, at *1, *4 (D. Md. Feb. 28, 2014) (Quarles, Jr., J.) (holding that "improper benefit" was sufficiently alleged where "defendants sold their stock" back to company "at artificially inflated prices and received proceeds from those sales," when company was nearly insolvent and sales amounted to constructively fraudulent transfers).

*Petroleum Corp.*, 78 F. App'x 857, 865 (4th Cir. 2003) ("As to active or deliberate dishonesty, the plaintiffs cannot prevail because the pleadings specifically exclude allegations of fraud.").

Again, Plaintiffs' sole remaining claim is that the Defendants approved an excessive termination fee. The termination fee was fully disclosed in the Proxy, which listed the termination fee among the factors the Defendant Directors weighed for and against approval of the transaction. Ex. 5, Proxy at 18-19. Though Plaintiffs state in conclusory fashion in their Motion that the Defendants "acted dishonestly and in bad faith when they breached their fiduciary duties by approving the unreasonable Termination Fee," (Mot. at 17, 23), Plaintiffs do not articulate any specific instances of the Board engaging in any dishonest conduct (deliberate or otherwise) with regard to the termination fee or anything else, and discovery has failed to identify any evidence of dishonesty by the Defendants. Because there is no genuine issue of material fact that Defendants received an improper benefit or acted with direct or deliberate dishonesty during the sale process, or, more narrowly, when agreeing to the termination fee, the Director Defendants are exculpated from any money damages arising out the Board's approval of the termination fee. *See In re Terra*, 2010 WL 5412283, at *10; *Grill*, 771 F. Supp. at 712; *Witchko*, 2016 WL 3887289 at *8.

**B.   The Defendants' Approval of the Termination Fee is Protected by the Business Judgment Rule**

As this Court recognized in its prior Memorandum Opinion, Defendants' actions are also protected by and "properly reviewed under the business judgment rule." Memo Op. at 17. Maryland recognizes and has codified the Business Judgment Rule in Md. Code, Corp. & Ass'ns § 2-405.1(g), which states that "[a]n act of a director of a corporation is **presumed to be in accordance**" with the requirements of director conduct in "subsection (c) of this section." (Emphasis added).

This means that absent evidence to the contrary, Maryland directors are presumed to act: "(1) [i]n good faith; (2) [i]n a manner the director reasonably believes to be in the best interests of the corporation; and (3) [w]ith the care that an ordinarily prudent person in a like position would use under similar circumstances." § 2-405.1(c). The business judgment rule exists because, "with limited exception, courts generally will not second-guess the management decisions of the directors of a corporation." *Nationwide*, 2011 WL 10603183 at *12.

Under this presumption, Defendants are not required to offer any evidence to establish that they complied with the requirements in § 2-405.1, though, here, they certainly did. Instead, "the presumption of the business judgment rule is a substitute for proof by the defendant director that he complied with the requirement of the statute." Hanks, *supra*, § 6.8 ("The principal procedural benefit of the presumption established by the business judgment rule is to enable the defendant to prevail on a motion for summary judgment without presenting any evidence in a case where the plaintiff presents no evidence on the issue of the defendant director's conduct.").

Thus, Plaintiffs have the burden to rebut the business judgment rule presumption, and to offer evidence that the Defendants engaged in "fraud, self-dealing or unconscionable conduct." *Wittman v. Crooke*, 120 Md. App. 369, 376 (1998) (quoting *Black v. Fox Hills N. Cmty. Ass'n, Inc.*, 90 Md. App. 75, 82 (1992)). Put another way, a court cannot find that a director breached their fiduciary duties if the evidence is only that "'the business decision made was rational in the sense of being one logical approach to advancing the corporation's objectives.'" Memo. Op. at 17 (citing *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 598 (Del. Ch. 2010)).

As discussed above in the exculpation context, there is no evidence that any Defendant acted fraudulently. Further, any claim of self-dealing was either previously dismissed by the Court or is contrary to common sense—the Defendants, as the largest stockholders of the Company, were

wholly aligned with the other stockholders because they were to receive the same consideration from the merger as all other stockholders.  Memo. Op. at 15-17.  And Plaintiffs cannot demonstrate unconscionable conduct because the record amply shows that the Defendants engaged in a reasonable and thorough sale process, kept themselves informed, and reasonably relied on their advisors.  *See, e.g.*, Ex. 5, Proxy; Ex. 35; Ex. 39; Ex. 42; Ex. 44; *supra* at 5-20.  By May 2021, after the sale process had been going on for nearly two years and COVID-19 had upended the economic landscape, Defendants had one offer in hand – a $44 million, all cash, no contingencies offer from Bowlero.  *See, e.g.*, Ex. 5, Proxy; Ex. 44; *supra* at 5-20.

Defendants engaged in arm's-length negotiations with Bowlero in an attempt to obtain the best deal possible for the stockholders, and believe they succeeded in that task.  These negotiations included securing a fixed extraordinary dividend for the stockholders, and an attempt (albeit unsuccessful) to reduce the termination fee.  In every negotiation, each party gets some of what they want and has to concede certain items, and Defendants' conduct cannot be held as unconscionable for achieving similar results.  Given that this was the best deal they were able to negotiate, Defendants reasonably determined that accepting the termination fee was advisable because it was highly unlikely that any other bidder would emerge at the 11th hour to submit a superior bid.  And, indeed, no bidder did.  When viewing the record as a whole, it is impossible to conclude that the Defendants' actions were fraudulent or unconscionable in any way, or involved self-dealing.[17]  As such, Plaintiffs cannot rebut the business judgment rule and Defendants must be presumed to have met their fiduciary duties.

---

[17] Plaintiffs' other arguments of bad faith – that the fee was in excess of "established and accepted legal and financial standards in other public company transactions," that the merger price was below the Company's market value, that the Company's financial condition provided it with sufficient bargaining power to resist the fee, that the Board agreed to other deal protection devices, and that the Board accepted the fee without any pushback (Mot. at 17) – are contradicted by the Court's prior Memorandum Opinion or the record, and

Based upon the protections afforded them by the exculpation provision in the Bowl America Articles of Incorporation and the statutory protections of the business judgment rule, Defendants' motion for summary judgment should be granted.

<u>**CONCLUSION**</u>

For all these reasons, Defendants respectfully request that the Court grant their Motion for Summary Judgment and deny Plaintiffs' Motion for Summary Judgment in its entirety.

**[SIGNATURE BLOCK ON FOLLOWING PAGE]**

---

regardless cannot rebut the business judgment rule presumption. *See* Hanks, *supra*, § 6.6[b] at 170 ("Often, a better result may appear, especially with hindsight, to have been attainable, but that conclusion does not necessarily mean a director's decision was wrong when made. Even if it were wrong by some measure, that fact does not mean that a director should be liable for money damages.").

Respectfully submitted: March 4, 2024

_/s/ John A. Tucker (with permission)_
John A. Tucker (admitted *pro hac vice*)
Foley & Lardner LLP
One Independent Drive, Suite 1300
Jacksonville, FL 32202-5017
(904) 359-2000
Primary Email: jtucker@foley.com
Secondary Email: avwilliams@foley.com

Jarren N. Ginsburg (Bar No. 19688)
Foley & Lardner LLP
3000 K Street NW, Ste 600
Washington, DC 20007
(202) 672-5300
jginsburg@foley.com

John A. Tucker (admitted *pro hac vice*)
Foley & Lardner LLP
One Independent Drive, Suite 1300
Jacksonville, FL 32202-5017
(904) 359-2000
Primary Email: jtucker@foley.com
Secondary Email: avwilliams@foley.com

Jonathan H. Friedman (admitted *pro hac vice*)
Foley & Lardner LLP
90 Park Avenue
New York, NY 10016
(212) 338-3416
jfriedman@foley.com

*Counsel for Defendants*

_/s/ Benjamin D. Schuman_
Benjamin D. Schuman (Bar No. 28829)
Meagan M. Pace (Bar No. 20765)
Alexa P. Ain (Bar No. 30563)
DLA Piper LLP (US)
650 S. Exeter St., Suite 1100
Baltimore, Maryland 21202
(410) 580-3000
ben.schuman@us.dlapiper.com
meagan.pace@us.dlapiper.com
alexa.ain@us.dlapiper.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of March, 2024, the foregoing response and attachments were served by electronic mail on all counsel of record.

*/s/ Benjamin D. Schuman*
Benjamin D. Schuman